IN THE UNITED STATES DISTRICT COURT
DISTRICT FOR KANSAS

LANCE FINLEY,                                )
                          Plaintiff,         )
          vs.                                )          Case 6:17-CV-01215-EFM-GLR
                                             )
CITY OF COLBY, KANSAS,                       )
RON ALEXANDER and                            )
TOM NICKOLS, JR.,                            )
                          Defendant.         )
_____)


## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ....................................................................................................i, ii

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ..............................................................................................2

    The encounter with Cousins .......................................................................................2

    The report by Plaintiff ...............................................................................................3

    The video ...................................................................................................................5

    The video is given to Chief Alexander .......................................................................7

    Plaintiff's termination ................................................................................................8

    Plaintiff's job duties ...................................................................................................9

    Plaintiff's work record ...............................................................................................9

    Comparators ............................................................................................................12

    Running tags ...........................................................................................................12

    Use of force report ..................................................................................................14

    Alleged sexual harassment .....................................................................................15

    Alleged investigation suppression ...........................................................................15

    Storage of cocain by canine officer .........................................................................15

    Acceptance of gratuities .........................................................................................16

    Marc Finley's letter .................................................................................................16

ARGUMENTS AND AUTHORITIES............................................................................17

    I.      Plaintiff cannot establish the elements of a First Amendment claim.....................17

            A.     Plaintiff's allegation against Cousins was not protected speech...............19

                  1.     The report was not protected because it was false.........................19

                  2.     Police officers can be held to a higher standard on and off duty....22

3.    Plaintiff's report is not protected because it was related to his employment duties.......................................................................24

B.    The report against Cousins was not a matter of public concern.................26

C.    Defendant's interest in the efficiency of the public service it performs sufficiently outweighs Plaintiff's free speech interest................28

D.    The report itself was not a motivating factor...............................................31

1.    The evidence does not support Plaintiff's claim....31

2.    Plaintiff's attempt to show motivating factor by the use of comparators fails...................................32

II.    Defendant Ron Alexander is entitled to Qualified Immunity...............................37

III.    Plaintiff cannot establish a Kansas "whistle blower" claim...................................40

A.    Plaintiff's report about Cousins is not "whistle blowing" .........................41

1.    The Uncontroverted facts negate the first element........................41

a.   Plaintiff's report did not involve his employer or a co-worker...41

b.   No reasonable person could have concluded that Cousins was violating the law.................................................................................42

2.    Plaintiff was not discharged for making the report.......................42

3.    Plaintiff's report was not made in good faith................................43

B.    Plaintiff is not entitled to protection from retaliation based upon the protected activities of his family................................................................43

CONCLUSION..................................................................................................................44

# INTRODUCTION

Plaintiff was employed as a Police Officer by the City of Colby. On January 15, 2016, he met a vehicle on the highway between Atwood and Colby.  The other vehicle was a Thomas County Sheriff's vehicle being driven by Sheriff's employee Jim Cousins.  That vehicle had previously been driven by Plaintiff's brother before he was terminated from his position as Undersheriff.   Plaintiff reported to dispatch, the County Attorney and Colby Chief of Police Ron Alexander that the Cousins was driving at a high rate speed ("looks like he is running 120," "running at least 90 plus"),  came left of center,  nearly went head on with the Plaintiff and ran him off the road.  Cousins  denied the accusations.  The City and Chief Alexander took no  action against Plaintiff at that time, as a result of the report.

Approximately one month later, the Sheriff discovered that the encounter had been recorded on the Sheriff's vehicle's dashcam.  He reviewed the video and determined that Plaintiff's accusations were false.  He took the video to the Colby Chief of Police,  Ron Alexander,  to review for himself.  Chief Alexander also reviewed the video carefully and concluded that Plaintiff's accusations were false. Plaintiff was asked to resign his position as a police officer for the City of Colby.

Plaintiff filed this lawsuit claiming that he was terminated for having made the report against the Sheriff's employee in violation of the First Amendment.  He also brings a state law whistle blower claim based on that report and on his brother's report of alleged wrongdoing by the Sheriff.

Defendants filed a motion for judgement on the pleadings (Doc. 49.)  The Court granted that motion in part and denied it in part. (Doc. 65.)  A central issue in the Court's denial was an allegation

in Plaintiff's Complaints that prevented the court from concluding that the Chief Alexander had concluded the report was false (Doc. 65, pp. 11-12). Discovery is now complete. The uncontroverted facts show that Chief Alexander concluded that the video contradicted Plaintiff's report.

Plaintiff cannot establish the elements of his claims. The uncontroverted facts show Plaintiff's rights were not violated by Defendants, and that Defendants are entitled to judgment as a matter of law.

## STATEMENT OF FACTS [1]

1.     Plaintiff was hired by Colby Police Department as a police officer in August of 2013. (Doc., 129, p. 3, §3.a.; Finley Dep., 31:8-14).

2.     Ron Alexander became Chief of Police in the fall of 2013. (Alexander Dep., 13:10-11).

3.     Tyson McGreer became the City Administrator in September 2012. (McGreer Dep., 4:12-14).

4.     On January 15, 2016 Plaintiff was still employed by the Colby, Kansas police. (Finley

Dep., pp. 46:2-6).

### The encounter with Cousins

5.     On the morning of January 15, 2016 Plaintiff was driving on Kansas Highway 25.

---

[1] For purposes of summary judgment, the facts must be construed in the light most favorable to Plaintiff. However, defendants reserve the right to contest any of the below facts, should the case proceed beyond summary judgment

(Finley Dep., 52:11-22,  53:1-6).

6.      Plaintiff was traveling northbound. (Finley Dep.,53:1-6).

7.      A Thomas County Sheriff's patrol vehicle was traveling on Kansas Highway 25. (Nickols Aff'd. 1:4);  Finley Dep., pp. 58:4-13).

8.      The Thomas County Sheriff's vehicle was driven by Jim Cousins. (Doc. 95, ¶¶ 1 and 2.)

9.      Jim Cousins had driven from Colby to Atwood, picked up a prisoner and was returning to Colby. (Nickols  Dep. 7:15 thru 8:3; Cousins Dep., 10:14- thru 11:3, 13:24 thru 14:15, 15:7-16, 37:22 thru 39:12).

10.      Plaintiff and the Thomas county vehicle passed each other near County Road W on Kansas Highway 25. (Finley Dep., 58:8-14)

11.      Plaintiff recognized the vehicle as the Thomas County Sheriff's vehicle previously operated by his brother Marc Finley. (Doc. 129, p. 3, § 2.a.iii; Exhibit B, 00:20-00:24; (Lance Finley: "Hey, do you know whose driving that blue Tahoe that used to be Marc's?"); Finley Dep., 59:4-16)

12.      Plaintiff's brother had been terminated from the position of Thomas County Undersheriff a few months prior to January 2016.  (Alexander Aff'd. ¶ 3).

13.      It was rumored that Jim Cousins would be Marc Finley's replacement as Undersheriff. (Alexander Dep. 48:13-15.)

### The report by Plaintiff

14.      Plaintiff called the law enforcement dispatch after passing the Thomas County Sheriff's vehicle. (Doc. 129, p. 3, § 2.a.iii; (Finley Dep., 75:2-24).

3

15.     Exhibit B is a true and accurate audio recording of Plaintiff's call to dispatch. Doc. 129, p. 3, § 2.a.iii; (Finley Dep., 266:20-23).

16.     Plaintiff stated to the dispatcher that the driver of the Thomas County Sheriff's vehicle "Just went left of center and about ran me off the road." (Exhibit B, 00:31-00:40).

17.     Plaintiff stated to the dispatcher: "and it looks like he is running a hundred and twenty." (Exhibit B, 00:31-00:40).

18.     Plaintiff told the dispatcher that the Thomas County Sheriff's vehicle "just about fucking hit me." (Finley Dep. 169:15-17; Exhibit B, 00:31-00:40).

19.     Plaintiff's call to dispatch was transferred to Deputy Jake Cox. (Exhibit B, 00:56-3:20).

20.     Plaintiff told Deputy Jake Cox the driver of the Thomas County Sheriff's vehicle was "running at least ninety plus." (Exhibit B, 3:25-3:33).

21.     Plaintiff told Deputy Jake Cox the Thomas County Sheriff's vehicle "Just about went head on with me." Exhibit B, 3:25-3:33).

22.     Plaintiff stated that the Thomas County Sheriff's vehicle came "clear left of center." (Exhibit B, 3:25-3:33; 4:01-4:05).

23.     Plaintiff told Deputy Jake Cox "to do what you want" with his report of the incident. (Exhibit B, 3:22-3:25;3:55-57).

24.     Plaintiff was asked by Deputy Cox "you want to sign a ticket?" (Exhibit B, 3:50-51).

25.     Plaintiff was also asked if he would "rather [Deputy Cox] just chew [Cousins'] ass?" (Exhibit B, 3:50-51).

26.     Plaintiff responded "might just say something to him." (Exhibit B, 4:15-16).

4

27.     After talking to Deputy Cox, Plaintiff tried to call Chief Ron Alexander. (Finley Dep., 76:7- 16).

28.     Chief  Alexander did not answer.  ( Finley Dep., 76:7-8).

29.     Plaintiff then called County Attorney Kevin Berens.  (Finley Dep., 76:7-8); Alexander Aff'd., ¶ 7, DEF 318).

30.     Plaintiff sent Defendant Ron Alexander the following text:

> Hey for what it's worth Jim just went left of center and ran me off the road at county road w i [sic] realize nothing can be done but it was bad he went left of center I called Kevin and he said he would note it.

( Finley Dep., 75:14-20); Alexander Aff'd., ¶ 7, DEF 318).

31.     Chief Alexanders response to the text was "k". (*Id.*)

32.     Cousins denies the allegations.. (Cousins Dep. 16:6-8; Alexander Dep. 100:8-9.)

33.     After the text  with  Ron Alexander on January 15, 2016, there was no communication between Defendant and Plaintiff regarding Plaintiff's allegations about the operation of the Thomas County Sheriff's vehicle for about a month.  (Finley Dep., 171:22-25, 172:1-4.)

**The video**

34.     There was a dash cam in the Thomas County Sheriff's vehicle. (Doc. 95; Finley Dep. 95:22 thru 96:23, 98:15-24.)

35.     The  dash cam recorded Cousins entire trip from Colby to Atwood and back. (Doc. 95, ¶  Ex. C; Cousins Dep. 37:22 thru 39:12.)

36.     The dashcam recorded when the vehicles passed each other. (Doc, 95, ¶ 2; Doc. 129, p. 2, §2.a.i.)

37.     That dashcam recording is the video offered as Deposition Exhibit 1 in the deposition of Lance Finely and previously filed conventionally with the court as Exhibit C. (Doc. 95, ¶¶ 1 and 2.)

38.     Exhibit C is a true and accurate copy of the Tahoe's dashcam video. (Doc. 95, ¶ 1.)[2]

39.     Exhibit C shows Plaintiff's vehicle going past the Thomas County Sheriff's vehicle at Media Player 01:19:13-01:19:22 and Time Stamp 09:19:20-09:19:29;[3] (Finley Dep., 147:16-25 thru 148:25; Exhibit C, Media player 01:19:13-01:19:22, Time Stamp 09:19:20-09:19:29).

40.     It is about thirty (30) miles from Atwood to Colby.  (Finley Dep., 155:15-17).

41.     The speed limit on K-25 between Atwood and Colby is Sixty-five miles per hour. (Finley Dep., 55:1-3)

42.     It took Cousins about thirty minutes to travel between Atwood and Colby (Exhibit C, (Media Player 00:55:00-01:26:40, Time Stamp 08:55:00-09:26:40).

43.     The video does not indicate that the Thomas County vehicle was ever operated at an unsafe speed. (Finley Dep., 160:14-19; Exhibit C).

44.     The video shows one location where Cousins went left of center to go around a semi on the shoulder with its flashers on. (Exhibit C, Media Player 00:21:24-00:21:32,  Time Stamp 08:21:17-08:21:25; Cousins Dep. 12:14 thru 13: 4).

45.     Plaintiff cannot identify any other place in the video where the Thomas County

---

[2] The file can be opened with VLC media player. The file used in this memorandum is VIDEO_TS, IFO.

[3] In this memorandum, references to Media player are to the time into the video beginning with 0:00.  The Time Stamp refers to the time stamp on the face of the video itself.  To view the Time Stamp in VLC player click on Subtitle, go to Sub Track and select Closed Captions 1.

Sheriff's vehicle was not within its own lane.  (Finley Dep., 86:21-25, 87:1-2).

46.     The video shows Cousins passing more than 40 other vehicles traveling in the opposite direction.  (*See* Exhibit C).

47.     Sheriff Nickols received no other complaints about Cousins' driving on that trip. (Nickols  Dep. 16:25 thru 17:2.)

48.     The video shows an occasion where Cousins past an oncoming car that was stopped and waiting to turn left.   (Cousins Dep. 13:5-23; Ex. C, Media Player 21-22, Time Stamp 08:21.)

49.     Other than the one location where Cousins went around a semi stopped on the shoulder, the video shows no occasion on which Cousins overtook and passed traffic traveling in the same direction. (*See* Exhibit C).

**The video is given to Chief Alexander**

50.     Sometime after January 15, 2016, one of Sheriff Nickols' employees gave him the video from the dashcam.  (Nickols  Dep. 8:21 thru 10:24.)

51.     Sheriff Nickols  reviewed the entire video.  (Nickols  Dep. 10:25 thru 11:11.)

52.     Sheriff Nickols  reviewed the video several times just to be sure Cousins stayed in his lane.  (Nickols Dep. 15:12 thru 16:24.)

53.     It did not appear to Sheriff Nickols that Cousins went left of center or in anyway swerved at Plaintiff.  (Nickols Dep., 11:12-16).

54.     Sheriff Nickols perceived from reviewing the video, that Plaintiff's accusation was false. (Nickols Dep. 53:16-18.)

55.      In mid February, 2016, Sheriff Nickols gave the video to Chief Alexander. (Alexander Dep., 65:6-9).

7

56.     Chief Alexander reviewed the video numerous times and concluded that it did not show Cousins leaving his lane of traffic when he passed Plaintiff. (Alexander Dep., 145:15-21, 60:10-13).

57.     Chief Alexander concluded that Plaintiff had been deceitful in making the report. (Alexander Dep., 145:15-21, 60:10-13; Alexander Affd. ¶ 5, DEF 244-245).

58.     Chief Alexander also had another officer review the video, who advised that he agreed with Chief Alexander's assessment. (Alexander Affd., ¶ 5, DEF 244, 3rd paragraph.)

**Plaintiff's termination**

59.     Plaintiff met with Chief Alexander on February 17, 2016. (Finley Dep., 178:17-24).

60.     This meeting was the first time Defendant Ron Alexander communicated with Plaintiff regarding Plaintiff's report about the operation of the Thomas County sheriff's vehicle since January 15, 2016.   (Finley Dep., 171:22 thru 172:4,  178:17-24).

61.     Prior to this meeting there was no criticism by Defendant Ron Alexander regarding Plaintiff's report on January 15, 2016.  (Finley Dep., 172:21-25, 173:1-4).

62.     Chief Alexander placed the video recording on the desk during the meeting. (Finley Dep., 180:4-5).

63.     This was the first time Plaintiff knew video existed of his encounter with the Thomas County Sheriff's vehicle on January 15, 2016.  (Finley Dep., 173:17-19).

64.     Chief Alexander informed Plaintiff that from his review of the dash cam footage he did not think the Thomas County Sheriff's vehicle had come left of center. (Finley Dep., 194:22-25).

65.     Plaintiff has no reason to believe Defendant Ron Alexander did not honestly believe

the Thomas County Sheriff's vehicle did not come left of center. ( Finley Dep., 195:5-9).

66.     Chief Alexander offered Plaintiff a chance to resign. (Alexander Dep., 60:10-13).

67.     Plaintiff initially resigned but then recanted his resignation.  His separation was involuntary.  (Doc. 129, § 2.a.iv.)

**Plaintiff's job duties**

68.     In becoming a law enforcement officer Plaintiff promised to "keep [...] [his] private life unsullied ... and [...] [to] behave in a manner that [...] [would] not bring discredit [...] to [...] [his] agency." (Alexander Aff'd., ¶ 6,  DEF 115)

69.     Plaintiff understood it was his fundamental duty as a law enforcement officer "to protect the innocent against deception." (Alexander Aff'd., ¶ 6 DEF 115).

70.     Plaintiff's Job Description included reporting "public safety or traffic hazards and other items requiring attention by other departments" (Alexander Aff'd., ¶ 15, DEF 502)

**Plaintiff's work record**

71.     Plaintiff was evaluated on August, 15, 2014. (Alexander Aff'd., ¶ 9, DEF 282-295)

72.     The "Initiative" section of the 2014 evaluation states "Areas of interest the initiative is excellent,""initiative on getting reports done & other calls are lacking." (Alexander Aff'd., ¶ 9, DEF 282).

73.     The "Productivity" section of the 2014 employee evaluation states: "Deadlines for reports getting better but needs improvement." (Alexander Aff'd., ¶ 9, 282).

74.     The "Interpersonal Relations" section of the 2104 evaluation rated the Plaintiff "Below  Standard[,] Occasionally causes conflict with others in implementation of assignment.  Occasionally fails to compromise or understand other points of view.  Tends to be negative."

9

(Alexander Aff'd., ¶ 9, DEF 285).

75.     The handwritten note under "Interpersonal Relations" on the 2014 employee evaluation states "Could be better at respecting chain of command & view points of other employees." (Alexander Aff'd., ¶ 9  DEF 285).

76.     The 2014 employee evaluation rated Plaintiff's "Teamwork" as "Below Standard[,] Requires considerable 'selling' of policies and disagreements are frequent.  Uncooperativeness displayed frequently.  Cannot count on willing contributions to the team.  Reactive rather than proactive." (Alexander Aff'd., ¶ 9,  DEF 287).

77.     The 2014 employee evaluation  also noted Plaintiff "[a]pparently [has] issues while on nights of not showing up on time." (Alexander Aff'd., ¶ 9,  DEF 287).

78.     Plaintiff responded to this 2014 evaluation. (the "Rebuttal").   (Alexander Aff'd., ¶ 9, DEF 291-DEF 295).

79.     In his Rebuttal, Plaintiff stated:   "I agree that I do have little respect for some in the chain of command" and admits "this is a fault."  (Alexander Aff'd., ¶ 9, DEF 293).

80.     In his rebuttal, Plaintiff acknowledged "I have issues with two supervisors, and one road officer." (Alexander Aff'd., ¶ 9, DEF 294).

81.     On May 26, 2015, Plaintiff was placed on probation beginning May 27, 2015 to end on August 15, 2015.  (Alexander Aff'd., ¶ 10, DEF 280).

82.     The reasons for the probation were: (1) Supervisor contact on controlled buys; (2) Narrative reports; (3) Timeliness on reports–per County Attorney; (4) Showing up for pass down; (5) Working with corporal Steele on corrections to reports and improving on future reports. (Alexander Aff'd., ¶ 10,  DEF 280).

83.     On June 10, 2014 Plaintiff was given a warning concerning "[f]ailing to contact supervisor while assisting with drug buys w/ sheriff Dept. in Rexford on 6/7/15.  Lance was recently written up for this issue.  When confronted on this date, Lance advised since he was not turning in OT w/ the city he didn't think notification was required." (Alexander Aff'd., ¶ 11, DEF 279).

84.     At the intended end of the probation period on August 15, 2015, Plaintiff was given an evaluation.  (Alexander Aff'd., ¶ 12,  DEF 271-278).

85.     On the August, 2015 evaluation,  Plaintiff was scored "Below Standard" under the  "Productivity" section. (Alexander Aff'd., ¶ 12,  DEF 271).

86.     On the August 2015 evaluation, Plaintiff was scored "Below Standard" on quality. (Alexander Aff'd., ¶ 12, DEF 272).

87.     The August, 2015 Employee evaluation scored Plaintiff "Below Standard" on "Interpersonal Relations." (Alexander Aff'd., ¶ 12, DEF 274).

88.     The August 2015 employee evaluation rated Plaintiff "Below Standard" for "Communications." (Alexander Aff'd., ¶ 12, DEF 275).

89.     The August 2015 evaluation rated Plaintiff "Below Standard" on "Teamwork." (Alexander Aff'd., ¶ 12  DEF 276).

90.     On the August 2015 Evaluation, Plaintiff's probation was extended.  (Alexander Affd. ¶ 13.)

91.     On October 1, 2015, Plaintiff was again evaluated.  (Alexander Dep. 109:10-14, Ex. 25; Alexander Aff'd., ¶ 14, DEF 261-270).

92.     The October 2015 evaluation was generally favorable and Plaintiff was taken off probation, given a promotion and salary increase.  (Alexander Dep.., 58:18-19 109:9 thru 110:24,

11

Ex. 25-26.)

93.    While employed with the city, Plaintiff would take cell phones from suspects and keep them in his file cabinet instead of getting an evidence custody receipt and logging them into evidence. (Finely Dep. 254:7-14; Alexander Affd., ¶¶ 5, 17, DEF 224-245; Alexander Dep., 59:3-8)..)

94.    Plaintiff would sometimes hold the phones in the file cabinet for months. (Finley Dep.  254:15-19.)

95.    Plaintiff was talked to by his supervisors about holding the phones outside of evidence without an evidence custody receipt or warrant. (Finley Dep. 253:11 thru 254:3; Alexander Affd. ¶ 17, DEF 244-45.)

96.    On February 12, 2016, Plaintiff was again discovered to be possessing cell phones outside the evidence locker, without an evidence custody receipt or of a search warrant. ( Alexander Dep., 59:3-8; Alexander Affd. ¶ 5, DEF 244-245).

97.    Plaintiff's termination was the culmination of issues including his probation, inappropriate handling of evidence, written warnings and problems on his written evaluations two years in a row and the video.  (Alexander Dep., 59:17 thru 60:13.)

## Comparators

98.    Ron Alexander terminated former officer, Kraig Cersovsky, because dash cam footage showed him being fellated in uniform in a patrol car. (Alexander Dep., pp. 130:18-21; Cersovsky Dep., pp. 67:17-24;73:21-24).

## Running tags

99.    Chris Bustillos became an officer with Colby Police Department in December 2014

(Bustillos Dep., 5:20-22).

100.    He began going on patrol by himself in February of March of 2015. ( Bustillos

Dep., 6:17-21)

101.    Ben Kahle, an officer with the Kansas State Patrol, approached Plaintiff and his

brother Marc because a friend of Mr. Kale's claimed Chris Bustillos ran her tag to friend her on

facebook. (Finley Dep., 204:5-20).

102.    Despite knowing this, and being on the Police force, Lance Finley did not ever talk

to Ron Alexander about it. (Finley Dep., 207:2-4).

103.    Either Kraig Cervosky or Marc Finley brought this to Ron Alexander's attention.

(Alexander Dep., 124:11-24).

104.    Ron Alexander does not recall being provided a name. (Alexander Dep., 126:2-

8).

105.    They only provided very general information.  (Alexander Dep., 126:7-9).

106.    This triggered an investigation by Ron Alexander. (Alexander Dep., 124:25;

125:1-4).

107.    The investigation  included "checking dispatch logs, checking driver's license

numbers" to calculate how many women versus men he pulled over.  (Alexander Dep., 125:19-25).

109.    Chief Alexander  confronted Chris Bustillos about the allegation.  (Alexander

Dep., 126:9-10).

110.    Chris Bustillos assured Ron Alexander "that didn't happen and wasn't happening."

(Alexander Dep., 125:12-14).

111.    Chris Bustillos told him of an incident where he accidently sent a friend request

13

while doing some investigative work. (Bustillos Dep., 12:18-25; 13:1-25; 14:1-25; 15:1-25; 16:1-25).

112.    Ron Alexander counseled Chris Bustillos about this. (Finley Dep., 6-8).

113.    During discovery in this case, additional information was provided supporting the allegation against Chris Bustillos.  He was written up and required to retake training fro the Kansas Highway Patrol on the proper uses of the NCIC computer.  (Alexander Affd., ¶ 18.)

**Use of force report**

114.    One of Plaintiff's commanding officers, Sam Steele, complained about the manner in which Finley performed the stop and arrest of Aaron Taylor. (Alexander Dep., 121:3-25; 122:1-25; 123:1-9); (Finley Dep., 216:7-19).

115.    The complaint was about Finley and another officer deviating from the operation plan. (Alexander Dep., 121:17-25; 122:1-9); (Finley Dep., 216:7-12).

116.    The complaint against Finely encompassed a complaint about the amount of force Finley used. (Alexander Dep., 122:23-25; 123:1-3).

117.    Ron Alexander's understood these complaints were tied together because "maybe use of force wouldn't have had to been applied, not that it was unjustified use of force, but maybe it wouldn't have had to have been applied had they stuck with the ops plan and had more officers present at the designated location." (Alexander Dep., 122:23-25; 123:1-3).

118.    Sam Steele addressed his concern regarding the deviation from the plan to both Plaintiff and Ron Alexander.  (Alexander Dep., 121:17-25; 122:1-9); (Finley Dep., 216:7-12).

119.    Sam Steele only addressed his concern that force could be avoided to Ron Alexander. (Finley Dep., 217:14-17).

14

**Alleged sexual harassment**

120.     Andrea Davis is the 911 Director and Chief Communications Supervisor. (Davis

Dep., 6:4-17).

121.     Andrea Davis characterized these as "hitting on her."  (Davis Dep., 27:22- 23).

122.     Marc Finley was one of the men hitting on her.  (Davis Dep., 33:21-25).

123.     Andrea Davis never reported receiving or being exposed to unwanted or

inappropriate text massages to Chief Ron Alexander or Tyson McGreer or anyone.  (Davis Dep.,

32:25; 33:1-20).

124.     Andrea Davis was not upset by any texts she saw or was exposed too.  (Davis

Dep., 32:25; 33:1-20).

125.     No text or images interfered with Andrea Davis' ability to do her job. ( Davis

Dep., 32:25; 33: 1-20).

**Alleged investigation suppression**

126.     At some point around July or August of 2014 Lance Finley told Ron Alexander that

Sherri Overton's name had come up in a drug investigation.  (Alexander Dep., 76:4-10).

127.     Terry Overton told Tyson Mcgreer that there were text messages from his wife to

someone being investigated or who had been arrested.  (Mcgreer Dep., 41:25;42:1-22). [4]

**Storage of cocain by canine officer**

128.     During Bob Herren's tenure as an Officer with the Colby Police Department Gary

---

[4] Ron Alexander has testified that he told Plaintiff to do whatever he needed to do.
(Alexander Dep., 85:4-6) However, even taking Plaintiff's version of this incident, it is not a
proper comparator.

15

Shull, Kent Dible, and Chief Randy Jones all had seniority over Ron Alexander concerning personnel Issues.  (Alexander Aff'd. ¶ 16).

129.    Bob Herren has not worked for the Colby Police Department since 2008. (Alexander Dep., 103:11-12).

### Acceptance of gratuities

130.    Sam Steele is a supervisor with the Colby Police.  (Steele Dep., 7:10-11).

131.    Sam Steele received free popcorn and was allowed to go see movies for free at the movie theater. (Steele Dep., 37:23-25; 38:1-12).

132.    Sam Steele received iced tea and other drinks from Starbucks for free. (Steele Dep., 37:18-22).

133.    Sam Steele had offered numerous times to pay for the movie and popcorn and they would not accept his money.  (Steele Dep., 39:13-19).

134.    Sam Steele never told Ron Alexander he was receiving gratuities.  (Alexander Dep., 40:4-9).

### Marc Finley's letter

135.    In September, 2015, Plaintiff's brother Marc Finley submitted a seven page letter to the KBI, the Attorney General, KS CPOST, and the Board of County Commissioners of Thomas County, Kansas, reporting numerous misdeed by Sheriff Rod Taylor. (Doc. 40, ¶ 9).

136.    Chief Alexander supported Marc Finley's efforts to notify public officials and media outlets about  Sheriff Taylor's illegal conduct. (Doc. 129, p. 4, Plaintiff's contentions)

137.    Marc Finley spoke to Chief Alexander about obtaining employment with the City when his employment with the Sheriff was deteriorating. (Alexander Aff'd. ¶ 2).

138.    After considering the issues raised by having the brothers working for the same agency, the city decided it would be willing to hire and Marc and so advised him. (Alexander Aff'd. ¶ 2).

139.    After Marc Finley was terminated from the Sheriff's department, Chief Alexander attended a County Commissioner's meeting to defend Marc Finley's position on the retirement of his drug dog.  (Alexander Aff'd. ¶ 4).

## ARGUMENTS AND AUTHORITIES

Summary judgment is appropriate if the record establishes that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986.)  Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### I.    Plaintiff cannot establish the elements of a First Amendment claim.

"To establish any  First Amendment retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the governments's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally protected conduct." *Nielander v. Bd of County Com'rs of County of Republic, Kan.*, 582 F. 3d 1155, 1165 (10th Cir. 2009).

17

In addition, analyzing a public employee's free speech claim requires analysis under the *Garcetti/Pickering* test. *See* Sean McGivern & Donald Peterson, *Employment Law Chapter 5: Civil Rights Act of 1871*, 5-10 (3rd ed. 2016).   The "Garcetti Pickering" test

> ... comprises five elements, called "prongs": (1) whether speech was made pursuant to an employee's official duties; (2) whether speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F. 3d 1294, 1302 (10th Cir. 2009).   The first three elements are questions of law.   *Id.*

Plaintiff's sole claim of activity protected by the First Amendment is his report concerning Jim Cousins on January 15, 2016. (Doc. 129, p. 10, ¶ 4. a.)[5]   Plaintiff called the dispatcher and stated that Cousins had "just went left of center and about ran me off the road" , "he just about fucking hit me" "and it looks like he is running 120."  (SOF 16-18). When the call was transferred to  Deputy Cox, Plaintiff stated  that Cousins "come clear left of center," "just about went head on with me," and was running "at least 90 plus."  (SOF 20-21).  Plaintiff then made these allegations to the County Attorney.   Plaintiff then reported directly to Chief Alexander that Cousins had "just went left of center and ran me off the road." (SOF 30).

The video shows undeniably that  this did not happen and the report was false. It, therefore,

---

[5] A previous claim based upon his brother's speech has been dismissed. (Doc. 65, p. 20.)

18

does not constitute protected speech.

In addition, because Plaintiff's job as a police officer required him to accurately observe and truthfully report misconduct of others, his false report is not protected speech and the defendants had the right to take adverse employment action in response to it.

### A.      Plaintiff's allegation against Cousins was not protected speech.

### 1.      The report was not protected because it was  false.

The first requirement – that the speech be protected –  is not a mere formality.  The Supreme Court has repeatedly stated the freedom of speech is not absolute.  *See., e.g. Virginia v. Black*, 538 U.S. 343, 358 (2003).  Moreover, the U.S. Supreme Court "has frequently said or implied that false factual statements enjoy little First Amendment protection." *U.S. v. Alvarez*, 567 U.S. 709 (2012).  For a hundred years the Supreme court has held "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic." *Schenck v. U.S.*, 249 U.S. 47, 52 (1919).   The Tenth Circuit has observed that "[w]e may assume that deliberately reckless or false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection.  *Moore v. City of Wynnewood,* 57 F. 3d 924, 933 (10th Cir. 1995.)

"Even if the speech touched on matters of public concern, it is not protected by the First Amendment if Plaintiff's statements were false or were made with reckless disregard for their truth. Speech involving matters of public concern is not protected when 'such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity.'" *Dillman v Winchester*, 639 F. Supp. 2d 1257, 1267 (W.D. Okla. 2009).

Moreover knowingly making a false report to a law enforcement agency that a person has committed a crime or that a law enforcement officer has committed misconduct is a crime under Kansas law:

> (a) Interference with law enforcement is:
>
>> (1) Falsely reporting to a law enforcement officer, law enforcement agency or state investigative agency:
>>
>>> (A) that a particular person has committed a crime knowing that such information is false and intending that the officer or agency shall act in reliance upon such information;
>>>
>>> (B) that a law enforcement officer has committed a crime or committed misconduct in the performance of such officer's duties, knowing that such information is false and intending that the officer or agency shall act in reliance upon such information;
>>>
>>> (C) any information, knowing that such information is false and intending to influence, impede or obstruct such officer's or agency's duty;...

K.S.A. 21-5904.

Discovery has shown that Plaintiff's accusation that Jim Cousins committed serious and dangerous misconduct  while engaged in his duties transporting a prisoner is false. The encounter – indeed Cousins' entire trip from Colby to Atwood ad back to Colby – was captured on video. Plaintiff has stipulated that the video is a true and accurate copy of the video from the dashcam in the vehicle being driven by Jim Cousins at the time of the encounter with Plaintiff. (SOF 38.)

The video  shows no near head on collision.  It shows neither vehicle going left of center or reacting as though the other had gone left of center.   Comparing the rest of the video to this encounter makes this clear.  During his trip to Atwood and back, Cousins passed many vehicles and his car is shown in the video to be oriented in the lane in the same manner as it was when he passed

Plaintiff.  Moreover, on at least one occasion, the car that Cousins went past was stopped in the opposite lane waiting to turn left and could not have avoided being hit if Cousins had been left of center.  (SOF 48).  No other complaints were received of Cousins driving that day as would be expected if he had nearly run them all off of the road.   Finally, in the video, Cousins is seen going left of center to pass a semi stopped on the shoulder of the road. (SOF 49).  This gives a clear indication of what one would see in the video if Cousins had gone left of center when encountering Plaintiff.  Comparing the two spots in the video makes it clear that Cousins did not go left of center when meeting Plaintiff.  Plaintiff's report that Cousins had  "come clear left of center," "just about went head on with me," about ran me off the road," "ran me off the road" and "about fucking hitting me," bears no relationship to the reality captured on the video and is undeniably false.

Plaintiff's report that Cousins was driving at a recklessly high rate of speed is also shown to be patently false by video.  The video shows a steady speed of the Tahoe throughout the trip. Plaintiff now admits that the video does not depict the Tahoe ever being driven at an unsafe speed. ( SOF 43). Instead the video depicts a travel speed at or slightly below the posted 65 mile per hour speed limit. (SOF 40-41). The time the trip took as recorded by the video matches what it would take driving at or near the speed limit.  The cross roads, like many in western Kansas, are a mile apart.  The time shown on the video for traversing between each set of crossroads is consistent with driving at the speed limit.  Despite all of the traffic shown to be on the road, there is no instance shown where Cousins suddenly, and at a high rate of speed, overtakes or passes another vehicle on the open highway.

Plaintiff's report that it looked like Cousins was "running a hundred and twenty" is far from

21

the reality shown on the video.   Even he seems to realize that when he downgraded his speed estimate to "at least 90 plus."  But even that reduced speed is nowhere near the speed shown on the video.[6]  Plaintiffs report was false and so far out of touch with the reality shown on the video that it must have bee deliberate or, at the very least reckless. It is, therefore, not protected by the First Amendment and his claim based upon it fails and must be dismissed.

Plaintiff may attempt to create a question of fact by arguing that his report was an good faith account of how he perceived the events on the morning of January 15, 2016,  However courts cannot, and need not, ignore clear, contrary video evidence in the record.   *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1207 (10th Cir. 2017).  When a party tells a version of events which is "blatantly contradicted by the record so that no reasonable juror could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."  *Id.,* quoting *Scott v. Harris,* 550 U.S. 372, 378 (2007.)

## 2.    Police officers can be held to a higher standard on and off duty.

Even if Plaintiff is given the benefit of the doubt on his claim that he honestly perceived Cousins coming left of center at a high rate of speed, summary judgment is still appropriate because his job required him to be able to accurately observe and report such events.  The video establishes without question that the report was wildly inaccurate at best, and Plaintiff's governmental employer

---

[6]  Plaintiff may attempt to hedge on his report further by alleging he was talking about a closing speed.  (Plaintiff's First Amended Combined Responses to Defendant's Discovery Requests, pp. 14).  However, this is illogical given plaintiff's clear statement that Cousins  was "running" at those speeds. Further, it does not work with his later statement regarding 90 plus miles per hour as that would mean at least one, if not both, vehicles were driven significantly below the posted speed limit.

had a right to consider that fact in making decisions about his employment as a police officer.

"It is well-settled that a police department may, in accordance with its well-established duty to keep peace, place demands upon members of the police force which have no counterpart with respect to the public at large." *Seegmiller v. LaVerkin City*, 528 F. 3d 762, 772 (10th Cir. 2008) (internal quotation marks removed) (finding Police Department could reprimand officer for off-duty sexual activity) (based on the same law enforcement code of ethics language). This court has found it reasonable for a police department to take steps responding to an officer's personal conduct that was not consistent with the departments "code of conduct when the department believes it will further internal discipline or the public's respect for its police officers and the department they represent." *Seegmiller v. LaVerkin City*, 528 F. 3d 762, 772 (10th Cir. 2008).

As already discussed above, the report was false. That is bad enough, but it was made by a police officer whose job duties require him to accurately observe and report the conduct of others - particularly illegal activity. Plaintiff's job required him to give testimony under oath that could result in lengthy jail sentences and other serious consequences. At worst the wide difference between what Plaintiff reported and what the video plainly shows draws Plaintiff's integrity and honesty into question. At best the wide difference raises serious questions about his judgment and his ability to accurately observe and report what happens in front of him. Either way it negatively impacts the question of whether he should continue to be employed as a police officer and Chief Alexander was entitled to consider in making that decision. Plaintiff's false or, at best inaccurate, report is not protected from scrutiny by his law enforcement employer and cannot form the basis of a First Amendment claim.

23

### 3. Plaintiff's report is not protected because it was related to his employment duties. [7]

While a "government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," "a governmental employer may impose certain restrictions on the speech of its employees, restraints that would be unconstitutional if applied to the general public. *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 80 (2004). Even where government employees make public statements outside the course of performing their official duties they are not guaranteed the same level of First Amendment protection as a citizen who does not work for the government. *See Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006) (stating such employees only "retain *some possibility* (emphasis added) of First Amendment protection"). And "[w]hen a public employee speaks pursuant to employment responsibilities... *there is no relevant analogue* [emphasis added] to speech by citizens who are not governmental employees. *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The U.S. Supreme Court recognized the serious ramifications a public employee's speech could have stating "[o]fficial communications have official consequences..." *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006). The *Garcetti* holding was supported by the emphasis of [...] [The United States Supreme Court's] precedents on affording government employers sufficient discretion to manage

---

[7] As noted above, whether the report was made pursuant to Plaintiff's duties is a question of law suitable for resolution on a motion for summary judgment.

their operations.

Employers have heightened interest in controlling speech made by an employee in his or her professional capacity. *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006). Government employers have an affirmative duty to "ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti v. Ceballos*, 547 U.S. 410, 422-23 (2006).

The court in *Garcetti* declined to define a comprehensive framework for defining the scope of an employee's duties, but emphasized that the inquiry is "a practical one," noting that "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti*, 547 U.S. at 424-25, 126 S. Ct.

The fact that Plaintiff was off duty at the time of his report does not matter. The Tenth Circuit has "noted that the question under *Garcetti* is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment." *Reinhardt v. Albuquerque Pub. Bd. Of Educ.*, 595 F.3d 1126, 1135 (10th Cir. 2010); *Thomas v. City of Blanchard*, 548 F.3d 1317,1323 (10th Cir. 2008) (internal quotation marks and citation omitted). "[T]his court has generally identified two factors that suggest an employee was speaking as a private citizen rather than pursuant to [...] [their] job responsibilities: (1) the employee's job responsibilities did not relate to reporting wrongdoing and (2) the employee went outside the chain of command when reporting the wrongdoing." *Reinhardt v. Albuquerque Pub. Bd. Of Educ.*, 595 F.3d 1126, 1135-36 (10th Cir. 2010).

Plaintiff fails to meet either factor from *Reinhardt* because both the code of ethics he signed

25

and his job description show that  he had a responsibility to report erratic driving to the appropriate department on and off duty.  (SOF 70).  Had plaintiff acted as a private citizen this would have been a singular report to the first responsible law enforcement agent he spoke with, however he made multiple reports to multiple parties – dispatcher, Deputy Cox, County Attorney and his own supervisor, Chief Alexander.

 Similarly, Plaintiff fails the second prong from *Reinhardt* because none of those calls were "outside the chain of command when reporting the wrongdoing."  *Reinhardt v. Albuquerque Pub. Bd. Of Educ.*, 595 F.3d 1126, 1135-36 (10th Cir. 2010).  Instead, pursuant to his job description he reported a safety/traffic hazard to the sheriff who had jurisdiction over that section of highway.  He then attempted to report by phone to his superior, Chief Alexander.  Having failed to do so, he made a report to the county attorney until "it dawned on" him he could make a report to his Chief by text.

Plaintiff's report–viewed  in the context of his job description, code of ethics, and behavior–demonstrate his report was made "pursuant to his official duties," within "the chain of command" and as such his supervisor was "ensur[ing] that [...] [his] employees' official communications [...] [were] accurate, demonstrate[d] sound judgment, and promote[d] the employer's mission."  *Garcetti v. Ceballos*, 547 U.S. 410, 422-23 (2006).

### B.    The report against Cousins was not a matter of public concern.

The Second prong of Garcetti/Pickering is whether the speech is a matter of public concern.  *Dixon v. Kirkpatrick*, 553 F. 3d 1294, 1302 (10th Cir. 2009).  Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  "The

26

question is one of law, not fact." *Larson v. Ruskowitz*, 850 P. 2d 253, 258 (Kan. 1993).

This court has held that, in determining whether a government employee's statement involved a matter of public concern, "the fundamental inquiry is whether the plaintiff speaks as an employee or as a citizen." *David v. City and County of Denver*, 101 F. 3d 1344, 1355 (10th Cir. 1996), *cert. denied*, 522 U.S. 858 (1997).   If the employee's speech relates only to "internal personnel disputes and working conditions," the employee speaks only as an employee, and the speech is not protected.  *Id*.  This distinction rests in part on the intent of the speaker.  "In deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."  *Gardetto v. Mason*, 100 F. 3d 803, 812 (10th Cir. 1996).  Sean McGivern & Donald Peterson, *Employment Law Chapter 5: Civil Rights Act of 1871*, 5-11 (3rd ed. 2016).

That Plaintiff did not intend his report to be a matter of public concern is evident by his repeated statements to the sheriff department to "do with it what you want", while declining to sign a ticket.   Instead Plaintiff agreed with the option offered by Deputy Cox that he simply say something to Cousins internally.

Further, Plaintiff's report regarding Jim Cousin's driving was erroneous to such an extent that it "[did] not supply the public with any useful information [...] [which is] generally insufficient to be protected, even if they relate generally to an issue of potential public concern.  Sean McGivern & Donald Peterson, *Employment Law Chapter 5: Civil Rights Act of 1871*, 5-11 (3rd ed. 2016).

A false report of something that did not happen provides absolutely no useful information.  False reporting of another law enforcement officer cannot be a matter of public concern, especially

when done internally and is likely to "undermine the director's authority" and "disrupt or undermine working relationships in the department."

      **C.**      **Defendant's interest in the efficiency of the public service it performs sufficiently outweighs Plaintiff's free speech interest.**

Even if a public employee's speech can be characterized as addressing a matter of public concern, it is the court's responsibility to then balance the interest of the employee with the interest of the State in effectively and efficiently fulfilling its responsibilities to the public.  This is a question of law satiable for determination on summary judgment.

"The determination whether a public employer has properly discharged an employee for engaging is speech requires 'a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *see also Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35, 20 L. Ed. 2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 140, 103 S. Ct. 1684, 1686, 75 L. Ed. 2d 708 (1983).

The Tenth circuit has "long recognized that loyalty and confidence among employees is especially important in a law enforcement setting. *Helget v City of Hays*, 844 F. 3d 1216, 1223 (10th Cir. 2017); *See Worrell v. Henry*, 219 F. 3d 1197, 1206 (10th Cir. 2000); *Moore v. City of Wynnewood*, 57 F. 3d 924, 934 (10th Cir. 1995).  "Where mutual trust and respect among employees are particularly important and the need for confidentiality cannot be gainsaid." *Ruff v. City of Leavenworth*, 854 F. Supp. 774, 775 (D. Kan. 1994).  "In this regard, a governmental entity does

not have to wait until the speech actually disrupts operations before taking action; in some cases, 'predictions of harm' may justify restrictions on employee speech." *Dillman v Winchester*, 639 F. Supp. 2d 1257, 1270 (W.D. Okla. 2009).

"These concerns are even greater in a relatively small department, where a minor disturbance in morale might loom large." *Helget v. City of Hays*, 844 F. 3d 1216, 1223 (10th Cir. 2017); *Lytle v. City of Haysville*, 138 F. 3d 857, 867 (10th Cir. 1998); *See also Moore v. City of Wynnewood*, 57 F. 3d 924, 934 (10th Cir. 1995). "In this regard, a governmental entity does not have to wait until the speech actually disrupts operations before taking action; in some cases, 'predictions of harm' may justify restrictions on employee speech." *Dillman v Winchester*, 639 F. Supp. 2d 1257, 1270 (W.D. Okla. 2009).

The Tenth circuit has found "close working agencies" extend beyond the immediate agency and include inter-agency relationships. *See Koch v. Hutchinson*, 847 F. 2d 1436, 1451-52 (10th Cir. 1988). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Koch v. Hutchinson*, 847 F. 2d 1436, 1451-52 (10th Cir. 1988).

As already discussed above, a central part of police officer's duties is to accurately observe, report and testify concerning the unlawful action of others. A false report of unlawful actions often results, at minimum, in inconvenience to the victim and, at worst, can result in punishment up to and including incarceration. Such a result based on a false report – whether that report is knowingly false or the result of poor judgment and inability to accurate perceive the events – strikes at the heart of the central function of law enforcement employer's mission. It generates ill will towards law

enforcement in general and the involved agency in general.  All to the detriment of the agencies ability to efficiently and accurately provide the public service it exists to provide.

Another  relevant inquiry is whether the action disrupted or undermined working relationships in the department.  Also relevant is the manner, time and place in which the [...] [activity occurred] and whether this had a disruptive effect on the department or undermined the director's authority.  If this balance tips in favor of the employee, the employee still has the burden of showing that the [...] [activity] was a motivating factor for his or her suspension.  *Larson v. Ruskowitz,* 850 P. 2d 253, 258 (Kan. 1993).

The  "pertinent considerations] [are] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Ranking v. McPherson*, 483 U.S. 378, 388 (1987); *See also Pickering*, 391 U.S., at 570-573, 88 S. Ct., at 1735-1737. "[T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personal relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

Any right Plaintiff have had  to make false statements and/or extremely erroneous statements about an employee of sister law enforcement agency  that works closely with his employer  is outweighed by the Police department's need to be efficient at serving and fostering trust in the community while sustaining internal harmony, loyalty, confidence, and discipline and a good

working relationship with another law enforcement agency in the area. .

Plaintiff's false accusation against a Sheriff's employee was likely to have "a detrimental impact on close working relationships" "for which personal loyalty and confidence are necessary." *Ranking v. McPherson*, 483 U.S. 378, 388 (1987).

### D.     The report itself was not a motivating factor.

### 1.     The evidence does not support Plaintiff's claim.

Even if Plaintiff is assumed to met the  requirements discussed above, the uncontroverted acts show that the report itself was not a motivating factor.

"A Plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient to create a genuine issue of fact."  *Nielander v. Bd of County Com'rs of County of Republic, Kan.*, 582 F. 3d 1155, 1165 (10th Cir. 2009).

To show that the motivation for the defendants actions were motivated by the free speech requires an analysis as to how much time elapsed and what other conduct occurred between the Plaintiff's words and the defendant's actions. *See Youngblood v. Qualls*, 308 F. Supp. 3d 1184, 1199-2000 (D. Kan. 2018).

The report Plaintiff made drew essentially no reaction from the Defendants.  Cousins denied the accusation and the matter was dropped.  (SOF 30-33, 61).  The request for Plaintiff's resignation came almost a month later and was not in reaction to the mere fact of the report, but in reaction to having been shown the video that clearly showed the report was false, along with other continuing performance issues. (SOF 97).  The  motivation was not Plaintiff's speech, but rather video evidence

31

showing Plaintiff's poor judgment and/or dishonesty.  Chief Alexander did not respond to Plaintiff's report, but rather the video evidence showing its falsity a month later.

### 2. Plaintiff's attempt to show motivating factor by the use of comparators fails.

While "[e]vidence of differential treatment can support a claim of First Amendment retaliation [...] [the] plaintiff must demonstrate that these comparators are similarly situated in all material respects." *Rotunno v. Town of Stratford*, No. 3:12cv1352 (WWE), 2015 U.S. Dist LEXIS 93062, at *9 (D. Conn. July 17, 2015); *Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 289 (E.D.N.Y. 2012); *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2nd Cir. 1997).  The "plaintiff who seeks relief... must make the same showing that is required to establish a claim of selective prosecution–'that he has been singled out... while others similarly situated have not been prosecuted for conduct similar to that for which he was prosecuted and that the government's discriminatory selection of him... was based upon his exercise of his first amendment right to free speech.'" *Gearin v. City of Maplewood*, 780 F. Supp. 2d 843, 859-60 (D. Minn. 2011); *United States v. Catlett*, 584 F. 2d 864, 66 (8th Cir. 1978) (citing *United States v. Berrios*, 501 F. 2d 1207, 1211 (2nd Cir. 1974)).

Because First Amendment Retaliation Claims do not tend to focus on similarly situated comparators, the courts turn to Equal Protection case law.  To be similarly situated the persons must be "in all relevant respects alike."  *Taylor v. Roswell Indep. Sch. Dist.*, 713 F. 3d 25, 54 (10th Cir. 2013).

The Tenth Circuit "has attempted to provide a somewhat detailed definition, noting that 'the

degree to which others are viewed as similarly situated... depends substantially on the facts and context of the case,' and that, consequently, many "legitimate" "variables" may serve to distinguish the plaintiff form those other persons," " *Selsor v. Workman*, 644 F. 3d 984, 1016 (10th Cir. 2011). In fact the "claim must allege an "extremely high" level of similarity with comparable person[s] to whom Plaintiff's circumstances are "prima facie identical." *Ellibee v. Roberts*, No. 08-3189-SAC, 2009 U.S. Dist. LEXIS 91405, at *6 (D. Kan. Sep. 30, 2009). Comparators have not been found to be "similarly situated" unless the same level of supervisory responsibility existed. *See Mitchell v. City of Wichita*, 140 F. App'x 767, 783 (10th Cir. 2005).

Title VII case law also provide guidance on when comparators can properly be used to establish motive. "Not every difference in treatment will establish discriminatory intent." *Kendrick v. Penske Transp. Sers.*, 220 F. 3d 1220, 1232 (10th Cir 2000.) In that case, Tenth Circuit noted that, from a legal standpoint, one employee assaulting another with deadly weapon is just as threatening as pushing another person in anger, but declined to find a difference in treatment of employees engaged in those two acts was evidence of discriminatory intent.

The *Kedrick* court also noted that a difference in time between disciplinary events is important. "Employers' disciplinary practices necessarily change over time, it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time in an effort to better address their business needs." *Id.,* at 1233-1234.

Another important factor is the relative work records of the plaintiff and the comparators. "Different disciplinary measures taken in response to different acts . . . by employees with different work records do not constitute disparate treatment for purposes of establishing a prima facie case."

33

*Lewis v. Four B Corp.,* 347 F. Supp 2d 1017, 1024 (D. Kan. 2004) quoting *Washington v. General Motors Corp.* 1992 WL 370620 *6 (D. Kan. 1992) quoting *Miller v. Yellow Freight Sys., Inc.,* 758 F. Supp. 1074, 1079 (W.D. Pa 1991) *affd.* 941 F 2d 1202 (3rd Cir. 1991.)

Other relevant factors include "(1) not performing the same job, (2) not subject to the same policies, statutes and findings of wrongdoing, and (3) different in their relative level of culpability." *McGowan v. City of Eufala,* 472 F. 3d 736, 745-46 (10th Cir. 2006.)

The comparators Plaintiff offers are:

1.  An officer running tags to identify and "friend" a female on face book;

2.  A city employee  making a false use of force report against Plaintiff;

3.  A city employee, sexually harassing a female dispatcher/supervisor;

4.  Suppressing a narcotics investigation against a city employee and her husband who were also friends of the City manager;

5.  The alleged storage of cocain at his house by a canine officer.

6.  A City employee accepting gratuities from a movie theater where he spends tine on duty.

Plaintiff was not similarly situated to any of the employees he offers as comparators.  One thing that immediately separates Plaintiff form any of them is his work record.  From the first evaluation he received, his work record has generally be unsatisfactory.  There was some improvement for a brief period in late 2015, but the unsatisfactory  conduct surfaced again in February, 2016 when it was discovered that Plaintiff was again improperly holding confiscated cell phones, despite previous counseling on the subject.  Shortly thereafter Chief Alexander received the

34

video showing that the report on Cousins was false.  There is no evidence in the record that any employee with 2 out of 3 unsatisfactory evaluations and a prior probation that had to be extended, was discovered to be again engaging in the behavior that had led to previous action and then shown by video to have made a false report.

Running tags to get contact information for women (No. 1)  is not the same type of misconduct as making false accusations.  One is misuse of power and resources and the other is dishonesty.  In addition, when the allegations of running tags were rumored, Chief Alexander investigated and found nothing to support them.  No citizen came forward to say this had happened, it was only rumor with out factual support. During discovery in this case, the name of an alleged victim was provided, by Plaintiff and  she was deposed and, the accusation is still not considered proven, Officer Bustillos was written up and required to redo training on the proper use of the NCIC computer.  (SOF 113).  Moreover, this comparator actually works against Plaintiff.  Though he was a law enforcement officer and now claims to have been aware of this, he did not report it to Chief Alexander when it allegedly happened but only brought forth the alleged victim to assist him with this case.

The allegation that a false use of force report was made against Plaintiff (No. 2) gets closer.  However, there is no evidence to support the conclusion that this report was a false  accusation of events that had not happened at all.  The gist of this complaint was not an allegation that  force actually was excessive, but that Plaintiff had deviated from the plan for the arrest, that resulted in the need to use force.  In evaluating this offered comparator, [t]he court must remember that it is the employer's perception of the employee's performance that is relevant, not the plaintiff's evaluation

of her own performance. *Salazar v. City of Commerce City*, 535 Fed. Appx. 692, 696 (10th Cir. 2013)(citing *Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1179 (10th Cir. 2006)). The issue is not whether an employer's conclusion about plaintiff's conduct was wrong, but whether it was honestly held. *Young*, 468 F.3d at 1250." *Davis v. Dillon Cos.,* 2014 U.S. Dist. LEXIS 141568, at *16 (D. Kan. Oct. 2, 2014.)

This incident also did not involve the same "level of responsibility." This report was by a supervisor reporting on Plaintiff, critiquing a subordinate's performance.

Allegations of sexual harassment (No. 3) are not the same as making false accusations like those made by Plaintiff. Moreover, the "victim" of the harassment was a supervisor and has testified she did not report it to anyone, and it did not interfere with her work.

The alleged suppression of a drug investigation (No. 4)  bears no similarity to Plaintiff's false report.  Nor does it involve an employee on the same level as Plaintiff. It is an allegation that the Chief of Police – who has the right and obligation to determine what time and resources will be spent on what investigations – told Plaintiff not to investigate a particular alleged crime.  Moreover the decision makers are different.  Chief Alexander was Plaintiff's supervisor.  Chief Alexander is supervised by the City Manager  and City Council.

The allegation of improper storage of drugs used to train drug dogs (No. 5)  is not similar to Plaintiffs's false report.  There is no video showing it.  It relates to an officer's level of responsibility in handling drugs for drug dogs not with his responsibility to make reports. Perhaps more importantly, it is remote in time and occurred before  Ron Alexander was Chief of Police.

The allegations that an employee accepted gratuities (no. 6) is not similar to fabricating an

accusation of serious misconduct.  Moreover, Chief Alexander did not know it about it until it came

out in depositions in this case.  The "gratuities" consisted of popcorn that the local theater would not

let an officer pay for, despite his repeated offer to do so, and accepting coffee at th local Starbucks.

These are common gestures offered by community merchants to police officers is not misconduct.

Certainly, its not at all similar to the making of a false report that Plaintiff.

　　　　For these reasons Plaintiff fails to establish he has a First Amendment retaliation claim.

## II.　　　Defendant Ron Alexander is entitled to Qualified Immunity.

　　　　Chief Alexander enjoys qualified immunity. There is a presumption in favor of qualified

immunity for public officials acting in their individual capacities, unless the Plaintiff proves

otherwise. *See Hidahl v. Gilpin County Dep't of Soc. Servs.*, 938 F.2d 1150, 1155 (10th Cir. 1991).

　　　　"Qualified immunity protects public officials performing discretionary functions unless their

conduct violates 'clearly established statutory or constitutional rights of which a reasonable person

would have known.'" *Anderson v. Willis*, 917 F. Supp 2d 1190, 1195, 2013 U.S. Dist. LEXIS 1712

(D. Kan. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396

(1982)). The key to this inquiry is the objective reasonableness of the official's conduct in light of

the legal rules that were clearly established at the time the action was taken.  *Laidley v. McClain*, 914

F.2d 1386, 1394 (10th Cir. 1990).

　　　　Once a qualified immunity defense is asserted, the burden shifts to the Plaintiff to meet a two

part test. *Saucier v. Katz,* 533 U.S. 194, 201(2001); *Green v. Post,* 574 F.3d 1294, 1300 (10th Cir.

2009). A Plaintiff must show that his constitutional right was infringed, and that such right was

clearly established at the time of the alleged infringement. The burden Plaintiff bears is a heavy one

and, if he fails to establish either prong, "the court must grant qualified immunity." *Carabajal v. City of Cheyenne,* 847 F.3d 1203, 1208 (10th Cir. 2017); *Croker v. Durkin,* 159 F. Supp. 1258, 1273 (D. Kan. 2001)("plaintiff[s] bear[]a heavy two part burden," quoting *Mick v. Brewer,* 76 F. 3d 1127, 1134 (10th Cir. 1996)).

Although a Plaintiff must establish both elements, the court may consider the elements in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Whether the right was clearly established is examined under the "specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. For a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the Plaintiff maintains." *Cortez v. McCauley*, 478 F.3d 1108, 1114—15 (citing *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). When it is debatable whether a violation has occurred, the law by definition cannot be clearly established, and qualified immunity applies. *See Reichle v. Howards*, 132 S. Ct. 2088, 2096 (2012) (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999)).

Plaintiff cannot meet his burden on the first prong for the reasons discussed above – there has been no violation of his First Amendment rights.

Plaintiff cannot meed his burden on the second prong either. The existing case law discussed above gives a great deal of discretion and deference to a Chief of Police faced with video evidence that a police officer has made a false report similar to the type of reports he his entrusted to routinely make as a part of his job.

It is clear defendant Alexander had discretion in employment matters within the city Police

38

Department.  A discretion which was heightened because as (1) law enforcement "loyalty and confidence[,]" "mutual trust and respect among employees is particularly important"; and (2) "These concerns are even greater in a relatively small department, where a minor disturbance in morale might loom large."  *Helget v. City of Hays*, 844 F. 3d 1216, 1223 (10th Cir. 2017); *Ruff v. City of Leavenworth*, 854 F. Supp. 774, 775 (D. Kan. 1994).

A law enforcement officer's false report would mean that his superiors could no longer trust him, "impair[ing] discipline by a superior."  *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899 (1987).  "It is particularly a serious problem if an officer is perceived to have made false accusations of criminal or infraction activity on the part of other people–particularly fellow officers."  (Finley Dep. pp. 22:3-12).  In a rural community like Colby and Thomas County Kansas this can impact the close working relationships both internally and with other agencies as between the Colby Police and the Thomas County Sheriff's department.  (Finley Dep. pp. 23:19-25; 24:1-8 ); *Helget v. City of Hays*, 844 F. 3d 1216, 1223 (10th Cir. 2017); *Lytle v. City of Haysville*, 138 F. 3d 857, 867 (10th Cir. 1998); *See Koch v. Hutchinson*, 847 F. 2d 1436, 1451-52 (10th Cir. 1988).

Even Plaintiff does not dispute that the video fails to support his allegations against Cousins.  He admits it does not show Cousins traveling at the unsafe speed he reported, that the video does not show Cousins going left of center or coming head on.  Under these facts and the case law discussed above it cannot reasonably be said that a Chief of police, faced with a report like that made by Plaintiff,  and the video that appears to show a different story, should know that terminating the officer making the report would violate the First Amendment. This is particularly true when the other problems with Plaintiff's employment are factored in.

39

Chief Alexander's decision under these circumstances was well within the "wide degree of deference to the employer's judgment."  He is, therefore, entitled to qualified immunity.

### III.  Plaintiff cannot establish a Kansas "whistle blower" claim.

Kansas has long "adhered to the rule prevailing in most jurisdictions... that in the absence of a contract, express or implied, between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party..."  *Mildfelt v. Lair*, 561 P.2d 805, 811 (Kan. 1977); *Johnston v. Farmers Alliance Mut. Ins. Co.*, 545 P.2d 312, 315 (Kan. 1976). Employment at will for public-employees is expressly recognized in the Kansas Constitution. Article 15 § 2 ("The tenure of any office not herein provided for may be declared by law; when not so declared, such office shall be held during the pleasure of the authority making the appointment").

Kansas does recognize common-law exceptions to this rule for certain retaliatory discharges.   The exceptions have expanded to recognize a cause of action for employees fired for "whistleblowing".  *See Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (Kan. 1988).

The elements of a Kansas common law whistle blower claim are:

(1) "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare;" (2) "the employer had knowledge of the employee's reporting of such violations prior to the discharge of the employee;" (3) "and the employee was discharged in retaliation for making the report.  *Palmer v. Brown*, 242 Kan. at 900; *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003).

Further, "the whistle-blowing must have been done out of a good faith concern over the

40

wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain." *Moyer v. Allen Freight Lines*, Inc., 885 P.2d 391, 394 (Kan. App. 1994). Good faith is a state of mind "consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation." *Good Faith*, Black's Law Dictionary (11th ed. 2019).

However, more than good faith is required as "the whistleblower must seek to stop unlawful conduct through the intervention of a higher authority, either inside or outside the company." *Shaw v. S.W. Kansas Groundwater Mgt. Dist. Three*, 219 P.3d 857, 863 (Kan. App. 2009).

Further, "[p]roximity in time between the report and the firing is a typical beginning-point, coupled with evidence of satisfactory work performance and supervisory evaluations. *Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197, 1204 (D. Kan. 2001). "If the case lacks close temporal proximity, a plaintiff still may withstand a summary judgment motion by demonstrating a pattern of retaliatory conduct stretching from whistle blowing activity to the termination." *Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197, 1204 (D. Kan. 2001). The uncontroverted facts negates the first and third elements. Moreover, the report was not made in good faith, nor was it made with an intent to stop ongoing unlawful conduct.

### A.   Plaintiff's report about Cousins is not "whistle blowing."

### 1.   The Uncontroverted facts negate the first element.

### a.   Plaintiff's report did not involve his employer or a co-worker.

As noted above whistle blowing is an insider (employee) blowing the whistle on misconduct inside the employer for whom he works – a report of misconduct by "the employee's co-worker or

employer." A person making a report of alleged bad driving by someone he encountered on the road simply does not meet this requirement or fit the concept of whistle blowing.

> **b.      No reasonable person could have concluded that Cousins was violating the law.**

Even if Cousins is regarded as a co-employee, as discussed in detail above, the video clearly shows that Plaintiff's report was false and therefore, that no reasonable person would have concluded that Cousins  was engaged in the violation of the law. Not even Plaintiff concludes this, conceding the video does not evidence the deputy traveling at an unsafe speed or going left of center.  (SOF 43 and 45).

> **2.      Plaintiff was not discharged for making the report.**

As discussed above, the report itself drew no criticism reaction or disciplinary action.  The action came a month later when the Chief was given unsolicited and irrefutable evidence that the report was false, on the heels of discovery that Plaintiff was again in engaging in other misconduct for which he had previously been disciplined. .  In other words, even if Plaintiffs report is regarded as whistle blowing, no one reacted to the fact that he "blew the whistle."  It was long after the echos of the whistle had faded that evidence surfaced showing that Plaintiff was untruthful  that he was asked to resign.

Plaintiff's termination occurred not because he blew a whistle, but because evidence came to light showing he wasn't blowing a whistle" but "crying wolf."

### 3.   Plaintiff's report was not made in good faith.

Plaintiff cannot invoke whistle-blowing protection as the veracity of his report is destroyed by the video evidence while also destroying any good faith grounds upon which to have made the report.  The lack of good faith is clear as plaintiff accurately ascertained the vehicle was not only a Sheriff's vehicle but the one previously driven by his brother, while being so grossly inaccurate as to misperceive a vehicle operated near the speed limit as traveling roughly double that.  Similarly the video evidences Plaintiff's lack of good faith regarding the report the deputy almost collided head on with Plaintiff.  Plaintiff concedes he cannot identify anywhere in the video where the deputy was not within his own lane.

### B.   Plaintiff is not entitled to protection from retaliation based upon the protected activities of his family.

Marc Finley's letter concerning Rod Taylor did not involve any alleged serious violation of the law by the City of Colby or any of Plaintiff's co-workers.  Thus, the first element of a whistleblower claim is missing.

But perhaps most damning to Plaintiff's claim is the fact, which he concedes and affirmatively alleges, that Ron Alexander supported Marc's efforts to report or blow the whistle on the issues with Sheriff Taylor. (SOF 136).  Moreover, Chief Alexander agreed to hire Marc Finely to work at the City of Colby because of his deteriorating relationship with Sheriff Taylor over those issues. (SOF 137-138.)

In addition, Plaintiff's evaluations in 2014 and early 2015, before Marc's letter was sent, were negative.  He  was placed on probation in May, 2015 and that probation was extended in

August.   Marc Finley sent the letter to CPOST in September of 2015.   The next action Chief Alexander took concerning Plaintiff's employment was to lift his probation, give him the best evaluation he had at the city, give him a promotion and raise his pay.  (SOF 92).   No reasonable person could conclude that Marc Finely's letter was the reason for the termination 5 months later after Chief Alexander was shown a video showing clearly that Plaintiff had made a false report and Plaintiff was, once again found to be improperly dealing with confiscated cell phones.   No reasonable juror could conclude that Plaintiff was terminated from his employment with the City of Colby because of Marc's activities concerning the Thomas County Sheriff several months previously – which Chief Alexander supported . Thus the third element of a whistleblower claim is missing.

## CONCLUSION

For the reasons set forth above, the Defendants are entitled to summary judgment.

WATKINS CALCARA, CHTD.

/s/ ALLEN G. GLENDENNING
     Allen G. Glendenning, #12187
     Michael C. Abbott #28111
     1321 Main Street - Suite 300
     P.O. Drawer 1110
     Great Bend, Kansas  67530
     (620) 792-8231  Fax (620) 792-2775
     Attorneys for Defendants Ron Alexander and
     City of Colby, KS

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on this 7th day of October, 2019, the above and foregoing Memorandum in support of Motion for Summary Judgment was filed electronically with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Sean M. McGiven, #22932

Donald N. Peterson, II, #13805

Graybill & Hazlewood, LLC

218 N. Mosley St.

Wichita, KS 67202

Attorneys for Plaintiff

/s/ ALLEN G. GLENDENNING

Allen G. Glendenning, #12187

45