1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                      DISTRICT FOR KANSAS
 3
    LANCE FINLEY,                    )
 4                                   )
                     Plaintiff,      )
 5                                   )
    vs.                              )   Case No.
 6                                   )   6:17-CV-01215-EFM-KGG
    CITY OF COLBY, KANSAS,           )
 7  RON ALEXANDER and TOM            )
    NICKOLS, JR.,                    )
 8                                   )
                     Defendants.     )
 9
10
11                  D-E-P-O-S-I-T-I-O-N
12
13
14              The deposition of
15                   LANCE FINLEY
16  was taken on behalf of the defendants before
17  ELAINE SHOGREN, a Certified Court Reporter of
18  Kansas, at Thomas County Courthouse, Commissioners
19  Room, 300 North Court Avenue, Colby, Kansas, on
20  December 20, 2018, commencing at 9:02 a.m.
21
22
23
24
    Job No. CS3065621
25
```

6

1   Q   All right.  Did you review anything in preparation

2       for this deposition?

3   A   Yes.

4   Q   What did you review?

5   A   My attorney gave me some papers to thumb through

6       and acquaint myself with.

7   Q   Is that the stack in front of you?

8   A   Yes, sir.

9   Q   Okay.  May I see it?

10  A   Yes, sir.

11  Q   Did you read every page of this?

12  A   I did not.  Like I said, I got it last night.

13  Q   Okay.  It looks like you got plaintiff's amended

14      responses to our discovery requests.

15              MR. GLENDENNING:  Is there anything in

16      here, Sean, that hasn't been produced?

17              MR. MCGIVERN:  Those are all

18      Bates-numbered documents that have been exchanged.

19              MR. GLENDENNING:  A few of them aren't.

20      Oh, no, there they are.  Okay.

21  Q   (BY MR. GLENDENNING)  Anything in particular that

22      you remember actually looking over or reading in

23      this stack of documents?

24  A   I thumbed through all of it.  But nothing in

25      particular that I read cover to cover, I suppose.

7

1  Q  Okay.  You understand that there has been a video

2     that has been produced in this case from the

3     sheriff's office?

4  A  Yes, sir.

5  Q  And did you review that video in preparation for

6     your deposition?

7  A  Yes, sir.

8  Q  When did you review it?

9  A  It has been maybe a month ago or so.

10 Q  Okay.  Where did you review it?

11 A  Like physically where at?

12 Q  Yes.

13 A  At home.

14 Q  Okay.  On your computer?

15 A  Yes.

16 Q  What software did you use to review it?

17 A  I don't recall.  Whatever it would open in.

18 Q  Okay.

19 A  I am not very tech savvy.

20 Q  Does it appear to be -- well, how long was the

21    video; do you recall?

22 A  Somewhere I have -- I can get you a better answer

23    if I can review this.

24 Q  And I think you are looking through your

25    interrogatory answer where you went through and

8

1    listed a bunch of things?

2  A  Yes, sir.

3  Q  Okay.  And we will get to that in a little bit.

4  A  So like an hour and 26 minutes or so, somewhere in

5    there.

6  Q  And did it appear to begin with the vehicle sitting

7    at the Thomas County Sheriff's Office?

8  A  Yes, sir.

9  Q  It went up to Atwood, picked up a prisoner, came

10    back and parked back in the sheriff's office?

11  A  Yes, sir.

12  Q  Okay.  How many times have you reviewed that tape?

13  A  In its entirety, maybe twice.  I mean, I sat

14    through -- obviously you can see by this that I sat

15    through and backed it up back and forth multiple

16    times, but --

17  Q  When did you first see that video?

18  A  When my attorney produced it to me.  That was the

19    first time I had seen it.

20  Q  When was that?

21  A  I don't remember, to be honest.  It is -- I am doing

22    ten different things at once, sir.  I would have to

23    look back to see when it was sent to me, to be

24    honest.

25  Q  What do you mean you are doing ten different things

Page 22

1  A  It wasn't a weekly thing, I don't believe.  It was

2     maybe biweekly, if not once a month.  I mean, it was

3     hit and miss, so I do not know.

4  Q  Were you ever told that a reason you were told not

5     to exceed your hours working for the Colby Police

6     Department was anything other than budgetary?  Were

7     they concerned about your fatigue, etc.?

8  A  There was a time or two, yes.

9  Q  Okay.  Is that a legitimate concern for police

10    officers?

11 A  I believe so.

12 Q  Did you continue exceeding your hours after you were

13    told not to?

14 A  There was a time or two I would try to get reports

15    caught up.  Or if I was going on days off, I was up

16    that day anyways coming off the night shift, I would

17    try to stay up so that I could get myself

18    rescheduled or realigned with my sleep schedule.  So

19    I would stay up and either ride along or do -- you

20    know, something of that nature.

21 Q  How important is honesty in police work?

22 A  Very important.

23 Q  Is there anything more important --

24 A  Than honesty?

25 Q  -- as far as the character of a police officer than

```
 1       his honesty or integrity?
 2   A   No, sir.
 3   Q   It is particularly a serious problem if an officer
 4       is perceived to have made false accusations of
 5       criminal or infraction activity on the part of other
 6       people, correct?
 7   A   Yes, sir.
 8   Q   That is not something that should be taken lightly?
 9   A   No, sir.
10   Q   Especially if the person they are accusing is
11       completely innocent?
12   A   Yes, sir.
13   Q   Would it be appropriate as a police officer to
14       target somebody for personal reasons, even if you
15       are nailing them for things they actually did but
16       you are focusing on them more than you do other
17       people?
18   A   No, sir, that is not appropriate.
19   Q   Do officers have to rely upon each other for safety?
20   A   Yes, sir.
21   Q   Okay.  In small rural counties like Thomas County,
22       does that include officers from other agencies?
23   A   Yes, sir.
24   Q   And in particular in the City of Colby, do Colby
25       officers need to be able to rely upon sheriff's
```

Page 24

```
 1      officers?
 2   A  Yes, sir.
 3   Q  And sheriff's officers need to be able to rely upon
 4      Colby police officers for backup?
 5   A  Yes, sir.
 6   Q  Maintaining a good relationship between the agencies
 7      is a very good idea then, isn't it?
 8   A  Yes, sir.
 9   Q  Do you ever drive above the posted speed limit?
10   A  Yes, I have.
11   Q  Okay.  Even on a regular basis, do you fudge it five
12      miles or so?
13   A  I try to set my cruise control.
14   Q  At?
15   A  The posted speed limit.
16   Q  Right at it, not above it a couple of miles an hour?
17   A  In my personal vehicle I try to set it right at it.
18      It doesn't get very good mileage.  In my patrol
19      vehicle there are times that I -- if I am trying to
20      get somewhere that, yeah, I have exceeded the speed
21      limit just a little bit.
22   Q  Well, setting that aside.  Just personal driving, do
23      you --
24   A  I try to set it at 65.
25   Q  Okay.  In a 65?
```

31

1  A   To my knowledge, yeah.

2  Q   Do you ever recall a time when you observed another

3      law enforcement officer doing something in a private

4      vehicle off duty that you could have pulled them

5      over for and did not?

6                  MR. MCGIVERN:   Object to form.

7  A   I don't recall any incidents.

8  Q   (BY MR. GLENDENNING)  When did you start working for

9      the Colby Police Department?

10  A   I believe -- I thought my hire-on date -- I would

11     have to look back.

12  Q   You don't recall?

13  A   I believe it was sometime in 8 of '13, but I would

14     have to look back.

15  Q   Okay.  What do you recall about the relationship

16     between the Colby Police Department and the Thomas

17     County Sheriff's Department at that time?

18  A   When I was hired on it was a decent working

19     relationship.

20  Q   Did that deteriorate over time?

21  A   Yes.

22  Q   When did you first become aware of a deterioration

23     in the relationship between the Thomas County

24     Sheriff's Department and the Colby Police

25     Department?

46

```
 1      substantive conversation with Chief Alexander?
 2   A  I would say probably the day after my termination or
 3      the day -- February 17th, 18th, I think, were the
 4      dates.
 5   Q  Of 2016?
 6   A  I believe so.
 7   Q  So basically since your departure from the Colby
 8      Police Department, you have had no substantive
 9      conversations with Mr. Alexander?
10   A  I don't believe so.
11   Q  Okay.  Has anyone told you anything Ron Alexander
12      has said about you since your departure from the
13      Colby Police Department?
14   A  I believe after my departure Kraig Chervoski was
15      working for the department and visited with Ron
16      about it, and Kraig had told me about the
17      conversation they had.
18   Q  Okay.  Is Kraig Chervoski a friend of yours?
19   A  We became friends after working -- or while working
20      for the PD.
21   Q  He was a friend of yours when you left the Colby PD?
22   A  Yes.
23   Q  And remains a friend of yours?
24   A  We are still -- not as close as we used to be, but
25      we still visit from time to time.  He sent me a
```

52

1    termination and I decided that I wasn't going to

2    admit to the wrongdoing with -- and I felt like that

3    is what the forced resignation was doing, so I

4    withdrew my resignation and --

5  Q  (BY MR. GLENDENNING)  You thought a resignation

6    would be an admission?

7  A  I believed it looked more that way than the

8    termination.

9  Q  Okay.  Even forced?

10 A  Yes.

11 Q  Okay.  Do you remember what time of day your

12   encounter with Mr. Cousins occurred on January 15,

13   2016?

14 A  It would have been early morning.  I don't recall

15   the exact time.

16 Q  And when you say early morning, is that before

17   sunup?

18 A  I don't know.  It depends on the time of year.  It

19   would have been January, so it would have been close

20   to sunrise, sunup.  I don't recall.  I mean, it

21   would have been sometime early morning because we

22   got off at 7:00 in the morning.

23 Q  Had you just completed a shift at the Colby Police

24   Department?

25 A  Yes, sir.

53

1  Q   Okay.  And where were you headed?

2  A   Out to the farm, my parents' farm.

3  Q   Okay.  And where is your parents' farm?

4  A   It is 12 miles -- 12 or 11 miles north of Colby

5      on K-25.

6  Q   And it is right on K-25?

7  A   Yes, sir.

8  Q   Did you grow up on that farm?

9  A   I did.

10 Q   How old are you?

11 A   27.

12 Q   Okay.  You have driven Highway 25 between Colby and

13     that farm many, many times?

14 A   More so Colby to Atwood, but yes -- or not Colby to

15     Atwood, the farm to Atwood.  I went to school in

16     Atwood, but I have traveled to Colby numerous times,

17     yes.

18 Q   Okay.  Can you put it in respect to a cross road,

19     where is the farm?

20 A   I don't know the roads.  I know it is near

21     Dave Pabst's road.

22 Q   Is it in Rawlins County?

23 A   As far as --

24 Q   The farm.

25 A   The farm.  Oh, it is right on the county line.

55

1  Q  What is the speed limit where you encountered

2     Mr. Cousins?

3  A  65, I believe.

4  Q  How fast were you going?

5  A  I don't recall.  I would assume 65, but I don't

6     recall.

7  Q  What were you driving?

8  A  My personal pickup.  It would have been an '09

9     Chevy.

10 Q  How long had you had that?

11 A  I don't recall when I bought that.  It would have

12    been prior to my employment, so 2012 maybe,

13    somewhere in there.

14 Q  Did anyone else ever drive it?

15 A  Yeah, it gets driven by others.

16 Q  Okay.  Do you know whether Mr. Cousins knew that

17    vehicle or was familiar with that vehicle?

18 A  I assume he probably did.  It was parked at the PD

19    numerous times when I would come to work.

20 Q  But that is just an assumption?

21 A  It was parked -- I mean, we live in a small town and

22    there is only two officers on at a time.  So when it

23    is sitting outside the police department, I would

24    assume that he -- it is fairly recognizable.  It is

25    a purple Chevy pickup with a flatbed.

58

1  A   It could be.  I would have to look at a map.  I

2      don't know.

3                  (Marked Exhibit 3.)

4  Q   (BY MR. GLENDENNING)  Let me show you Exhibit

5      Number 3.  Do you recognize what that shows?  Well,

6      actually let me have that back for a second.  This

7      is a multi-page exhibit.  Okay.

8                  I am handing you Exhibit 3, which is a set

9      of photographs from Google Maps.  Do you recognize

10     what those show?

11 A   I believe it is Highway K-25 near County Road W.

12 Q   Does that appear to be the location where you

13     encountered Mr. Cousins?

14 A   Yes, sir.

15 Q   Did you encounter him north of Road W or south of

16     Road W?

17 A   In reviewing that video, it appears that it was just

18     south, if not right at, County Road W.  That morning

19     in my perception, I thought we were just a little

20     further north of that.  But, I mean, it was in that

21     exact same vicinity, but I recall -- I mean, it

22     would be a matter of meeting here versus perceiving

23     meeting here.  I mean, a technicality, but --

24 Q   A matter of feet?

25 A   Yeah.

59

1  Q  Okay.  Had you ever encountered Mr. Cousins on

2     Highway 25 before?

3  A  Oh, I am sure I have.  I don't recall.

4  Q  Okay.  Do you remember whether you ever encountered

5     that Tahoe that he was driving on the morning of

6     January 15, 2016 on Highway 25 before January 15,

7     2016?

8  A  With other drivers and stuff, is that what you are

9     asking?

10 Q  Yeah.

11 A  Yes, I have met it numerous times.

12 Q  Okay.  When do you recall the last time before

13    January 15, 2016?

14 A  I couldn't give you a date.  I just -- I can say

15    with certainty that I had met it because it was

16    driven by my brother prior to that.

17 Q  Do you specifically ever remember meeting that

18    Tahoe, or any Thomas County sheriff's vehicle, at

19    this same location on any other time other than

20    January 15, 2016?

21 A  I don't recall one way or the other.  It is very

22    likely, but --

23 Q  Why is it very likely on that stretch of highway

24    that you would meet exactly at that spot?

25 A  Because like you pointed out earlier, I travel that

75

1       when Mr. Cousins went by you?

2   A   I believe -- looking at the video, when we meet

3       it was -- I was still up on the road.

4   Q   You say you slowed down after you went by him.  How

5       slow did you -- how far did you slow down?

6   A   I don't recall what I slowed down to.

7   Q   Okay.  And then you continued driving?

8   A   I didn't stop on the road right there.  No, I

9       continued.  I don't recall -- I may -- my brother

10      lives right up in that area, so I may have pulled

11      into his yard to make the phone calls.

12  Q   Okay.  Who did you call first?

13  A   I tried -- or I called dispatch first.

14  Q   Did you send a text to anyone before you called

15      dispatch?

16  A   I don't believe so.  I called dispatch first.

17  Q   Okay.  Did you call Kevin Berens?

18  A   After I called dispatch.

19  Q   Okay.  Did you send a text to anyone?

20  A   Chief Alexander.

21  Q   Anyone else?  And to be clear.  Did you send a text

22      to anyone about your encounter with Mr. Cousins that

23      morning?

24  A   I don't believe so, but I don't know.

25  Q   Okay.  And you believe that -- well, what order were

76

1    those three things in; the call to dispatch, the

2    call to Mr. Berens and the --

3  A My recollection three years later was I called

4    dispatch.  Dispatch, Darren Touslee, transferred me

5    to Jake on the same call.  I visited with Jake Cox a

6    little bit.

7            Then after visiting with Jake, I hung up

8    and I called Ron.  He did not answer.  So I -- at

9    that time, I believe I called Kevin Berens, the

10   county attorney at the time.  And then it dawned on

11   me I could send Ron a text, if he wasn't going to

12   answer the call.  So I believe I called Kevin and

13   then texted Ron.  But those two may have been

14   switched.  I don't recall.

15 Q Okay.

16 A I know that I tried calling Ron first, though.

17 Q Were all --

18 A Or second.  Second.  First between him and Kevin,

19   sorry.

20 Q And you are not sure where you were when you made

21   these calls?

22 A I don't recall exactly.

23 Q Did you make them while you were still driving?

24 A It may have been as I was continuing up to that

25   drive.  I don't recall.

86

1      10:51 a.m.)

2   Q   (BY MR. GLENDENNING)  Do you know of anyone other

3      than you that observed Mr. Cousins left of center at

4      any time on the morning of January 15, 2016 while

5      he was driving to or from Atwood?

6   A   To say specifically, no.  If you review the video,

7      it appears that others would have seen it.

8   Q   Do you know of anybody that reported seeing

9      Mr. Cousins left of center?

10  A   Not to my knowledge, no.

11  Q   And that -- and when you say "would have seen it",

12     that is assuming that you can look at that video and

13     tell where the car is in relation to the roadway,

14     correct?

15             MR. MCGIVERN:  Object to form.

16  A   You can't tell conclusively where that video -- or

17     where that vehicle is in relationship to the line.

18     You can tell general vicinity of that vehicle

19     swerving from left to right, failure to maintain a

20     single lane of traffic.

21  Q   (BY MR. GLENDENNING)  Okay.  Can you identify any

22     place on that video tape where you know for sure

23     that he was across the center line, from looking at

24     the tape?

25  A   From looking at the video?

87

1   Q   Yes.

2   A   I cannot.

3   Q   Okay.  The movement that you see could be within his

4       own lane, correct?

5   A   It could.

6                  (Marked Exhibit 4.)

7   Q   (BY MR. GLENDENNING)  Okay.  I want to show you

8       Exhibit Number 4.  Have you seen that document

9       before?

10  A   Is this the same I have here?

11  Q   It should be.

12  A   Okay.  Yes, I have.

13  Q   Okay.  Let me look at that.

14             MR. GLENDENNING:  Did you ever get me a

15      signature page on this?  The one I have isn't

16      signed.

17             MR. MCGIVERN:  He can sign it right now

18      and then we will get you a notarized copy of it.

19             MR. GLENDENNING:  I don't know that it

20      needs to be notarized if it is on the record.

21             MR. MCGIVERN:  Yeah.

22  Q   (BY MR. GLENDENNING)  Sir, you understand if you

23      sign that, you are signing that Exhibit 4 and the

24      answers that are given in there are true and

25      correct?

95

1    dispatch?

2  A  I don't believe it was embellished or inaccurate.  I

3    believe I was worked up during it, yes.

4  Q  Okay.  Why is that important?

5           MR. MCGIVERN:  Object to form.

6  A  Why is it important?

7  Q  (BY MR. GLENDENNING)  My question has simply to do

8    with embellishment or inaccuracies.  If it is not

9    embellished and it is perfectly accurate, why do you

10    want to add on that you were worked up?

11           MR. MCGIVERN:  Object to form.

12  Q  (BY MR. GLENDENNING)  Is that a hedge against an

13    inaccuracy that you think we might find in it?

14  A  No.

15  Q  Okay.

16  A  It is an explanation as to -- if you listen to the

17    video, I used profanity in it and that is -- I was

18    worked up at it [sic].

19  Q  But the facts that you reported are not embellished

20    or inaccurate in any way?

21  A  I don't believe so.

22  Q  Okay.  Have you ever ridden in that Tahoe that

23    Mr. Cousins was driving?

24  A  I have.

25  Q  On how many occasions?

96

1  A  Quite a few.  I don't recall how many, but --

2  Q  Have you ever driven it?

3  A  I believe on a few occasions.

4  Q  Did you ever use that dash cam?

5  A  It was on while I was in there, but I don't recall

6     ever using it for a case or anything.

7  Q  Okay.  Was it always on when that vehicle was in

8     operation?

9  A  If the radios and stuff are on, I believe it was

10    wired on.

11 Q  Okay.  There was no way to turn it off?

12 A  If you turn the toggle switch, turn the radios off

13    for like at night and stuff, yeah, you could turn it

14    off.

15 Q  Okay.  And if you had your radios on, the video

16    would be running?

17 A  I believe that is how that one is wired.  They are

18    all kind of wired different, but I believe so.

19 Q  When did you learn that?

20 A  As far as --

21 Q  When did you learn that that video would be always

22    on if the radios were on?

23 A  Probably when it was first put into service.  Like I

24    said, my brother drove it so I was familiar with how

25    it was wired and stuff.

98

1    pulling behind them on the interstate.  I would

2    watch more the interaction of the people at the

3    vehicle.

4  Q  Well, did you ever see it in motion?

5  A  I had seen it in motion before.

6  Q  Did you ever see it going around the vehicles to the

7    left, around vehicles in its own lane?

8  A  As far as like passing somebody?

9  Q  Yes.

10  A  I believe so.

11  Q  How many times do you think you observed that?

12  A  I couldn't give you an answer on that.  I assume

13    multiple times.

14  Q  Okay.  Where was this camera mounted?

15  A  It would have been mounted either on the visor

16    lights or on the windshield.  I believe it would

17    have been the visor lights, but I don't recall.  It

18    has been quite a while since I have been in it.

19  Q  In the center of the vehicle?

20  A  It would have been to the right of the center

21    because the rearview mirror would have been in the

22    center, I believe.

23  Q  Okay.  A little bit right of center?

24  A  I believe so.

25  Q  Okay.  Kind of over towards where a passenger would

147

1  Q  Okay.  And do you think Mr. Alexander may have given
2     you advice to not get sucked into that and let him
3     take care of his own issue over there?
4  A  There may have been something to that effect, yes.
5  Q  That would be good advice, wouldn't it?
6  A  It was.
7  Q  Both personally and from a standpoint of
8     interrelations between the departments, correct?
9  A  I still maintain a working relationship with the
10    deputies, yes.
11 Q  Well, that wasn't my question.  My question is:
12    That would be good advice from a personal standpoint
13    and from the standpoint of maintaining a good
14    relationship between the departments, correct?
15 A  It was good advice to stay away from it.
16 Q  Let's go back to Exhibit 1.  We have got it paused
17    here at one minute and -- or one hour and 18 minutes
18    and 52 seconds in.  Do you recognize where that is
19    at?
20 A  There is a glare --
21 Q  Well, let's just play it and you tell me when you
22    think you know where we are at.
23 A  This appears to be approaching --
24 Q  Road W?
25 A  I believe so.

148

1  Q   Okay.  I have stopped it at 1:19:13.  Can you see a

2      vehicle approaching?

3  A   It appears that you can see the glare off the

4      windshield maybe, but it is pretty fuzzy on your

5      computer screen.

6  Q   Okay.  Well, would you agree with me that you can

7      probably in real life -- large as life out there at

8      the scene you would have been able to see the

9      vehicle approaching sooner than it would be visible

10     on this video?

11 A   I believe so.

12 Q   Okay.  Let's keep watching.  I stopped it at

13     1:19:14.  Do you think you can see that vehicle

14     approaching?

15 A   Like I said, your computer screen is real fuzzy, but

16     I believe so.

17 Q   Okay.  Let's go on up to 1:19:17.  At that point you

18     can make out the headlights, correct?

19 A   Yeah.  That is apparently what I was seeing, rather

20     than the windshield glare.

21 Q   Okay.  Let's just run through this.  Is that your

22     pickup?

23 A   It is hard to tell from that angle, but I believe

24     so.  After -- of all the times I have watched the

25     video, I believe that is probably my vehicle.

155

1  Q  Okay.  At 1:19:21 are you still in your lane?

2  A  I can't tell if I am across that fog line or not at

3     that point.

4  Q  Okay.  Well, let's just back it up and you tell me

5     when you think it looks like you crossed -- do you

6     see anything on there where you think the video

7     shows you crossing the fog line?

8  A  I can't tell whether I crossed it on the video or

9     not.  Like I said, I am moving that way.

10 Q  But the video doesn't show you crossing it, that you

11    can tell, correct?

12 A  It doesn't show me not crossing it either, though.

13 Q  Okay.  Well, it doesn't show you crossing, correct?

14 A  It doesn't show one way or the other, sir.

15 Q  Okay.  How far is it from Atwood to Colby?

16 A  Depending on where you take the sign, but I believe

17    it is 29 to 30 miles.

18 Q  How long does it take to drive it at normal highway

19    speeds?

20 A  I don't know.  If you figured 60 miles an hour like

21    you said, it would be a half hour, I suppose.

22           MR. MCGIVERN:  Counsel, what is the

23    difference between these different videos?

24           MR. GLENDENNING:  What different videos?

25           MR. MCGIVERN:  I think you opened a

Page 169

1    what I perceived.

2    Q  And if he would have been doing 120, the closing

3       speed would have been 185?

4    A  Something to that effect, but --

5    Q  Which would have been markedly higher than anybody

6       else you met on the road that morning, correct?

7    A  It would have been.

8    Q  Okay.  And you saw Mr. Cousins going past vehicle

9       after vehicle before and after he encountered you,

10      correct?

11   A  Yes.

12   Q  And doesn't it look to you like he is going past

13      them at the same speed he is going past you?

14   A  I haven't looked at that.

15   Q  Did you tell Darren that, "He almost fucking hit

16      me"?

17   A  I believe I did.

18   Q  Did you tell him, "He came clear left of center and

19      almost head-on'd me"?

20   A  I believe I did.

21   Q  And you believe "came clear left of center" is an

22      accurate depiction of what you perceived?

23   A  Of what I perceived that day.

24            MR. MCGIVERN:  Object to form.

25   Q  (BY MR. GLENDENNING)  Do you think it is an accurate

171

1  A    So --

2  Q    -- what you saw.  I am asking you if someone looks

3       at this videotape, do you think this videotape would

4       show that person that Mr. Cousins came clear left of

5       center and almost head-on'd you?

6  A    If you watch this -- that tidbit in perspective to

7       the other videos, I believe you would make the

8       inference that it is moving left of center.

9  Q    It is moving towards the left, right?

10 A    Moving towards or over left of center.

11 Q    But you have already told me that you really can't

12      say from looking at this video whether he ever

13      crossed left of center, correct?

14 A    And that is what I am saying right now, too, is you

15      can't tell one way or the other --

16 Q    Right.

17 A    -- just by looking at this video.  There is no way.

18 Q    So if somebody just looked at this video, it would

19      not show them that he came clear left of center and

20      almost head-on'd you, would it?

21 A    It would be inconclusive.

22 Q    After you texted Ron Alexander about this incident

23      with Mr. Cousins, when was the next time you had any

24      contact with Mr. Alexander about this encounter with

25      Mr. Cousins?

172

1  A  I don't believe we spoke about it until about a

2     month later.

3  Q  Okay.  And was that the day he called you in?

4  A  Yes, sir.

5  Q  Okay.  So for a whole month there after you had

6     reported this incident with Mr. Cousins,

7     Mr. Alexander said nothing to you?

8  A  I don't believe so.  He may have.  I just don't

9     recall it.

10 Q  Okay.  You don't recall him coming to you and

11    saying, hey, quit making these reports about

12    Cousins?

13 A  There was the one report.

14 Q  Okay.

15 A  The snow was --

16 Q  But he didn't come to you and tell you to not do

17    that anymore, correct?

18 A  I don't believe so.

19 Q  It is not correct?  Let me re-ask the question.

20 A  Yeah.

21 Q  Between the month of when you had your encounter

22    with Mr. Cousins and when Mr. Alexander called you

23    in on February 17, did Mr. Alexander say anything to

24    you to the effect of don't make reports like that

25    about Mr. Cousins?

173

1  A  I don't believe it came up.

2  Q  Did he criticize you in any way for making this

3     report --

4  A  I don't believe so.

5  Q  -- in that time frame?  Has anyone ever told you

6     that Mr. Alexander said anything critical of you

7     making this report before February 17, 2016?

8  A  Not that I recall.

9  Q  Do you know what Mr. Alexander's next involvement

10    was with this issue after you texted him?

11 A  I do not.

12 Q  Do you know if Sheriff Nickols brought him the

13    video?

14 A  That morning Chief Alexander stated that Nickols had

15    brought the video and was threatening criminal

16    charges.

17 Q  Okay.  Did you know about the video before

18    February 17th?

19 A  I did not.

20 Q  Did it ever occur to you before February 17th that

21    Mr. Cousins' video -- car would have had a video?

22 A  I knew that it had video, yes.  I didn't think

23    anything of it.

24 Q  Okay.  Well, did you -- did it ever occur to you,

25    hey, there is a video of this encounter?

178

1   That was their decision whether they wanted to

2   pursue it or not.

3 Q Okay.  But your testimony is that you knew when you

4   made that call that there was probably a video of

5   this incident; is that correct?

6 A It didn't occur to me at the time, but I --

7 Q Okay.  When did it first occur to you that there

8   could be a video of this event?

9 A I don't know when I would have thought about it.  I

10  mean, I guess the most obvious moment was when Chief

11  Alexander brought it to me.

12 Q Can you think of any time between January 15, 2016

13  and when Mr. Alexander told you there was a video

14  that it ever crossed your mind that there was

15  probably a video of this event?

16 A I can't think of any specific time.

17 Q When Chief Alexander called you in on February 17th,

18  did you have any idea what he was calling you in

19  for?

20 A I did not.

21 Q Okay.  Tell me how that meeting went.  Who was

22  present?

23 A Chief Alexander, Detective Richard Barrett and

24  myself.

25 Q Okay.  Did they tell you that they were there to

180

1    recall the order.  At some point he read me the

2    Garrity warning and then also told me that I was

3    under the threat of criminal charges.

4  Q  Okay.  At some point in this conversation he laid

5    the video on the desk, correct?

6  A  At some point.

7  Q  Okay.  And then he asked you again about what

8    happened, correct?

9  A  Yes.

10 Q  And at that point you told him, well, you had been

11   sleep deprived and you might have misperceived

12   things, correct?

13 A  I don't recall what I said exactly.

14 Q  Is it possible that you told him that when he showed

15   you the video?

16 A  I recall that I did not change my story.

17 Q  That wasn't my question.  My question is:  Is it

18   possible that you told Chief Alexander when he said

19   we have got a video of this and laid it on the desk

20   that, well, maybe I misperceived some of it?

21 A  I don't recall if that was before or after I

22   explained that what I saw that morning was what I

23   saw, irregardless of the video.

24 Q  Did you at any point tell Mr. Alexander during that

25   meeting that it is possible that because you were

194

1    your encounter with Mr. Cousins by the time he

2    talked to you on February 17th?

3  A  I believe he probably had.

4  Q  Do you have any reason to think he hadn't?

5  A  He stated he had.

6  Q  Okay.  And do you have any reason to think he

7    hadn't?

8  A  No.

9  Q  Has anyone ever told you that Mr. Alexander had not

10   seen the video by the time he talked to you on

11   February 17th?

12 A  No.

13 Q  Do you know why it was alleged in the lawsuit on

14   your behalf that Chief Alexander told someone that

15   he had not seen the video?

16 A  I don't recall where that was ever alleged.

17 Q  Okay.  Did you have any conversations with

18   Mr. Alexander on February 17th about whether or not

19   that video would be conclusive about going left of

20   center?

21 A  I don't know whether we discussed it or not.

22 Q  Did Mr. Alexander tell you that from his review of

23   the tape he did not think that Mr. Cousins had come

24   left of center?

25 A  I believe he stated something to that effect.

1  Q  Okay.  And do you have any reason to believe that he

2     did not honestly believe that that tape does not

3     show Cousins coming left of center?

4  A  Can you rephrase that?

5  Q  Do you have any reason to believe that Mr. Alexander

6     does not honestly believe that the tape does not

7     show Cousins coming left of center?

8  A  I don't have any reason to believe that he does not

9     believe that.

10 Q  It wouldn't be an unreasonable interpretation of

11    that tape, would it?

12 A  To somebody who is not the chief of police and does

13    not have years of experience or should have years of

14    experience reviewing videotapes and understanding

15    perspective, then I suppose it would not be

16    reasonable.

17        But somebody who has had law enforcement

18    experience and should have the knowledge of

19    reviewing tapes and what perspective they do and do

20    not show, I think it is unreasonable.

21 Q  Do you know how many law enforcement officers have

22    viewed that tape and concluded that it does not show

23    Mr. Cousins going left of center?

24 A  I do not know how many they have shown.

25 Q  But in your judgment, every one of them has been

204

1  Q  Is he still there?

2  A  I believe so.

3  Q  Okay.  And you say he was not fired over misconduct.

4     What information do you have about his misconduct?

5  A  It is been brought to my attention a couple of times

6     that he has followed females from Starbucks and

7     around town, the ones that have college stickers,

8     and either pulled them over or ran their tags and

9     then added them on Facebook and instances of

10    communication with them.

11 Q  Who brought that to your attention?

12 A  The original person that brought it to my attention

13    was Ben Kale [phon] with the Kansas Highway Patrol.

14 Q  And when did Ben Kennel [sic] tell you about this?

15 A  Kale.

16 Q  Kale.  When did Ben Kale tell you about this?

17 A  He brought it to my brother Marc and a group of us

18    that he was approached by a young female who had

19    done it -- or had had it done to her.

20 Q  When?

21 A  I can't recall the date.

22 Q  Was it while you were still employed at the Colby

23    Police Department?

24 A  Yes.

25 Q  Okay.  And which brother did he bring it to?

Page 206

1   A   From when the incident occurred.  I believe that is

2       what Marc said had happened.

3   Q   Okay.  But you weren't there when anything was told

4       to Mr. Alexander about that?

5   A   I was not.

6   Q   Do you know what became of that?

7   A   From my understanding, Chief Alexander counseled

8       Bustillos and that was the end of it.

9   Q   Okay.  Did Mr. Kale tell you how he came about this

10      information?

11  A   The female victim had brought it to him, I believe.

12  Q   Okay.  One time?

13  A   That particular one, yes.

14  Q   Okay.  Did you receive any subsequent information

15      that there was any other females saying that this

16      had happened to them?

17  A   I believe that there was another female who said it

18      happened to them.  I don't believe they ever filed a

19      report.

20  Q   Okay.  So the only report you are aware of or have

21      any information getting to Chief Alexander is an

22      allegation that on one occasion this happened?

23  A   To my knowledge, yes.

24  Q   Okay.  Did you ever talk to Mr. Kale about this

25      again?

207

1  A  I don't recall -- not -- no, I haven't.

2  Q  Did you ever talk to Mr. Alexander about Chris

3     Bustillos?

4  A  I did not.

5  Q  Did you ever talk to any supervisors in the Colby

6     Police Department about Chris Bustillos?

7  A  I don't know whether I talked to -- I may have

8     talked to Kyle Askren about it, but I don't know

9     whether I did or not.

10 Q  Okay.  So you don't know what Kyle Askren said, if

11    anything?

12 A  No.  The other person that I knew -- I know knew

13    about it and we discussed it was Cole Andreasen, but

14    he wasn't a supervisor at the time.  He is

15    currently, to my understanding.

16 Q  How did Cole Andreasen know about it?

17 A  At the time he hated him.

18 Q  He hated who?

19 A  Chris.

20 Q  Chris Bustillos?

21 A  Yeah.

22 Q  Okay.  How does him hating him mean he knows what

23    Chris Bustillos is up to?

24 A  Because he hated him and we discussed -- I mean, he

25    would discuss that.  It wasn't a secret that this

216

1      leader.

2   A  I guess I may have misspoke on be the leader.  I

3      think he wanted to have the glory of putting the

4      cuffs on.

5   Q  Is that what he said?

6   A  He didn't say it specifically, but it was implied.

7   Q  What did he say his complaint with you was?

8   A  At what point?

9   Q  When he came up and complained about where you had

10     done this arrest or how this arrest had gone down.

11  A  He came up and was upset that we did it there

12     instead of in the middle of the trailer park.  That

13     is when the suspect was complaining that his leg was

14     hurt.

15              So I asked Sam, because I was in the

16     middle of a bunch of other stuff, if he would

17     transport him to the hospital just to get checked

18     out.  Sam takes him to the hospital and that is when

19     he called Ron and Ron called me up yelling at me.

20  Q  How did this arrest go down?  Did he get peacefully

21     out of the car?

22  A  It was -- he was assisted out of the vehicle, but it

23     was not --

24  Q  Who assisted him out of the vehicle?

25  A  I did.

217

1  Q  Okay.  Did you pull him out of the vehicle?

2  A  I assisted him out of the vehicle by taking his seat

3     belt off and helping him out and then setting him on

4     the ground.

5  Q  Setting him on the ground?

6  A  Lowering him to the ground.  I guess he wasn't

7     sitting.

8  Q  Face first, on his back, on --

9  A  He was on his belly.

10 Q  Okay.

11 A  We believed him to be armed and dangerous.

12 Q  Okay.

13 A  So that is why we took the precautions that we did.

14 Q  Did Mr. Steele ever voice any concern to you about

15    the force you had used in effecting that arrest?

16 A  He never addressed it with me.  He went straight to

17    Ron.

18 Q  How far away was Mr. Steele when you made the

19    arrest?

20 A  I don't know.  He was there as we were -- you know,

21    in the middle of it, he was there.

22 Q  Okay.  But you said something about he had put

23    himself where he would be out of it?

24 A  He -- if we could pull up the map I can show you.  I

25    believe he staged himself at the hospital because he

226

1    thought I would have heard about it.  But --

2  Q  Do you think you know about everybody's reprimands?

3  A  Usually it was discussed, but maybe not every single

4    one of them.

5  Q  Okay.  Let's go back to Exhibit 4.  Oh, before we

6    leave the Sam Steele thing.  Do you know exactly

7    what Sam Steele said to Mr. Alexander?

8  A  I do not.

9  Q  And do you remember what Mr. Alexander's exact words

10    were to you about Mr. Steele's allegation?

11  A  He never discussed the allegation that Sam made with

12    me other than saying that Sam claimed that I used

13    excessive force and Ron was upset that we had a

14    hospital bill now.

15  Q  Okay.  What was Jesse Hernandez' misconduct?

16  A  From my understanding, he was having an extramarital

17    affair with the head dispatcher, Andrea Davis, while

18    on duty.

19  Q  And what is your understanding based on?

20  A  I believe I talked to an employee at the time who

21    had rolled up on them behind the elevator.

22  Q  Okay.  And who was that employee?

23  A  Officer Chervoski.

24  Q  Okay.

25  A  I do not recall at the time whether he told me his

253

1    my head what I can think of right now.

2  Q  In the fall of 2015 and early 2016 before you

3    were -- resigned or were let go, did you have any

4    other issues that you were reprimanded for or

5    counseled for at the Colby Police Department?

6  A  Between when?

7  Q  Let's say between October of 2015 and February 17 of

8    2016.

9  A  I would have to look back at my personnel file and

10   see if there was.

11 Q  Okay.  Do you remember an issue with holding cell

12   phones?

13 A  I believe we were talked -- I was talked to about

14   that.  I don't remember if there was ever a formal

15   issue.

16 Q  Do you remember whether you were talked to about

17   that by your supervisors on more than one occasion?

18 A  I know we were -- we discussed it.  And there was

19   reasons for why I was behind on getting them.

20 Q  Well, we will get to that.  Right now the question

21   pending is:  Were you talked to about holding cell

22   phones that had been seized in arrests by your

23   supervisors -- let me re-ask it.

24         Were you talked to by your supervisors

25   about holding cell phones inappropriately or for

254

1    inappropriate long periods of time on more than one

2    occasion?

3  A  I believe it happened a couple of times.

4  Q  Okay.  When do you recall the first time?

5  A  I don't recall when.  I remember it being in the

6    squad room, but I don't remember when it happened.

7  Q  And was the issue that you would take phones from

8    suspects and, instead of logging them into evidence,

9    you had them in a file drawer somewhere?

10  A  I would put them with the case jacket in my filing

11    cabinet in an evidence bag and I just -- there is

12    times I didn't get an ECR or get them logged into

13    the evidence locker because I was in the process of

14    trying to work on search warrants for them.

15  Q  Okay.  What is the longest you held one like that?

16  A  I don't recall.

17  Q  Could it have been as high as months?

18  A  I was doing so many of them at the time, it possibly

19    could have.

20  Q  Did you ever tell your supervisors when they talked

21    to you about it that you didn't need to do anything

22    different with them than what you were doing?

23  A  I don't know whether I said that or not.

24  Q  Is that possible?

25  A  I mean, I understood the protocol.  I may have tried