## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| LANCE FINLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 6:17-cv-1215-EFM-KGG |
| | ) | |
| CITY OF COLBY, KANSAS and | ) | |
| RON ALEXANDER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN OPPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court should overrule Defendants City of Colby, Kansas and Ron Alexander's Motion for Summary Judgment (Doc. 132) based upon genuine issues of material fact and send Plaintiff Lance Finley's claims of First Amendment retaliation, and common law retaliation, to trial. Highly summarized, Defendant Alexander concedes he is unclear about the falsity of Finley's report about Cousins, his assumption that the report was politically motivated was unfounded and not made in good faith, and a host of other circumstances and misconduct at City of Colby show that there are two sides to this story. Ultimately, a jury trial will be required to decide Finley's claims.

### I.      Response to Defendants' Statement of Facts

Uncontroverted: 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 14, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 46, 48, 49, 50, 51, 52, 53, 54, 55, 59, 60, 61, 62, 63, 67, 68, 69, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 95, 98, 99, 100, 101, 103, 111, 114, 115, 116, 118, 120, 121, 122, 123, 124, 125, 127, 129, 130, 131, 132, 134, 135, 136, 137, 138, 139.

8.     Controverted in part.  Finley controverts the implication that he knew Jim Cousins was driving the Tahoe.  At the time Finley encountered the Tahoe, Finley did not know who was driving it.  Finley Depo., 60:22-61:2 (Ex A).

13.     Controverted in part.  The cited testimony does not support Defendants' implication that *Finley* was aware of the rumor that Jim Cousins was going to get Marc Finley old job (Undersheriff of Thomas County, Kansas).  To the contrary, the cited testimony shows *Alexander's* attribution of Finley's January 15, 2016 actions to that rumor.

15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25 & 26.  Regarding Finley's phone call to dispatch on January 15, 2016, Plaintiff does not controvert the authenticity of the recording or what was said.  However, Defendants have pointed to no admissible evidence that Defendant Alexander ever listened to the call to dispatch. Plaintiff therefore controverts the implication that the audio recording contained in the call to dispatch was material to the decision to terminate Finley, and Plaintiff objects to the recording on this basis.

43.     Controverted.  Finley testified he could not point to any specific place in the video where Cousins was traveling at an unsafe speed.  Finley testified that the Tahoe "absolutely" travelled above the posted rate of speed.  Finley Depo., 161:9-15(Ex A).

45.     Controverted.   Finley testified through written interrogatory responses, served before his deposition, about dozens of instances in the video where the Tahoe appears to crowd the fog line, if not cross the center line.  Finley Resp. to Interrog. No. 22 (Ex B).  Additionally, the testimony Defendants cite for this proposition must be read in light of the testimony immediately before.  Specifically, Finley testified the video could not *conclusively* tell where the camera was in relation to the center line.  Finley Depo., 86:11-20 (Ex A).  After that statement, Defendants

simply confirmed that Finley could not say *for sure* whether the Tahoe crossed the center line. Finley Depo., 86:21-87:2 (Ex A).

47.     Controverted.  By watching the video from the Tahoe of the January 15, 2016 video, Tom Nickols observed Cousins commit at least three unique violations of traffic laws.  Nickols Depo., 31:14-31:25 (Ex C).  Nickols did not do anything about the violations the observed Cousins commit on the January 15, 2016 video.  Nickols Depo., 31:22-25 (Ex C).

56.     Controverted.  Alexander admitted to Kraig Cersovsky that the video was not conclusive as to whether the Tahoe crossed the center line.  Cersovsky Depo., 20:4-21:10; 63:16-64:2 (Ex D).  Alexander sent the video from the Tahoe to Kansas C Post for their review, and he wrote "I was just looking for some confirmation that what we saw or didn't see had an agreement with a third party's perspective," which is inconsistent with the firm conclusion that the Tahoe never crossed the center line or that Finley was deceitful.  Alexander Email to CPost, Depo. Ex. 27 at DEF 494 (Ex E).  Alexander initially characterized Finley's January 15, 2016 report as unsubstantiated, which does not necessarily mean Finley's report was deceitful.  Alexander Depo., 107:18-22 (Ex F).  Finally, though Alexander claims he had concerns about Finley's integrity due to the Tahoe video, and he "knew everything he needed to know," he nonetheless allowed Finley to go out on a drug buy operation that night.  Alexander Depo., 137:2-139:16 (Ex F).  This behavior by Alexander is inconsistent with the stated genuine belief that Alexander had concerns about Finley's integrity.

57.     Controverted.  Finley incorporates by reference his response to SOF No. 56.

58.     Controverted.  The other officer's opinion, as stated, is hearsay.  Further, Finley incorporates by reference his response to SOF No. 56 as it pertains to Alexander's assessment of the video.

64.     Controverted in part.  Finley incorporates by reference his response to SOF No. 56 as it pertains to Alexander's opinions about the Tahoe video.

65.     Controverted.  Finley testified he has genuine doubts about the sincerity of Alexander's beliefs concerning the Tahoe video.  Finley Depo., 199:17-200:9 (Ex A).  Finley also testified through written interrogatory responses, served *before* his deposition, about dozens of instances in the video where the Tahoe appears to crowd the fog line, if not cross the center line. Finley Resp. to Interrog. No. 22 (Ex B).  Finley incorporates by reference his response to SOF No. 56 as it pertains to Alexander's opinions about the Tahoe video.  Finally, this is controverted because Alexander's credibility is impaired and, by his own admission, he has memory issues. SOF 140, 141.

66.     Controverted is the implication that the separation was voluntary.  Finley's separation from employment was involuntary.  Stipulation, Doc. 108.

70.     Controverted in part.  Finley acknowledges the quoted job duties as stated ("report public safety or traffic hazards and other items requiring attention by other departments"), but Finley was *off duty* when he made the report on January 15, 2016.  Finley Depo., 52:11-25 (Ex A). According to the City of Colby's employee handbook, employees are only supposed to work when scheduled or when requested by a supervisor.  Employee Handbook, Depo. Ex. 13, at DEF 335-38 (Ex G).

94.     Controverted.  The cited deposition testimony shows Finley stating it "possibly" could have been months.  Finley Depo., 254:17-19 (Ex A).

97.     Controverted.  Defendant Alexander expressly told Finley that his termination was political.  Alexander Depo., 46:8-10 (Ex F).  But in response to interrogatories, Defendants *denied*

ever having fired anyone in 2016 due to political considerations.  Defs.' Resp. to Interrog. No. 4 (Ex H).

Alexander believed, without any justification, that Finley made the report about Jim Cousins because of a rumor that Jim Cousins would be the next Undersheriff of Thomas County.[1] Alexander Depo., 48:6-18 (Ex F).  Defendant Alexander and Jim Cousins were old drinking buddies and they used to chase women together, which supports Alexander's assertion that the termination of Lance Finley was political.  Marc Finley Decl., ¶ 4 (Ex I); Cousins Depo., 30:1-14 (Ex J).  In fact, Defendant Alexander had previously overrode Lance Finley's attempt to write Jim Cousins a ticket for driving down the road in Colby with a windshield almost completely covered in snow, in November 2015.  Finley Depo., 37:12-38:25; 41:8-12 (Ex A).

It is further controverted that Defendants would have terminated Finley over the cell phone issue, in the absence of his report of Cousins' driving on January 15, 2016.  Defendant Alexander testified that he discovered that Finley had been holding a suspect's cell phone on February 12, 2016.  Alexander Depo., 63:18-64:2 (Ex F).  Alexander was asked in his deposition whether the decision to terminate Finley was made when he discovered that Finley kept cell suspects' cell phones and he gave an evasive answer.  He refused to answer, instead stating it was the "totality" of circumstances that led to Finley's termination.  Alexander Depo., 60:19-61:4 (Ex F).  Alexander went on to testify that "the ultimate date" that Alexander decided to terminate Finley was the date he received the Tahoe dashcam video of the January 15, 2016 encounter.  Alexander Depo., 61:23-62:2 (Ex F).  Alexander was asked whether there was any documentation of his "working towards" Finley's termination, based upon the February 12, 2016 discovery of the cell phones, and

---

[1]  Also Defendants have provided no evidence that Finley knew Cousins was driving the Tahoe when he called it in (see response to Defendants' SOFs 8, 13) or that Alexander bothered to ask Finley about his understanding of who was driving at the time he made the call.

Alexander obfuscated, only referring to the personnel file.  Alexander Depo., 61:4-11 (Ex F).  When asked whether the decision to terminate Finley was triggered by him having a suspect's cell phone on his desk, Alexander again obfuscated by testifying "it was a continuing factor." Alexander Depo., 62:12-23 (Ex F).

City Manager Tyson McGreer testified that the decision to terminate Finley was a joint decision between Defendant Alexander and Tyson McGreer, City Manager of Colby.  McGreer Depo., 68:11-13 (Ex K).  McGreer remembers talking about the issue of Finley holding cell phones, but he does not believe termination was discussed in connection with holding cell phones. McGreer Depo., 67:2-68:1 (Ex K).

Cole Andreason would hold narcotics and phones in the filing cabinet pending processing into evidence.  Lance Finley Decl., ¶ 4 (Ex L).  The practice was permitted by City of Colby to the point that the County Attorney's office would make deals with defense attorneys to give back cell phones pending completion of their cases.  Lance Finley Decl., ¶ 4 (Ex L).

Finally, this is controverted because Alexander's credibility is impaired and, by his own admission, he has memory issues.  SOF 140, 141.

102.    The implication that Finley knowingly withheld information is controverted.  As Finley testified, he knew his brother Marc Finley took the issue directly to Alexander.  Finley Depo., 205:20-24 (Ex A).

104 & 105.    Controverted.  Marc Finley specifically told Defendant Alexander the name of the victim.  Marc Finley Decl., ¶ 6 (Ex I).  Finally, this is controverted because Alexander's credibility is impaired and, by his own admission, he has memory issues.  SOF 140, 141.

106.    Controverted.  Defendants were asked in Interrogatory No. 8, as modified, if they were aware of any alleged misconduct by Officer Bustillos concerning using NCIC computer

systems to obtain the names and addresses of women; and if so, identify the misconduct, the date, to briefly explain the investigation, and the outcome of the investigation.  Defendants responded, "Chief Alexander heard allegations of this.  He confronted Mr. Bustillos, who denied it."  Defs.' Supp. Resp. to Interrog. No. 8 (Ex M).  *Only after Defendants appreciated the significance of Bustillos' misconduct later in this case,* Defendants claimed there was an investigation into Bustillos' misconduct.  Further, Alexander has misrepresented whether he knew the name of the victim (see Resp to Defs.' SOF 104 & 105).  A reasonable factfinder could certainly disbelieve Defendants' version of events.

107.    Controverted.  Defendants were asked in Interrogatory No. 8, as modified, if they were aware of any alleged misconduct by Officer Bustillos concerning using NCIC computer systems to obtain the names and addresses of women; and if so, identify the misconduct, the date, to briefly explain the investigation, and the outcome of the investigation.  Defendants responded, "Chief Alexander heard allegations of this.  He confronted Mr. Bustillos, who denied it."  Defs.' Supp. Resp. to Interrog. No. 8 (Ex M). Only after Defendants appreciated the significance of Bustillos' misconduct later in this case, Defendants first asserted there was an investigation. Further, Alexander has misrepresented whether he knew the name of the victim (see resp to Defs.' SOF 104 & 105). A reasonable factfinder could disbelieve Defendants' version of events.

109.    Controverted in part.  Alexander did not address the issue of Bustillos sending facebook friend requests to the women whose plates he ran, which was the whole point of the victim's complaint that was relayed to Defendant Alexander.  Bustillos Depo., 19:15-19 (Ex N).

110.    Controverted.  A reasonable factfinder could disbelieve Bustillos' assurance that he engaged in no misconduct, because Defendants specifically state that Bustillos was *written up* over this incident.   Defs.' SOF No. 113.

112.    Controverted.  In this testimony, Finley was clearly referring to was referring to the Defendant Alexander's alleged counseling of Bustillos over misusing the NCIC license plate lookup to send friend requests on facebook (not the "accidental" friend request that Bustillos sent to someone in connection with his "investigative work").  Finley Depo., 203:23-206:8 (Ex A).

113.    Controverted in part.  It is uncontroverted that discovery in this lawsuit established Bustillos misused the NCIC system to look up women to pursue them on Facebook.

Defendants' assertion that Bustillos was "written up" over abuse of the NCIC system is controverted.  Defendants cite paragraph 18 of Defendant Alexander's Affidavit for the assertion that Bustillos was "written up" over his misuse of NCIC resources.  Paragraph 18 of Alexander's Declaration belies this assertion:

> 18. During discovery in this case new information about a single incident  involving Chris Bustillos came to light.  While I do not think the allegation was actually proven, I have required Officer Bustillos to retake CJIS training from the Kansas Highway Patrol training related to the use of NCIC computer.

Alexander Decl., ¶ 18, Doc. 133-1.  The Affidavit *does not say* that Bustillos was written up. Further, the affidavit reflects Defendants' belief that Bustillos did not engage in misconduct.  A reasonable factfinder could determine from Defendants' SOF No. 113 that Defendants are being dishonest about the Bustillos incident.

116.    Controverted in part.  Finley does not dispute that Steele made a report against Finley alleging use of force over the Aaron Taylor incident.  It is controverted that the report was true.  Officer Cersovsky was present at the arrest of Aaron Taylor and he observed no excessive force being used.  Cersovsky Depo., 30:2-32:1 (Ex D).  More importantly, Defendant Alexander admitted to Colby Communications Specialist Keyna Baalman that Corporal Steele *had not told*

*him the truth* about what happened during the arrest of Aaron Taylor.  Baalman Decl., ¶¶ 3-4 (Ex O).

117.    Controverted.  Use of force was part of the complaint that Sam Steele submitted to Defendant Alexander.  Alexander Depo., 122:10-18 (Ex F).  Defendant Alexander admitted to Colby Communications Specialist Keyna Baalman that Corporal Steele had not told him the truth about what happened during the arrest of Aaron Taylor.  Baalman Decl., ¶¶ 3-4 (Ex O).

119.    Controverted.  Steele does not remember specifically what he said.  Steele Depo., 33:1-12 (Ex P).  Finally, this is controverted because Alexander's credibility is impaired and, by his own admission, he has memory issues. SOF 140,

141.    Defendant Alexander admitted to Colby Communications Specialist Keyna Baalman that Corporal Steele had not told him the truth about what happened during the arrest of Aaron Taylor.  Baalman Decl., ¶¶ 3-4 (Ex O).  From Keyna Baalman's understanding, Defendant Alexander's acknowledgment that Steele had lied to him, concerned Finley's alleged use of excessive force.  Baalman Decl., ¶¶ 3-4 (Ex O).

126.    Controverted.  Both Sherry and Terry Overtons were implicated by the subject text messages.  Lance Finley Decl., ¶¶ 2-3 (Ex L).

128.    Controverted is the implication that *Defendant Alexander* did not have supervisory authority over Bob Herron.  To the contrary, the position of corporal at City of Colby Police Department is a supervisory position.  Alexander Depo., 15:22-16:1 (Ex F); see also Defs.' SOF NO. 130 (referring to Sam Steele as a supervisor).

133.    Uncontroverted that Corporal Steele gave this testimony, but it is controverted because a reasonable jury could disbelieve it.  First, Defendant Alexander admitted that Corporal

Steele lied to him about Finley in the Aaron Taylor Arrest.  Baalman Decl., ¶¶ 3-4 (Ex O).  Steele's testimony can be disregard because Defendants themselves have acknowledged he is not honest.

## II.      Plaintiff's Statement of Additional Facts

140.     Defendant Alexander admitted to Marc Finley that (i) he has trouble remembering things under stress; (ii) he has trouble remembering things in chronological order under stress; and (iii) he has no short-term memory.  Marc Finley Decl. ¶ 7 (Ex I).

141.     Defendant Alexander gave a recorded interview to the KBI in 2015 regarding a shooting incident involving Charles Dewey.  Alexander Depo., 66:5-67:21 (Ex F).  A clip from the recording of that interview, attached as Ex. Q, is authenticated 67:12-18 of Alexander's Deposition (Ex F).  In the clip from the interview, Alexander stated: "I have had two open heart surgeries, one of those was last summer, and I had a stroke with it, and so I have, these finite details that happened in between, and everything that I've told you, I mean, *tomorrow I might remember a little bit more, but I kind of struggle with those details.*"  Clip from KBI Interview of Defendant Alexander (Ex Q).

142.     In September 2015, Marc Finley sent a letter to the Thomas County Board of County Commissioners outlining misconduct by Sheriff Taylor, including:

a)  Working under the influence of alcohol.  Letter, Ex. A to Marc Finley Decl. at 1-2 of 7 (Ex I).

b)  Getting into car accidents in his County vehicle. Letter, Ex. A to Marc Finley Decl. at 1-3 of 7 (Ex I).

c)  Cutting off the seatbelt of his County vehicle.  Letter, Ex. A to Marc Finley Decl. at 1-2 of 7 (Ex I).

d) Soliciting sexual encounters from public employees and sexually harassing them. Letter, Ex. A to Marc Finley Decl. at 3 of 7 (Ex I).

e) Entering a private residence without a warrant and without exigent circumstances, and unlawfully arresting the occupant.  Letter, Ex. A to Marc Finley Decl. at 4 of 7 (Ex I).

f) Threatening physical violence towards inmates (including the threat to shove a broom up one inmates's ass), and striking a staff member with a baton while attempting to unlawfully strike an inmate.  Letter, Ex. A to Marc Finley Decl. at 4 of 7 (Ex I).

g) Removing his gun from his service holster, to show off to inmates during prisoner transports.  Letter, Ex. A to Marc Finley Decl. at 5 of 7 (Ex I).

h) Destroying evidence in ongoing cases.  Letter, Ex. A to Marc Finley Decl. at 6 of 7 (Ex I).

i) Placing male and female detainees in the same jail cells.  Letter, Ex. A to Marc Finley Decl. at 6 of 7 (Ex I).

j) Billing the County for conferences that he did not attend.  Letter, Ex. A to Marc Finley Decl. at 6 of 7 (Ex I).

143.    Marc Finley's employment with Thomas County, Kansas was separated in October 2015 after he submitted the letter documenting serious misconduct by Sheriff Rod Taylor.  Marc Finley Decl., ¶ 1 (Ex I); "Documentation Concerning Lance Finley", filed with Defs.' MSJ, Doc. 133-1, p. 5 (stating Marc Finley was terminated from Thomas County).

144.    Defendant City of Colby's policies provide that Department Heads (like Defendant Alexander) shall review the compensation of all employees annually, and to provide merit raises

if warranted.  Alexander Depo., 25:23-26:18 (Ex F); Employee Handbook, Depo. Ex. 13, at DEF 338 (Ex G).

145.    The annual compensation review shall take into consideration personnel records, tardiness and absenteeism, performance and length of service.  Alexander Depo., 26:19-23 (Ex F); Employee Handbook, Depo. Ex. 13, at DEF 338 (Ex G).

146.    Things that prevent employees at the Colby P.D. from receiving a merit raise include "quality of work, inability to turn reports in on time, tardiness, teamwork, [and] overall attitude," among other things.  Alexander Depo., 28:21-29:5 (Ex F).

147.    In Finley's October 2015 evaluation, Defendants rated his overall performance between "satisfactory" and "good."  McGreer Depo., 38:22-39:1 (Ex K).

148.    Finley received a promotion *and* a raise because of his October 2015 evaluation. Alexander Depo., 111:5-10 (Ex F).

149.    It is a terminable offense at City of Colby to issue mandates to police officers not to enforce ordinances against an individual.  McGreer Depo., 59:10-17 (Ex K).

150.    In 2015, Defendant Alexander instructed his staff not to enforce traffic ordinances against Sheriff Taylor.  Davis Depo., 23:3-18 (Ex R); Cersovsky Depo., 32:12-33:14 (Ex D).

151.    While Defendant Alexander was the supervisor of Bob Herron, he was aware of Herron's storage of six kilograms of cocaine at his personal residence.  Marc Finley Decl., ¶ 5 (Ex I).  Defendant Alexander admitted this was wrong, but he never did anything about it.  Marc Finley Decl., ¶ 5 (Ex I).

152.    At some point in the summer of 2014, Finley discovered text messages on the phone of a drug dealer implicating City of Colby employee Terry Overton and his wife Sherry Overton

in narcotics purchases.  Lance Finley Decl., ¶ 2 (Ex L).  Finley reported the issue to Defendant Alexander.  Lance Finley Decl., ¶ 2 (Ex L).

153.   Defendant Alexander instructed Finley to refrain from following up on these leads implicating the Overtons.  Lance Finley Decl., ¶ 2 (Ex L).

154.   City Manager McGreer admits that he "talked to" Defendant Alexander about the subject narcotics investigation.  McGreer Depo., 43:6-11 (Ex K).

155.   Defendant Alexander did CrossFit two to three times per week at the gym where Sherry Overton worked in 2014.  Alexander Depo., 73:24-74:20 (Ex F).  City Manager McGreer attended CrossFit with the Overtons as well.  McGreer Depo., 43:1-2 (Ex K).

156.   It was well known in Colby, Kansas, that the Overtons were social friends of City Manager McGreer.  Lance Finley Decl., ¶ 3 (Ex L).

157.   In 2015, Defendant Alexander reported Thomas County Sheriff Rod Taylor to the Kansas Department of Revenue for a drivers license review due to automobile accidents involving Sheriff Taylor. Marc Finley Decl., ¶ 8 (Ex I); Alexander Depo., 149:20-150:13 (Ex F).

158.   Alexander testified that he repeatedly advised Finley to stay out of politics. Alexander Depo., 47 (Ex. F).

159.   In November 2015, Finley was on duty and he encountered Jim Cousins driving his truck on the public streets, with his windshield almost completely covered in snow.  Finley Depo., 38-40 (Ex A); Photo of Cousins' truck, Depo. Ex. 22 (Ex S).  Defendant Alexander instructed Finley not to write Cousins a ticket, but to issue him a warning instead.  Finley Depo., 37:12-38:25; 41:8-12 (Ex A).

160.     During Finley's call to dispatch on January 15, 2016, Finley told Jake Cox there's no way he could pace the speed of the blue Tahoe.  *1/15/16 dispatch recording*, 3:56-4:02 (Def. Ex. B).

161.     During the encounter on January 15, 2016, Finley went across the fog line on the side of the road, and the ditches on the road are extremely deep.  Finley Depo., 69:20-70:2 (Ex A).

162.     Finley's tires left the pavement during the encounter on January 15, 2016.  Finley Depo., 70:3-5 (Ex A).

163.     The ditches on the road where the encounter occurred on January 15, 2016 are extremely deep.  Finley Depo., 69:25-70:2; 70:5-12 (Ex A).

164.     Tom Nickols became the Undersheriff of Thomas County, Kansas, on December 1, 2015.  Nickols Depo., 5:18-6:1(Ex C).  This is the position Finley's brother Marc Finley held until October 2015.

165.     Tom Nickols has anger issues.  Nickols Depo., 61:19-21 (Ex C).

166.     Alexander testified as follows about his discussions with Tom Nickols about Lance Finley on February 17, 2016, concerning Nickols' plans

Q: Okay. So you reported to Tom Nickols that Mr. Finley's employment was over, right?

A: That -- later that day, yes.

Q: And that is when he told you --

A: On the 17th.

Q: And that is when he told you, ok, we are not going to be filing a criminal case?

A: I asked him at that point, I said, hey, just so you know, I gave Lance an opportunity to resign, he accepted that, he has turned in his verbal resignation, are you guys looking at going any further with this case, and he said no, he is not.

Q: Okay. So when Tom Nickols learned that Mr. Finley's employment was separated, he said he would not be looking into any type of filing a case?

A: ***That was the impression he gave me.***

Alexander Depo., 98:5-20 (emphasis added) (Ex F).

167.    Tom Nickols failed to adhere to traditional chain of custody requirements for the video of encounter of January 15, 2016.  Nickols Depo., 67:11-17 (Ex C).

168.    By watching the video from the Tahoe of the January 15, 2016 video, Tom Nickols observed Cousins commit at least three unique violations of traffic laws.  Nickols Depo., 31:14-31:25 (Ex C).

169.    Nickols did not do anything about the violations the observed Cousins commit on the January 15, 2016 video.  Nickols Depo., 31:22-25 (Ex C).

170.    Former Thomas County Sheriff Rod Taylor's wife put an ad in the newspaper praising Finley's termination from City of Colby.  Finley Depo., 199:17-200:9 (Ex A).

171.    Finley's separation from employment was involuntary.  Pretrial Order, Stipulated Facts, Doc. 129 at pp. 2-3.

172.    City of Colby policy provides the following type of misconduct that results in discipline or termination: "The employee takes or accepts, or attempts to take or accept, for personal use, profit or gain, from any person or entity, any fee, tip, gift, reward, gratuity, or other thing in the course of his or her work in connection with it."  Employee Handbook, Depo. Ex. 13, at DEF 359 (Ex G).

173.    City of Colby policy provides, "no employee shall take or accept anything including, but not limited to, any gratuity, loan, money, goods, or services, when the employee knows, or should know, that such things are intended, directly or indirectly, to influence the employee in the discharge of his or he duties as a City employee."  Employee Handbook, Depo. Ex. 13, at DEF 360 (Ex G).

174.     Sam Steele read the City of Colby's policy on gratuities when he was hired.  Steele Depo, 39:6-12 (Ex P).

175.     As part of his work at City of Colby, Steele would visit the local movie theatre, on duty, to make sure the girls are OK when they leave the theatre at the end of the night.  Steele Depo, 36:18-37:6 (Ex P).

176.     The movie theatre employee would give Steele popcorn and movie tickets, which Steele knew were gratuities.  Steele Depo., 37:18-38:7 (Ex P). Steele claimed he did not know how many times he had accepted gratuities from the movie theater.  Steele Depo., 38:20-21 (Ex P).

177.     Despite the plain language of City of Colby's policies, City Manager Tyson McGreer could not agree that conduct like Steele's amounted to a violation of the City's prohibition against gratuity.  McGreer Depo., 17:2-23 (Ex K).  McGreer insinuated there was a dollar-value threshold for when a gratuity violates the City's prohibition against accepting gratuities, but he could not say what it was.  McGreer Depo., 17:2-23 (Ex K).

178.     On one occasion, Steele drove to work on one occasion as a City of Colby police officer in such a state that people thought he was intoxicated.  Steele Depo., 18:7-19:10 (Ex P). He took a breathalyzer test.  Steele was asked "is it your understanding that it was determined that you were intoxicated?" and he responded, "My understanding, *it appeared that it would.* I was never shown and I don't know."  Steele Depo., 19:7-17 (emphasis added) (Ex P).  Steele was asked to leave work afterwards.  Steele Depo., 18:11-12.

179.     On March 1, 2016, Steele was interviewed by Cody Honas of the Kansas Highway Patrol regarding Lance Finley's application for employment with KHP.  KHP reference check,

Depo. Ex. 30 (Ex T)[2]; Steele Depo., 15:24-16:4 (Ex P) (authenticating notes of KHP's interview of Steele about Finley).

180.    Steele told Honas he would *not* trust Finley because Finley would tell his brothers confidential information.   KHP reference check, Depo. Ex. 30 (Ex T); Steele Depo., 16:5-15 (Ex P).

181.    When asked what kind of confidential information Finley had told his brothers, he responded, "I don't recall any specifics."  Steele Depo., 16:5-19 (Ex P).

182.    Honas asked Steele whether he had seen Finley do anything morally improper, and Steele responded that "he had both seen and heard Mr. Finley pushing the legality of some traffic stops," and that Steele "went on to say that some of [Finley's] traffic stops lacked violations / probable cause." KHP reference check, Depo. Ex. 30, p. 3 (Ex T).

183.    When asked to explain this in his deposition, Steele testified "on the traffic stop, *I don't have a problem with anything that he – I never heard of anything that he had done.  I think his traffic stops were legitimate."*  Steele Depo., 22:19-23:3 (emphasis added) (Ex P).

184.    Steele was asked in his deposition: "Did Lance Finley push the legality of some traffic stops?"  Steele responded: "Of the probable cause traffic stops, no, he did not.  Not that I know of."  Steele Depo., 23:12-17 (emphasis added) (Ex P).

185.    Steele ultimately recanted, and he admitted that Finley did *nothing wrong* in terms of traffic stops.  Steele Depo., 24:15-21 (Ex P).

186.    Ron Alexander attended Steele's deposition.  Steele Depo., 1-2 (Ex P).

187.    There is nothing in the summary-judgment record indicating that Steele was punished or terminated for lying to the KHP about Finley.

---

[2]   Defendants listed the KHP interview documents as exhibits that they intend to use at trial.  Defs.' Supp. Rule 26(e) Disclosures, p. 3 (Ex. U).

188.    Witness JS[3], then a student at the community college in Colby, went to get coffee at Starbucks and then drove to school.  JS Depo., 4:24-6:5; 6:12-22 (Ex V).  She received a Facebook friend request from Officer Chris Bustillos after she was followed by the police vehicle to school.  JS Depo., 5:20-22 (Ex V).  This occurred sometime between 7:00 and 8:00 am in the morning.  JS Depo., 18:18-21 (Ex V).

189.    JS could not give a specific date for the event but testified it occurred while she was a student at the community college in Colby, between August 2014 and August 2015, likely during the spring semester of 2015.  JS Depo., 36:6-19 (Ex V).  JS did not attend the college after August 2015.  JS Depo., 11:12-16 (Ex V).

190.    JS was upset because she suspected that Officer Bustillos because it appeared to her that Bustillos had run her tag to pursue her.  JS Depo., 9:20-10:11 (Ex V).

191.    JS reported her concern to Ben Kahle, a member of the law enforcement community.  JS Depo., 9:10-14 (Ex V).

192.    Chris Bustillos is designated as Officer 107 at the City of Colby Police Department.  Lance Finley Decl., ¶ 5 (Ex L).

193.    Defendants have produced records demonstrating that Officer Bustillos ran Witness JS' tag at 7:37 AM on February 3, 2015.[4]  Email requesting tag identified by JS (disclosing tag number to Defendants' counsel) (Ex W); Email enclosing search for tag disclosed by JS (Defendants providing KBI Archive & Retrieval Details Report) (Ex X); Defendants' 2nd Supp.

---

[3] To protect the identity of this witness, a nonparty to this litigation, Finley is seeking permission documents connected with Witness JS under seal. That motion is being filed separately.

[4] Finley has provided the best evidence he can to support this point in light of the context.  After the close of discovery, Defendants began producing logs to substantiate their position that Bustillos did not abuse his authority to look up license plates to pursue women.  Through that dialogue referenced in the cited emails, Finley was able to confirm Bustillos' misconduct.  Defendants agree, as they represent in SOF No. 113 that Bustillos was "written up" because additional information was made available substantiating the allegation against Bustillos.

Disclosures (listing the KBI Archive & Retrieval Details Report as a document Defendants will use in this case) (Ex Y); City of Colby Dispatch Log 2/3/2015, DEF 1656 (demonstrating tag search by Bustillos) (Ex Z); KBI Archive & Retrieval Details Report, DEF 3165 (same) (Ex AA).

### III.      Argument

#### A.  Legal standards applicable to motions for summary judgment.

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. Fed. R. Civ. P. 56(a). The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.*

Credibility determinations are reserved for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact." Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2726 (3d ed.); *see also State Farm Mut. Auto. Ins. Co. v. Farm Bureau Mut. Ins. Co.*, No. 08-1375-WEB, 2010 WL 2544940, at *10 (D. Kan. June 18, 2010) (denying summary judgment because the court cannot make credibility determinations about the witnesses).

Thus, although the Court should review the record as a whole*, it must disregard all evidence favorable to the moving party that the jury is not required to believe*. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000)[5] (emphasis added). That is, the Court should give

---

[5] The standard for summary judgment mirrors the standard for judgment as a matter of law. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).

credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from *disinterested* witnesses." *Reeves*, 530 U.S. 133, 151 (emphasis added).

### B. A reasonable jury could determine that Defendants violated Finley's rights under the First Amendment when it fired him based upon his report of Cousins' erratic driving.

Defendants have correctly stated the standards applicable to First Amendment claims at the bottom of page 17 and the top of page 18 in their memorandum brief (Doc. 133).

#### 1. A reasonable factfinder could conclude that Plaintiff's report of Jim Cousins' driving to Defendant Alexander on January 15, 2016 was substantially true.

Defendants' chief contention is that Finley's report that the blue Tahoe crossed the center line and ran him off the road on January 15, 2016 is false.[6]  Finley's interrogatory responses and testimony cited above demonstrate the following about the encounter on January 15, 2016: (i) Finley perceived that Cousins' vehicle crowded, if not crossed, the center line; and (ii) Finley's tires left the pavement.  This is entirely consistent with Finley's communication to Defendant Alexander.  By analogy to the law of defamation, a statement will be deemed "substantially true" as long as the "gist" or "sting" of the defamation is true.  Smolla & Nimmer on Freedom of Speech § 23:8 (2019).  At bottom, there are factual disputes whether Finley's report about Cousins driving was substantially true.

---

[6]  The Court ruled in its Memorandum & Order of July 19, 2018, that Defendants had not stablished that Alexander listened to the recording of Finley's call to dispatch on January 15, 2016.  Doc. 65, p. 11, n. 32.  Now, at summary judgment, Defendants *still* fail to point to specific evidence demonstrating that Defendant Alexander listened to the recording of Finley's call to dispatch, or even requested or read a transcript of it, and determined it was false.  *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004) (addressing decision maker's knowledge in the termination context). Instead, Defendant Alexander knew that Finley had reported that Cousins crossed the center line and ran him off the road.  "2/19/2016 Documentation Concerning Lance Finley", filed at Doc. 133-1, p. 5.

The video evidence does not "blatantly contradict" Finley's report to Alexander. *See Estate of Ronquillo by & through Estate of Sanchez v. City & Cty. of Denver*, No. 16-1476, 2017 WL 6422342, at *2 (10th Cir. Dec. 18, 2017). First, the video is taken from the perspective of the *Tahoe*, not Finley's vehicle. Defendants are free to count the seconds and put stickers on the monitor, but none of those activities will replicate what Finley observed.

Defendant Alexander himself admitted he could not tell conclusively whether the Tahoe crossed the center line in the video. This is consistent with Alexander's initial reaction of reviewing the video, that Finley's report was "unsubstantiated." Now Alexander tells the Court that Finley is a liar and he is deceitful, and that Finley reported the Tahoe because of rumors that Cousins was going to get Marc Finley's old job of Undersheriff of Thomas County.

If Defendant Alexander could not tell conclusively whether Cousins crossed the center line on a road steep ditches flanking each side, how can the Court? Likewise, If Defendant Alexander could not conclusively determine whether Finley's vehicle left the road, how can the Court conclusively determine that? If Defendant Alexander believed that Finley reported Cousins for political reasons, wouldn't he have bothered to ask him about it and learn that Finley didn't even know who was driving the Tahoe when he called it in? *See Waters v. Churchill*, 511 U.S. 661, (1994) (reasonable municipal manger should at least inquire what employee said before imposing adverse action on the basis of potentially protected speech).

Further, Defendant Alexander has a personal bias because he and Cousins are old drinking buddies. If there is any question about this issue, summary judgment must be denied because of crippling issue with Alexander's credibility in the next section.

> **2. A reasonable factfinder could conclude that Defendant Alexander's credibility is substantially impaired; it would be impossible to make determinations as a matter of law based upon his testimony.**

Defendant Alexander admits that his memory is poor, and that he struggles with details under stress.  In addition to memory issues which impair the validity of his testimony, Defendant Alexander has substantial credibility issues based on this summary-judgment record:

a)   Alexander admitted to Keyna Baalman that Sam Steele lied about Finley's use of force during the Aaron Taylor incident, and he did nothing about it.

b)   Alexander watched Sam Steele give testimony in his deposition that was entirely at odds with what Steele hold the KHP about Finley.  Alexander did nothing about it.

c)   Alexander admitted that a subordinate stored six kilograms of cocaine at his residence, and he did nothing about it.

d)   Alexander suppressed an investigation into narcotics purchases, and a fair inference is that he did so to protect his and Tyson McGreer's CrossFit friends.

e)   Alexander represented to the Court that Officer Bustillos was written up over abusing the NCIC system to pursue women (SOF 113), yet his underlying affidavit says nothing to that effect. To the contrary, Alexander testified that he doubts that the event was ever proven.

f)   Alexander claims he investigated the Bustillos incident when he learned about it, but his Interrogatory Response provide earlier in the case flatly contradicts this assertion (he asked Bustillos, who denied it, and that was that).

g)   Alexander issued a mandate against enforcing ordinances against Sheriff Rod Taylor, which is a terminable offense at City of Colby.

h)   Alexander twisted the City of Colby gratuity policy to protect Sam Steele, who plainly violated the policy.

i)   Alexander gloats about Finley's evaluations, in minute detail, and brushes over the last evaluation he had (October 2015), which entitled Finley to a promotion and a raise.

In sum, it would be manifest error to credit the testimony of Defendant Alexander for purposes of summary judgment.

### 3.   Finley's off duty report of Cousins was <u>not</u> part of his job duties.

Defendants make two arguments concerning step 1 of *Garcetti / Pickering*: the "higher duty" and off-the-clock arguments that appear at ECF pages 25-29.  For the higher-duty argument, Defendants cite *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008), which is about off-duty sexual conduct reported in the newspaper.  Here, Finley's off-duty conduct consisted of reporting a traffic infraction of an on-duty public official.

For the "job duties" argument, Defendants begin their argument by mischaracterizing the law.  Defendants contend that Finley's report "is not protected because it was *related to* his employment duties."  Doc. 133, p. 27.  That is not the standard—the question is whether Finley's report was *pursuant to* his official duties.  First of all, if Finley was on duty, he would have been in a position to pull the driver of the Tahoe over and issue a citation, but he was not on duty, he did not have a radar, and he had just come off a long shift.

A fair inference from the evidence is that Finley did not have a job duty to report Thomas County public officials' misconduct.  Finley had been overruled previously when writing a ticket based upon Cousins' unsafe operation of a vehicle.  Also, Alexander had issued a mandate against enforcing traffic laws against Cousins' prior boss, Rod Taylor.  The summary-judgment record shows that intervention against officials of Thomas County would be considered "political" and unwise.  Moreover, Defendants' one case on this issue—*Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*— asks whether there is an underlying "legal obligation" to report the misconduct, when the context has to do with reporting misconduct of public officials.  *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1137 (10th Cir. 2010).  Defendants provide no authority for the proposition that an aspirational law-enforcement oath imposes legal obligations on Finley to work off the clock and call in erratic driving of public officials.

Finally, *Garcetti* asks whether calling in erratic driving by a public official, off the clock, is a task that Finley was paid to perform. Garcetti, 547 U.S. at 419. Here, the City of Colby has very strict policies about work hours so as to avoid responsibility for paying overtime (see Resp. to SOF 70 above, requiring approval of supervisor, etc.). If given credit, Defendants' argument would necessarily require any person who signed a law-enforcement oath an irreconcilable duty to work outside normal hours, without supervisor permission.

### 4.  Reporting erratic driving by an on-duty public official is a matter of public concern.

Defendants contend that Finley's report about Cousins was not a matter of public concern, the second step of *Garcetti / Pickering*. However, the Court already addressed this issue*, a question of law*, on July 19, 2018. Finley incorporates the Court's discussion and reasoning on pages 9 and 10 of its previous Memorandum & Order, Doc. 65. The facts are as outlined in the operative complaint, down to the detail that Defendants have pointed to no evidence that Alexander even listened to the audio of the 911 call.

### 5.  Defendants' interests "in the efficiency of public service" do not outweigh Plaintiff's right to free speech.

Defendants contend that, at step three of *Garcetti / Pickering*, the Court should determine that their interests in running a police department should outweigh Finley's right of free speech. Doc. 133, pp. 31-34. This issue, too, is a *question of law*, that the Court has already determined in its Memorandum & Order of July 19, 2018. Doc. 65, 10-12. Defendants have provided no good reason for the Court to deviate from its previous ruling on this issue of law. If a factfinder determines Finley's report was true, it was protected. If a factfinder determines that Finley's report

was "deceitful" and based on political motives, as Defendants now suggest, Finley will not fare well.  Yet these are factual determines not suited for summary judgment.

Defendants cite a litany of authorities about trust, loyalty, and camaraderie in the law enforcement community.  Beginning with Tom Nickols' acknowledgment that Cousins violated traffic ordinances three times on the subject video without recourse, to Nickols' decision not to file criminal charges after he secured Finley's dismissal, to Alexander's attribution of Finley's termination to politics (while unfairly assuming that Finley was targeting Cousins), to the numerous incidents of misconduct uncovered just in this case, there are legitimate questions about the interests that Defendants are pursuing in the first place.

### 6.  Issues of fact exist as to whether Finley's report of Cousins motivated his termination.

Defendants' next argument is that Finley cannot show that his report of Cousins was a motivating factor in his dismissal (the fourth *Garcetti / Pickering* element, which is typically a fact issue).  First, Defendants argue that Finleys' report was not a factor in his termination, rather, the video was. Doc. 133, pp. 34-35. Second, Defendants argue that the evidence of other misconduct in this case cannot be compared with Finley's alleged misconduct.  Doc. 133, pp. 35-40.  Both arguments lack merit.

Finley reiterates that there is a factual question regarding his report of Cousins' driving.  As stated above, Finley's interrogatory responses and testimony demonstrate the following about the encounter on January 15, 2016: (i) Finley perceived that Cousins' vehicle crowded, if not crossed, the center line; and (ii) Finley's tires left the pavement.  This is entirely consistent with Finley's communication to Defendant Alexander about what happened that day.  On the other

hand, if the factfinder sides with Defendants' position in this litigation—that Finley's report was deceitful and politically motivated—Finley will lose.

Given Alexanders' competing versions of his interpretation of the video, whether the Tahoe crossed the line or not, and his profound credibility issues, his testimony must be disregarded anyway. Nickols, who did not even have a proper chain of custody for the Tahoe video, insinuated to Alexander that he would not pursue criminal charges once he had secured Finley's dismissal. Nickols has anger issues after all. When it was all said and done, Rod Taylor's wife published an ad in the newspaper bragging about Finley's termination. This, viewed in the context of Alexander's statement that the termination was political, permit a reasonable factfinder to determine that Finley was fired based upon his report of misconduct by Deputy Cousins. This is compounded by the fact that Defendant Alexander repeatedly obfuscated when being asked whether Finley would have been terminated in the absence of his report about Cousins.

<u>Comparators</u>. As for comparing the alleged misconduct of Finley to the misconduct demonstrated in this case, this is not a close call. Defendants represent to the Court that Officer Bustillos *was written up* for misusing the NCIC license-plate lookup system (SOF 103). If that is true, then Defendants necessarily would have determined that Bustillos *did not tell the truth to Alexander* when Alexander asked him about it to begin with. Defendants nowhere concede that Bustillos lied to Alexander. They were both line-level officers under the supervision of Defendant Alexander and moreover, and both involve claims of dishonesty. Bustillos' dishonesty is directly related to his efforts to misuse police resources to pursue women. Alexander initially claimed Bustillos denied the allegation and that was the end of the matter. Later in the case, Alexander claimed he conducted an investigation. But Marc Finley told him the name of the victim that Bustillos looked up through NCIC, and Alexander never did anything with it.

Defendant Alexander *admitted* to Keyna Baalman that Sam Steele did not tell the truth to him about Finley's use of force in the Aaron Taylor arrest.  Defendant Alexander *saw* Sam Steele essentially admit what he had told KHP about Finley was a lie.  Steele accepts gratuities connected with his hanging out at a movie theater on the clock.  Defendants' response is to say the gratuity prohibition has unwritten thresholds.  While Steele held a higher rank than Finley, he is not relieved of his basic obligation to refrain from lying or following basic police policy.  He is a fair comparator, and the circumstances of his conduct provide strong evidence that the distinguishing factor in Finley's case was his reporting a member of the Thomas County Sheriff's Department.

Defendant Alexander admitted that Bob Herron store commercial quantities of cocaine at his house while under het supervision of Ron Alexander, who did nothing about it.  This, again, is evidence of gross misconduct that Alexander had the obligation to address, but he did not.  This is as troubling as Defendant Alexander's suppression of an investigation into his and the City Manager's CrossFit companions over narcotics. For his part, City Manager Tyson McGreer testified it is a terminable offense for Defendant Alexander to issue a mandate against enforcing the law against anyone.  Alexander still works at City of Colby despite issuing such a mandate.

In conclusion, there is substantial evidence that Finley's report of misconduct by Cousins motivated his termination.  There is comparator misconduct which likewise calls into question the overall integrity of Defendants.  Summary judgment on Finley's First Amendment claim must be denied.

### 7. Defendant Alexander is not entitled to qualified immunity on Finley's claim of First-Amendment retaliation.

The Court previously ruled that *Walter v. Morton*, 33 F.3d 1240 (10th Cir. 1994) and similar authorities[7] put Defendant Alexander on fair notice that his conduct would violate clearly established law.  Doc. 65, pp. 16-17.  In that ruling, the Court specifically rejected Defendant Alexander's framing of the question—whether it was clearly established that an employer could not take action against an employee for making what the employer reasonably believed to be a false accusation of wrongdoing by against an officer in a neighboring agency.  Doc. 65, p. 16, n. 49.  The Court rejected Defendant Alexander's framing of the question because the operative complaint did not "allege or concede that Chief Alexander believed Plaintiff's allegations regarding Cousins were false."  Doc. 65, p. 16, n. 49.  Thus, the Court ruled Alexander could raise qualified immunity again at summary judgment.  Doc. 65, p. 17, n. 53.

Now, with the benefit of discovery, Defendant Alexander has reasserted his qualified immunity defense.  Defendant Alexander firmly maintains in this Court that Finley was deceitful, and that the Tahoe never crossed the center line.  Yet Alexander admitted to at least one person that the video was not conclusive.  A litany of evidence, including many admissions, plainly impair Alexander's credibility.  Finally, it was clearly established that Defendant Alexander should have inquired whether Finley's report was motivated by a rumor about Cousins' potential promotion, before attributing Finley's January 15, 2016 report to that rumor.  *Waters v. Churchill*, 511 U.S. 661, 698 (1994).  Because Defendant Alexander's qualified immunity defense hinges on one version of competing facts, it would be improper to sustain his request for qualified immunity.

---

[7] *Thomas v. City of Blanchard*, 548 F.3d 1317, 1328 (10th Cir. 2008).

**C. A reasonable jury could determine that Defendant City of Colby retaliated against Plaintiff for 1) his report of Cousins' erratic driving and 2) his brother Marc Finley's letter about serious misconduct by Sheriff Rod Taylor.**

Defendant City of Colby asserts it is entitled to summary judgment because on this claim for several reasons. Three of these arguments are already addressed above.[8] Finley respectfully reiterates all arguments made above and reasserts that factual disputes preclude summary judgment. Colby makes three arguments, however, unique to this claim.

First, Colby asserts that Cousins was not a "co-worker", therefore his conduct cannot support a common law whistleblower claim. Finley acknowledges that Cousins was employed by a different agency. But the test is not whether Cousins was a fellow *employee*. Rather, the test is whether he is a *co-worker*. Given that Defendants' repeated attestations about the tight-knight and interdependent relationship of Colby and Thomas County (e.g., Alexander Aff., ¶ 1 (Doc. 133-1, p. 1)), a reasonable factfinder could determine that Finley and Cousins were co-workers.

Second, Colby asserts that no reasonable jury could conclude that Colby fired Finley over his brother Marc Finley's report about Rod Taylor.[9] Colby first asserts that Alexander supported Marc Finley's efforts. This is disputed. When the rubber hit the road, Alexander backed out from signing the letter that Marc Finley wrote about Rod Taylor's misconduct. Contrary to support for the claim of misconduct by Taylor, Alexander issued a mandate protecting him. By his own admission, Alexander was always harping about Finley avoiding politics and he even told Finley to tell people his termination was political. Thus, Alexander's concern about Marc Finley's

---

[8] Specifically, these arguments are under the following headings in Defendants' brief:
- "No reasonable person could have concluded that Cousins was violating the law" (Doc. 133, p. 45);
- "Plaintiff was not discharged for making the report" (Doc. 133, p. 45); and
- "Plaintiff's report was not made in good faith" (Doc. 133, p. 46).

[9] Kansas law extends whistleblower protection to siblings of those who engage in protected activity. *Thummel v. PSI Transp.*, LLC, No. CIV.A. 14-1299-MLB, 2015 WL 475183, at *2 (D. Kan. Feb. 5, 2015).

"political" activities extended from the time September 2015 through the date of Lance Finley's termination in February 2016.  Colby's remaining arguments on this point—having to do with the alleged inevitability of Finley's termination—are factual disputes for the jury, as addressed above. Finally, Chief Alexander's credibility is hotly contested. Therefore, Finley's common law claim should go to trial.

## IV.    Conclusion

The Court should deny Defendants City of Colby, Kansas and Ron Alexander's Motion for Summary Judgment in its entirety.

DATED: November 14, 2019.

SUBMITTED BY:

GRAYBILL & HAZLEWOOD, LLC

/s/ Sean McGivern
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932
218 N. Mosley St.
Wichita, KS 67202
Telephone: (316) 266-4058
Fax: (316) 462-5566
don@graybillhazlewood.com
sean@graybillhazlewood.com
*Attorneys for Plaintiffs*

<u>To be filed 11/15/19</u>

- Exhibit Index
- Exhibits
- Motion for Leave to File Audio Recording Conventionally
- Motion for Leave to File Certain Exhibits Under Seal

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2019, a copy of the above and foregoing was filed electronically with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Allen G. Glendenning, #12187
Travis J. Ternes, #27203
Watkins Calcara, Chtd.
1321 Main - Suite 300
P.O. Drawer 1110
Great Bend, Kansas 67530
Phone (620) 792-8231
*Attorneys for Defendants Ron Alexander and City of Colby, KS*

/s/ Sean McGivern
Donald N. Peterson, II, #13805
Sean M. McGivern, #22932