Page 1

1

   IN THE UNITED STATES DISTRICT COURT

2      DISTRICT FOR KANSAS

3

 LANCE FINLEY,       )

4             )

     Plaintiff,   )

5             )

 vs.          )  Case No.

6             )  6:17-CV-01215-EFM-KGG

 CITY OF COLBY, KANSAS,   )

7  RON ALEXANDER and TOM    )

 NICKOLS, JR.,       )

8             )

     Defendants.  )

9

10

11      D-E-P-O-S-I-T-I-O-N

12

13

14     The deposition of

15      LANCE FINLEY

16  was taken on behalf of the defendants before

17  ELAINE SHOGREN, a Certified Court Reporter of

18  Kansas, at Thomas County Courthouse, Commissioners

19  Room, 300 North Court Avenue, Colby, Kansas, on

20  December 20, 2018, commencing at 9:02 a.m.

21

22

23

24

 Job No. CS3065621

25

1      that they were friends.

2   Q  And that is all the information you have about the

3      nature of the relationship between Chief Alexander

4      and Jim Cousins in 2015 and 2016?

5   A  I believe -- there was others present when those

6      discussions happened and I have heard from them it

7      reiterated [sic].

8   Q  Reiterated what?

9   A  What Jim had said.

10  Q  Just that they had been friends in the past?

11  A  Yes.

12  Q  Okay.  Let's talk about that stop, which I

13     understand was in November of 2015, when you stopped

14     him with snow on the vehicle.

15  A  Yes, sir.

16  Q  When did you first see Mr. Cousins' vehicle that

17     day?

18  A  I am a little fuzzy on my geography of Colby right

19     now.  It has been a while since I worked here.  But

20     if I had a map, I could tell you the streets.  I

21     believe it was by the hospital, somewhere in there.

22     It would have been Franklin and College, I believe,

23     but I -- I believe that is the streets.

24  Q  I have pulled up a map from Google Maps.  Does that

25     help you?

Page 38

1    A   If you can click on the satellite view.

2    Q   Yes.  Where is my curser?  Is it over there?

3    A   You are up top.

4    Q   Okay.  Here we go.  I am doing this backwards.

5                  MR. MCGIVERN:  Did you bring this monitor?

6                  MR. GLENDENNING:  Yeah.

7    A   Can you scroll down just a little bit and zoom in?

8    Q   (BY MR. GLENDENNING)  In here somewhere?

9    A   Yeah, in this area [indicated].  I believe I wrote a

10       report on this incident, too, that I could maybe

11       refer back to.  But if I remember rightly, it was --

12       it would have been further south maybe, because

13       there is the college.

14   Q   Somewhere around Franklin, is that what we are

15       looking at?

16   A   I believe it was Franklin and College, somewhere in

17       this intersection.

18   Q   Okay.  And was he moving when you first saw him?

19   A   He was pulling up to this stop sign and then turned

20       south on Franklin when I saw him.

21   Q   Okay.  Had he stopped when you first saw him?

22   A   Yes.

23   Q   Okay.  And there was snow on his windshield at that

24       point?

25   A   Yes.

1   Q   Okay.  And then he turned?

2   A   And started northbound on Franklin.

3   Q   Is that when you stopped him?

4   A   Yes, sir.

5   Q   Okay.  I assume you informed dispatch that you were

6       pulling him over?

7   A   I believe so.

8   Q   Did you know it was Jim Cousins when you initiated

9       the stop?

10  A   I recognized his vehicle.

11  Q   Okay.  Other than dispatch, did you have any

12      conversations with anyone at the Colby Police

13      Department during that stop?

14  A   I don't recall if I talked to Ron or not, Chief

15      Alexander.

16  Q   Okay.

17  A   I believe I talked to him maybe afterwards, but it

18      may have been during.  I don't recall.

19  Q   Well, I assume you approached the vehicle?

20  A   Yes, sir.

21  Q   What was your conversation with Mr. Cousins?

22  A   He told me that he had cleaned the corner off and

23      that it had slid down and he was going to get it

24      cleaned off.  And I told him that that was

25      excessive -- he couldn't see out of the windshield

```
 1       and he was still driving down the road.
 2   Q   He told you that snow had slid down off the roof?
 3   A   Yes.
 4   Q   Over the windshield?
 5   A   Yes.
 6   Q   Did he tell you when that had happened?
 7   A   I believe he said when he stopped.
 8   Q   At the stop sign?
 9   A   I would speculate that is when he was insinuating.
10   Q   Okay.  And based on what you saw of the snow, did
11       that make sense?
12   A   It was plausible, yes.
13   Q   Okay.  So what did you say to him?
14   A   That it was excessive and that it was dangerous.
15   Q   Okay.  What else was said?
16   A   I don't recall.  There should be audio recording of
17       it.
18   Q   Okay.  Do you recall anything else that was said
19       during the stop?
20   A   I know that there was other -- we were in the
21       middle -- if I remember right, we were in a school
22       zone and I had something else going on, a call or
23       something, and I asked him to come down to the
24       office and I would issue him a ticket there later or
25       that I would catch up with him later.  It was snowy.
```

Page 41

1       I think there may have been an accident or something

2       that I needed to go to.  There was some reason why I

3       didn't issue him a citation right there.

4    Q  Okay.  And then you left?

5    A  Yes.

6    Q  Did you remove the snow from his windshield?

7    A  He was doing it as I was getting ready to leave.

8    Q  Okay.  What do you remember next with regard to that

9       situation?

10   A  I got back to the office at some point.  And Chief

11      Alexander told me not to issue a ticket, just to

12      issue a warning.

13   Q  Okay.  How did that come up?

14   A  I believe I told him that Jim would be down to get a

15      ticket here later.

16   Q  Okay.  Why would you tell him that?

17   A  He was my supervisor and we had decent

18      communication.

19   Q  Okay.  Well, did you tell him about every ticket you

20      wrote?

21   A  This was atypical of most tickets that I wrote.

22      Typically I wrote them on the scene.  I was having

23      him come down to the office because of other

24      instances.

25   Q  Okay.  Had you ever done that on any other occasion?

Page 52

1     termination and I decided that I wasn't going to
2     admit to the wrongdoing with -- and I felt like that
3     is what the forced resignation was doing, so I
4     withdrew my resignation and --
5   Q (BY MR. GLENDENNING)  You thought a resignation
6     would be an admission?
7   A I believed it looked more that way than the
8     termination.
9   Q Okay.  Even forced?
10  A Yes.
11  Q Okay.  Do you remember what time of day your
12    encounter with Mr. Cousins occurred on January 15,
13    2016?
14  A It would have been early morning.  I don't recall
15    the exact time.
16  Q And when you say early morning, is that before
17    sunup?
18  A I don't know.  It depends on the time of year.  It
19    would have been January, so it would have been close
20    to sunrise, sunup.  I don't recall.  I mean, it
21    would have been sometime early morning because we
22    got off at 7:00 in the morning.
23  Q Had you just completed a shift at the Colby Police
24    Department?
25  A Yes, sir.

Page 60

```
 1      road quite a bit.
 2   Q  Sure.  But it could be anywhere on that road,
 3      couldn't it?
 4   A  Absolutely.  And that is what I am saying.  It is
 5      likely it could have been here, it could have been
 6      here [indicated].  I am sure I have met other
 7      officers on that road.
 8   Q  Or it could have been miles away?
 9   A  Absolutely.
10   Q  Okay.  And you have no specific recollection of
11      encountering a Thomas County sheriff's vehicle at
12      this same location that you encountered Mr. Cousins
13      on January 15, 2016; is that correct?
14   A  Not specifically, no.
15   Q  That is not correct or you don't recall?
16   A  Can we read that question so I can listen to it
17      again?
18   Q  Do you recall ever seeing a Thomas County sheriff's
19      vehicle on Highway 25 at that same location where
20      you met Jim Cousins on January 15, 2016?
21   A  I do not recall.
22   Q  Okay.  When you passed Mr. Cousins, could you tell
23      it was him in the vehicle?
24   A  I could not.
25   Q  Why not?
```

Page 61

1    A   Like I explained, at closing speed I just -- I

2        couldn't see who was driving.

3    Q   Okay.  Is it possible that it is because what you

4        saw were headlights coming at you?

5    A   If his headlights were on, it is possible.

6    Q   Would there be any reason that Mr. Cousins could

7        have identified you as he passed if you couldn't

8        identify him?

9                MR. MCGIVERN:  Object to form.

10   A   I don't know whether he could or could not.

11   Q   (BY MR. GLENDENNING)  Do you know whether there was

12       any other person in the vehicle with Mr. Cousins

13       when you encountered him on January 15, 2016?

14   A   That vehicle was used for transport, so I assume

15       there probably was.

16   Q   Okay.  Was it used for any other purpose?

17   A   At that point in time, I don't believe it was.

18   Q   Did your vehicle have cruise control?

19   A   It does.

20   Q   And did you have it on?

21   A   I believe so.

22   Q   Do you know whether or not the Tahoe that

23       Mr. Cousins was driving has cruise control?

24   A   I believe it does.

25   Q   In the mile before you encountered Mr. Cousins, what

Page 69

1      from inside its own lane to across the center line?
2   A  What I recall was it being left of center.  I don't
3      recall whether it came out left of center or it was
4      left of center.  What registered in my mind was it
5      is left of center.
6   Q  And do you think you would have seen the vehicle
7      before it registered in your mind that it was left
8      of center?
9   A  I -- sitting here going back three years, I can't
10     say one way or the other.
11  Q  Okay.  And when you first thought it is left of
12     center, how far was it from Road W?
13  A  I would say maybe a quarter mile, somewhere in
14     there.
15  Q  Did it remain left of center for the whole quarter
16     of a mile?
17  A  It happened so fast, I don't recall whether it
18     remained or if it was for that time being and I
19     started moving over.  I don't recall.
20  Q  Did you ever cross the fog line?
21  A  The fog line is in the white line on the side of the
22     road.
23  Q  Right.
24  A  I believe I did.
25  Q  How far across the fog line did you go?

Page 70

1   A   Those ditches are extremely steep, so I tried not to
2       go very far at all.
3   Q   Did your tires ever leave the payment on
4       January 15th, 2018 [sic]?
5   A   I believe they did.
6   Q   Did they leave the pavement before Mr. Cousins'
7       vehicle got to you?
8   A   I believe it was a last-minute evasive action.  So I
9       believe it was right at the meeting [sic].  Like I
10      said, those ditches are extremely steep.  If you get
11      in them, you are -- there is a good chance you are
12      going to have bigger problems than --
13  Q   How far off the pavement did your tires get at its
14      farthest?
15  A   I assume just the shoulder.  Otherwise, like I said,
16      I probably would have had other issues.
17  Q   Did you slow down at any time during this encounter?
18  A   I believe I took it off cruise and slowed down.  I
19      don't know whether it was --
20  Q   Do you know?
21  A   Before meeting him, I don't believe I did.  But
22      after meeting him, I think I did.
23  Q   Okay.  While he was approaching you, you did not
24      slow down?
25  A   I don't believe so.  I don't think I had time.

1       10:51 a.m.)

2    Q  (BY MR. GLENDENNING)  Do you know of anyone other

3       than you that observed Mr. Cousins left of center at

4       any time on the morning of January 15, 2016 while

5       he was driving to or from Atwood?

6    A  To say specifically, no.  If you review the video,

7       it appears that others would have seen it.

8    Q  Do you know of anybody that reported seeing

9       Mr. Cousins left of center?

10   A  Not to my knowledge, no.

11   Q  And that -- and when you say "would have seen it",

12      that is assuming that you can look at that video and

13      tell where the car is in relation to the roadway,

14      correct?

15            MR. MCGIVERN:  Object to form.

16   A  You can't tell conclusively where that video -- or

17      where that vehicle is in relationship to the line.

18      You can tell general vicinity of that vehicle

19      swerving from left to right, failure to maintain a

20      single lane of traffic.

21   Q  (BY MR. GLENDENNING)  Okay.  Can you identify any

22      place on that video tape where you know for sure

23      that he was across the center line, from looking at

24      the tape?

25   A  From looking at the video?

Page 87

1    Q   Yes.

2    A   I cannot.

3    Q   Okay.  The movement that you see could be within his

4        own lane, correct?

5    A   It could.

6            (Marked Exhibit 4.)

7    Q   (BY MR. GLENDENNING)  Okay.  I want to show you

8        Exhibit Number 4.  Have you seen that document

9        before?

10   A   Is this the same I have here?

11   Q   It should be.

12   A   Okay.  Yes, I have.

13   Q   Okay.  Let me look at that.

14            MR. GLENDENNING:  Did you ever get me a

15       signature page on this?  The one I have isn't

16       signed.

17            MR. MCGIVERN:  He can sign it right now

18       and then we will get you a notarized copy of it.

19            MR. GLENDENNING:  I don't know that it

20       needs to be notarized if it is on the record.

21            MR. MCGIVERN:  Yeah.

22   Q   (BY MR. GLENDENNING)  Sir, you understand if you

23       sign that, you are signing that Exhibit 4 and the

24       answers that are given in there are true and

25       correct?

Page 161

1      the semi, correct?

2   A  Yes.

3   Q  And that could be because the semi slowed down in

4      front of him, correct?

5   A  Could be.

6   Q  Okay.  So his speed may have actually reduced at

7      that point to stay behind the semi, correct?

8   A  Yes.

9   Q  Do you have any information indicating that at any

10     time during this video Mr. Cousins was traveling at

11     a speed above the posted maximum?

12  A  Absolutely.  Just like you explained, if he slowed

13     down for that semi, yet he still made that trip in

14     30 minutes, he would have had to have made up that

15     speed and time at some point.

16  Q  The trip from Colby to Atwood?

17  A  No.  We were just talking about the trip from

18     Atwood -- or Colby to Atwood, yes.

19  Q  Okay.  Now let's talk about the second leg, from

20     Atwood to Colby.

21  A  Like I said, I haven't reviewed it in that aspect.

22     I would be more than happy to for you, if you would

23     like that.  But I --

24  Q  Regarding the trip from Atwood to Colby, do you know

25     of anything on this tape that indicates that

Page 191

1    A   I believe he said if I resigned or was no longer

2        with the department that he wouldn't.  Because then

3        later he texted me that he had talked to Tom and

4        that since I had resigned that they weren't going to

5        press charges.

6    Q   Okay.  That really goes beyond my question and I am

7        not sure if you answered my question.  My question

8        is:  Do you recall in a meeting on February 17th of

9        2016, Mr. Alexander telling you that he was trying

10       to keep anyone from filing charges against you?

11   A   I don't recall if he did or not.

12   Q   After you left that meeting, what did you do?

13   A   That is kind of foggy.  I don't remember.  I think I

14       visited with my brothers, went home to the farm.  I

15       think I got some sleep somewhere in there, tried

16       gathering up all my equipment.

17   Q   Did you visit with your brothers about the video?

18   A   I think I told them that they had the video or had a

19       video.  I hadn't seen the video or anything.  They

20       wouldn't let me watch it, so I really had nothing to

21       talk about.

22   Q   Who are your brothers?

23   A   I have three brothers.  One would be Matt Finley,

24       one would be Shane Finley, and the other one would

25       be Marc Finley.

1   Q  Okay.  And Marc Finley would have been the one that

2      used to drive that Tahoe?

3   A  Yes.

4   Q  Do you remember talking to him about the video on

5      February 17th?

6   A  Like I said, there wasn't much to talk about.  I may

7      have said that they have a video.

8   Q  Okay.  Did you guys have any conversation about what

9      the video might show or not show?

10   A  I don't know whether I did or not.  I imagine we

11      probably talked about how in -- where there is

12      federal court cases that say the video is

13      inconclusive and shows what the -- not what the

14      naked eye can see.

15   Q  Do you know if you had that conversation with your

16      brothers?

17   A  I don't know whether I did or not.

18   Q  Okay.  And before we completely leave February 17th,

19      let's go back to that meeting with Chief Alexander.

20      Did Chief Alexander tell you what he had seen on the

21      video?

22   A  I think he said that it didn't show him coming left

23      of center.

24   Q  Okay.  Did Chief Alexander tell you that he had

25      looked at the video?

1   A   I believe he stated he had seen it multiple times.

2   Q   Did he say that he had looked at it with -- under

3       Sheriff Nickols?

4   A   I don't know whether he said he did or not.  I

5       thought he said him and Richard.

6   Q   Mr. Barrett?

7   A   Yes, sir.

8   Q   And did Mr. Barrett tell you that he had seen the

9       video?

10  A   I don't know whether he said it or not.  He kind of

11      sat in the corner quiet.

12  Q   Okay.  Do you believe that Mr. Alexander had seen

13      the video by the time he talked to you on

14      February 17th?

15  A   I believe he probably did.

16  Q   Okay.  Do you have any reason to think he hadn't

17      seen it?

18  A   I don't know whether he had seen the whole video or

19      that part or -- because the original video produced

20      to the attorney was only half of it, and then they

21      eventually produced the rest of it.  So I don't know

22      which video he saw or did not see or was on the desk

23      that day because I was never afforded the

24      opportunity to watch it.

25  Q   But do you think Mr. Alexander had seen the video of

Page 194

```
 1      your encounter with Mr. Cousins by the time he
 2      talked to you on February 17th?
 3   A  I believe he probably had.
 4   Q  Do you have any reason to think he hadn't?
 5   A  He stated he had.
 6   Q  Okay.  And do you have any reason to think he
 7      hadn't?
 8   A  No.
 9   Q  Has anyone ever told you that Mr. Alexander had not
10      seen the video by the time he talked to you on
11      February 17th?
12   A  No.
13   Q  Do you know why it was alleged in the lawsuit on
14      your behalf that Chief Alexander told someone that
15      he had not seen the video?
16   A  I don't recall where that was ever alleged.
17   Q  Okay.  Did you have any conversations with
18      Mr. Alexander on February 17th about whether or not
19      that video would be conclusive about going left of
20      center?
21   A  I don't know whether we discussed it or not.
22   Q  Did Mr. Alexander tell you that from his review of
23      the tape he did not think that Mr. Cousins had come
24      left of center?
25   A  I believe he stated something to that effect.
```

1    Q   Okay.  And do you have any reason to believe that he

2        did not honestly believe that that tape does not

3        show Cousins coming left of center?

4    A   Can you rephrase that?

5    Q   Do you have any reason to believe that Mr. Alexander

6        does not honestly believe that the tape does not

7        show Cousins coming left of center?

8    A   I don't have any reason to believe that he does not

9        believe that.

10   Q   It wouldn't be an unreasonable interpretation of

11       that tape, would it?

12   A   To somebody who is not the chief of police and does

13       not have years of experience or should have years of

14       experience reviewing videotapes and understanding

15       perspective, then I suppose it would not be

16       reasonable.

17              But somebody who has had law enforcement

18       experience and should have the knowledge of

19       reviewing tapes and what perspective they do and do

20       not show, I think it is unreasonable.

21   Q   Do you know how many law enforcement officers have

22       viewed that tape and concluded that it does not show

23       Mr. Cousins going left of center?

24   A   I do not know how many they have shown.

25   Q   But in your judgment, every one of them has been

1      unreasonable in reaching that conclusion?

2   A  I --

3              MR. MCGIVERN:  Object to form.

4   A  I can't say what parts they showed and didn't show.

5      You can't look at the video in 18 seconds and gain a

6      perspective.  If they showed somebody only that,

7      then I suppose they are not being unreasonable.  But

8      if you watch in the totality then, yeah, I believe

9      it is unreasonable.

10  Q  (BY MR. GLENDENNING)  Okay.  And why do you -- what

11     do you think is shown in the totality that makes it

12     unreasonable to conclude that that tape does not

13     show Cousins going left of center?

14  A  I believe it shows him failing to maintain a single

15     lane of traffic and it goes to show a pattern of

16     erratic driving.  To say that he has crossed or not

17     crossed, you can't say from that perspective.  But

18     it does continue to show when he is meeting me that

19     the pattern of erratic behavior is continued.

20  Q  Okay.  You keep saying -- well, you have agreed,

21     have you not, that nowhere on this tape can you say

22     that shows him going left of center?

23  A  You cannot see the left side of the vehicle in

24     relationship to the line.

25  Q  That isn't what I asked you.  Is there any place on

1     that tape, other than when he goes around vehicles

2     those couple of occasions we looked at where he went

3     around vehicles to the left, is there any place on

4     that tape where you think it shows that he went left

5     of center?

6  A  I do think there is spots that show it, but you

7     can't tell one way or the other from the video.

8  Q  That is not --

9  A  But from my watching it and my perspective of

10    watching the entire thing, it does appear that he is

11    crossing left of center.

12  Q  But you have also said that regardless of how it

13    appears to you that he is going -- you have actually

14    written time and time again in your sworn

15    interrogatory answers that he is crowding, if not

16    crossing, correct?

17  A  Yes.

18  Q  Because you can't tell whether he is crossing from

19    just looking at the video, correct?

20  A  Yes.

21  Q  I am correct?

22  A  Yes, you are correct.

23  Q  All right.

24  A  The video is inconclusive.

25  Q  Is there any chance that Mr. Alexander asked you to

Page 198

1    resign out of a good faith belief that you had made

2    a false report?

3  A  I guess I don't understand what you are asking

4    there.

5  Q  Is it possible that Mr. Alexander had a good faith

6    belief that you had made a false report when he

7    asked you to resign?

8  A  I don't know that that is possible when he said it

9    was political.

10 Q  Okay.  Well, you keep going around the question and

11   I will get -- I will get to what you want to say,

12   trust me.  But I need to make sure we have a clear

13   answer to my question and not an evasive one.

14 A  Okay.

15 Q  Do you think it is possible that Mr. Alexander

16   honestly believed that you had made a false report

17   when he asked you for your resignation?

18          MR. MCGIVERN:  So he just wants a yes or

19   no.

20 A  No.

21 Q  (BY MR. GLENDENNING)  What information do you have

22   that indicates that Mr. Alexander did not have a

23   good faith belief that you had made a false report?

24 A  When he told me it was political.

25 Q  Okay.  Any other information that indicates to you

1    that Mr. Alexander did not have a good faith

2    belief --

3  A  The inconclusive --

4  Q  -- that you had filed a false report?

5  A  The inclusive video that he based it on.

6  Q  Any other reason?

7  A  Those are the two main ones.

8  Q  Well, are there any other reasons?

9           MR. MCGIVERN:  That he can recall off the

10    top of his head?

11  Q  (BY MR. GLENDENNING)  Are there any other reasons --

12           MR. GLENDENNING:  Don't interrupt unless

13    you want to make a form or foundation --

14           MR. MCGIVERN:  Sure.

15           MR. GLENDENNING:  -- objection.

16  A  Any other reasons?

17  Q  (BY MR. GLENDENNING)  That you believe that

18    Mr. Alexander could not have had a good faith belief

19    that you had filed a false report.

20  A  In looking back on it, the timing of everything

21    was not kosher.

22  Q  What is the timing?

23  A  It took them a month to produce the video or to go

24    back and recreate it.  Then a month later they are

25    bringing this up after a recall petition had started

1    and you were investigating everybody -- or

2    investigating Rod and the allegations.  And then Tom

3    was in a heated campaign against my brother.

4              So for the timing to happen -- and then

5    after I get terminated, Sheriff Taylor's wife puts a

6    paid political -- or paid classified ad saying that

7    I was fired and linking me to Marc.  And then Ron

8    saying that day that it was political.  To me, those

9    are all instances of it being very political.

10 Q  Most of the information you have just provided there

11    has to do with stuff going on in the sheriff's

12    department, correct?

13 A  It is intertwined.

14 Q  Do you have any information that Ron Alexander ever

15    took sides in the campaign between you and your

16    brother?

17 A  Between me and my brother?

18 Q  I mean between your brother and Mr. Nickols.

19 A  Besides buying into Tom's allegations and then

20    whoever he produced the information to that I was

21    fired for lying or whatever and it made it to

22    Sheriff Taylor's wife.

23 Q  Okay.  I don't understand that answer.

24 A  Would you like me to explain it?

25 Q  No.  Let's just ask it this way.

Page 203

1   A   I believe there was others, but I don't -- I can't

2       recall off the top of my head.

3   Q   And that accident happened after January 15, 2016,

4       correct?

5   A   Yes.

6   Q   Can you tell me any instance of Jim Cousins driving

7       under unsafe conditions, other than the snow, prior

8       to January 15, 2016?

9   A   Off the top of my head, I can't list the date or

10      specific incident.

11  Q   Can you identify any person who told you that they

12      had information about Jim Cousins driving under

13      unsafe conditions before January 15, 2016?

14  A   Can you reword that or restate that?

15  Q   Do you -- can you identify any person who told you

16      that they had information about Jim Cousins driving

17      under unsafe conditions prior to January 15, 2016?

18  A   Prior to that?

19  Q   Yes.

20  A   Off the top of my head, I can't think of anybody.

21      That is not to say there wasn't, but I just can't

22      think of specific instances.

23  Q   Who is Chris Bustillos?

24  A   He would be a deputy -- or an officer with the

25      police department.

Page 204

1    Q   Is he still there?

2    A   I believe so.

3    Q   Okay.  And you say he was not fired over misconduct.

4        What information do you have about his misconduct?

5    A   It is been brought to my attention a couple of times

6        that he has followed females from Starbucks and

7        around town, the ones that have college stickers,

8        and either pulled them over or ran their tags and

9        then added them on Facebook and instances of

10       communication with them.

11   Q   Who brought that to your attention?

12   A   The original person that brought it to my attention

13       was Ben Kale [phon] with the Kansas Highway Patrol.

14   Q   And when did Ben Kennel [sic] tell you about this?

15   A   Kale.

16   Q   Kale.  When did Ben Kale tell you about this?

17   A   He brought it to my brother Marc and a group of us

18       that he was approached by a young female who had

19       done it -- or had had it done to her.

20   Q   When?

21   A   I can't recall the date.

22   Q   Was it while you were still employed at the Colby

23       Police Department?

24   A   Yes.

25   Q   Okay.  And which brother did he bring it to?

Page 205

1   A   Marc.

2   Q   Okay.  And was Marc employed by the Colby Police

3       Department?

4   A   He was employed by the Thomas County Sheriff's

5       Office.

6   Q   So where were you when Mr. Kale gave you this

7       information?

8   A   I don't recall.  I don't remember whether I heard it

9       at Starbucks when he told Marc or when he was living

10      with one of the other troopers or current trooper,

11      but he was a deputy at the time.

12  Q   Okay.  Was this a formal report of any sort or was

13      it just you guys sitting around chewing the fat?

14  A   I believe he made a formal report to Marc and then

15      to me.  I had no authority or anything, so I imagine

16      it was just us talking and him saying I can't

17      believe this is going on.

18  Q   And you think there is a formal written report to

19      Marc Finley?

20  A   I don't know that it is a formal written report.

21  Q   Okay.  Do you know what Marc Finley did with that

22      report?

23  A   From my understanding, he took it to Chief

24      Alexander.

25  Q   Okay.  And where did you get that understanding?

Page 206

1  A  From when the incident occurred.  I believe that is
2     what Marc said had happened.
3  Q  Okay.  But you weren't there when anything was told
4     to Mr. Alexander about that?
5  A  I was not.
6  Q  Do you know what became of that?
7  A  From my understanding, Chief Alexander counseled
8     Bustillos and that was the end of it.
9  Q  Okay.  Did Mr. Kale tell you how he came about this
10    information?
11 A  The female victim had brought it to him, I believe.
12 Q  Okay.  One time?
13 A  That particular one, yes.
14 Q  Okay.  Did you receive any subsequent information
15    that there was any other females saying that this
16    had happened to them?
17 A  I believe that there was another female who said it
18    happened to them.  I don't believe they ever filed a
19    report.
20 Q  Okay.  So the only report you are aware of or have
21    any information getting to Chief Alexander is an
22    allegation that on one occasion this happened?
23 A  To my knowledge, yes.
24 Q  Okay.  Did you ever talk to Mr. Kale about this
25    again?

Page 254

```
 1       inappropriate long periods of time on more than one
 2       occasion?
 3    A  I believe it happened a couple of times.
 4    Q  Okay.  When do you recall the first time?
 5    A  I don't recall when.  I remember it being in the
 6       squad room, but I don't remember when it happened.
 7    Q  And was the issue that you would take phones from
 8       suspects and, instead of logging them into evidence,
 9       you had them in a file drawer somewhere?
10    A  I would put them with the case jacket in my filing
11       cabinet in an evidence bag and I just -- there is
12       times I didn't get an ECR or get them logged into
13       the evidence locker because I was in the process of
14       trying to work on search warrants for them.
15    Q  Okay.  What is the longest you held one like that?
16    A  I don't recall.
17    Q  Could it have been as high as months?
18    A  I was doing so many of them at the time, it possibly
19       could have.
20    Q  Did you ever tell your supervisors when they talked
21       to you about it that you didn't need to do anything
22       different with them than what you were doing?
23    A  I don't know whether I said that or not.
24    Q  Is that possible?
25    A  I mean, I understood the protocol.  I may have tried
```