RON ALEXANDER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LANCE FINLEY,              )
                       )
          Plaintiff,   )
                       )
vs.                   )  Case No.
                       )  6:17-CV-01215-EFM-
CITY OF COLBY, KANSAS and  )  KGG
RON ALEXANDER,         )
                       )
         Defendants.  )

D-E-P-O-S-I-T-I-O-N

The deposition of

RON ALEXANDER

was taken on behalf of the plaintiff before

ELAINE SHOGREN, a Certified Court Reporter of

Kansas, at Thomas County Courthouse, Commissioners

Room, 300 North Court Avenue, Colby, Kansas, on

June 24, 2019, commencing at 8:58 a.m.

RON ALEXANDER

1   A   Job knowledge, the application of the job, any
2       aspects about being about to do the job.  Basically
3       a person at the two-year mark is expected to be at a
4       certain level of ability.  And if you met that in
5       what would be the norm, you would probably be moved
6       to that Patrolman II status.
7   Q   Okay.  When you got the news that you had been
8       promoted to a Patrolman II, were you pleased?
9   A   Looking back this many years, 20 years, I would
10      recall that probably be something on my annual
11      evaluation that was, hey, this is your annual
12      evaluation, we are sitting down to go over it and,
13      by the way, we are going to go ahead and move you to
14      that Patrolman II spot.  I really don't remember
15      many details about the moment that that happened.
16  Q   It would have been something you would have called
17      your mom and told her about?
18  A   Not necessarily.
19  Q   Okay.
20  A   I mean, corporal, sergeant, probably.  But a
21      Patrolman II, not necessarily.
22  Q   Okay.  Who is the person that promoted you to
23      corporal in 2005?
24  A   It would have been Chief Randy Jones.
25  Q   And is the position of corporal at Colby Police

RON ALEXANDER

```
 1     Department a supervisory position?
 2  A  Yes.
 3  Q  Let's go back to Deposition Exhibit 12.  Chief Jones
 4     writes the city manager advised me she has heard a
 5     rumor that you have a hit list, people that you are
 6     really going to get.  Do you recall receiving that
 7     memo?
 8  A  Yes, I do.
 9  Q  Where were you when you received this memo?
10  A  I don't remember where I was when I received the
11     memo.
12  Q  Was it in person with Chief Jones?
13  A  I don't remember.  I mean, at some point we would
14     have talked in person about this.
15  Q  Okay.  In August of 1999, did you maintain a hit
16     list?
17  A  No, I did not.
18  Q  Okay.  Tell me what you recall about this
19     allegation.
20  A  Michelle Morris, I believe, was working part time
21     for the Free Press.  She wanted to do a ride-along.
22     We did a ride-along one evening.  She asked what are
23     some of the things that you look for.  I explained
24     the warrant board, which I explained this situation
25     to Chief Jones at the time, that we have a list on a
```

RON ALEXANDER

```
 1      talking about?

 2  Q   Yes.

 3  A   Yes.

 4  Q   Okay.  Do you have any knowledge why the City of

 5      Colby does not have such a policy?

 6              MR. GLENDENNING:  Object to form.

 7  A   Well, this -- this is an older working manual.  I

 8      believe that there may be something in the newer,

 9      most recent manual out about that.  I know I am

10      currently in the process of approving a new SOP for

11      the police department through a company called

12      Lexipol, and I know that there is a policy in there

13      for that.  But that policy has not been absolutely

14      approved yet.  But I believe that there may be

15      something in the newest City of Colby Personnel

16      Handbook that was approved last year maybe.  I would

17      have to go back and refer to that.

18  Q   Okay.  But during Mr. Finley's employment, to your

19      knowledge there was not a policy?

20              MR. GLENDENNING:  Object to form.

21  A   I don't recall if there was or not.  I don't believe

22      so.

23  Q   (BY MR. MCGIVERN)  Okay.  I would like you to turn

24      to page DEF 338.  And actually if you look back a

25      couple of pages you will see it appears this is part
```

RON ALEXANDER

```
 1      of the pay plan section in the City of Colby's

 2      handbook?

 3  A   What page are you on?  Okay.  You are on Page 334?

 4  Q   Correct.

 5  A   Okay.  And now we are at 338?

 6  Q   Right.  So this is a continuation of the pay plan

 7      policy.  Do you see that?

 8  A   Okay.

 9  Q   Paragraph 8 says "Administrative page estimate and

10      performance evaluation.  The compensation of all

11      employees shall be reviewed annually by their

12      department heads."  Is that your understanding of

13      the policy?

14  A   Yes.

15  Q   And it goes on "If warranted by merit, employees may

16      receive increases in compensation within the

17      guidelines of the pay plan."  Is that accurate?

18  A   Correct.

19  Q   And then it goes on "The annual compensation review

20      shall take into consideration personnel records,

21      tardiness and absenteeism, performance and length of

22      service."  Is that right?

23  A   Correct.

24  Q   Lastly, it says "Major emphasis shall be placed on

25      evaluation of services rendered and the quality of
```

RON ALEXANDER

```
 1  Q  Now, you can go on.
 2  A  The context there is the City of Colby has been back
 3     and forth over the years.  It was a five-percent
 4     increase every year evaluation, and then you could
 5     take away from that five percent.  Then there was a
 6     season where they went, okay, we want to separate
 7     this a little more, we want to give a COLA, a cost
 8     of living crease, and a merit increase.
 9           And so you could still get your cost of
10     living.  That way you didn't walk away at the end of
11     your evaluation and you are getting nothing, no
12     raise.
13           But if you -- your performance wasn't
14     great it may ding you on the merit side of it.
15     Well, now they have kind of gone back to here is a
16     breakdown within his salary range bracket and your
17     performance is definitely based in there.  But you
18     have the ability to either get the full merit
19     increase or a divided portion of that, depending on
20     how good or bad their performance was.
21  Q  Okay.  What are the types of things in your
22     experience that have held back officers from
23     receiving a merit raise?
24  A  Quality of work, ability to turn reports in on time,
25     tardiness, teamwork, overall attitude, monthly
```

RON ALEXANDER

```
 1      statistics on actually showing that you are doing
 2      something proactive.  Those are generally the main
 3      things.  Teamwork, not just with your coworkers, but
 4      teamwork with your supervisors, how well you get
 5      along with your supervisors.
 6   Q  What types of monthly statistics does Colby Police
 7      Department maintain?
 8   A  They maintain basically numbers that are put down on
 9      the daily trip sheets.  So every shift that an
10      officer works, he is going to tally a trip sheet.
11      And then our records clerk goes through and combines
12      the trip sheets with the realtime information as far
13      as reports taken, actual written warnings taken,
14      cases pulled.  That is all put into a monthly trip
15      sheet.
16   Q  Okay.
17   A  Or monthly statistics.
18              (Marked Exhibit 14.)
19   Q  (BY MR. MCGIVERN)  What is Deposition Exhibit 14?
20   A  This looks like a very rough breakdown of an annual
21      count of trip sheets.  So what I usually do at the
22      end of very year is go through and total up each
23      category and then use that to help with my
24      evaluation.
25              Looking here, it looks like 2014 may be a
```

RON ALEXANDER

```
 1              MR. GLENDENNING:   Object to form and
 2      foundation.
 3   A  Can you be more specific in your question?
 4   Q  (BY MR. MCGIVERN)  Yeah.
 5   A  I want to make sure that I answer a correct
 6      question, and I am not understanding the question
 7      right now.
 8   Q  Okay.  Well, do you recall telling Lance Finley that
 9      his termination was political?
10   A  Absolutely I remember saying those words, yes.
11   Q  Okay.
12   A  In a context.
13   Q  Okay.  When you said to him that his termination was
14      political, did that violate any City of Colby
15      policy?
16   A  No --
17              MR. GLENDENNING:   Object to form.  Go
18      ahead.
19   A  -- because of the context.
20   Q  (BY MR. MCGIVERN)  Okay.  What was the context?
21   A  The context was is when you walk out of here and you
22      are no longer employed, I don't care what you tell
23      people.  You can tell them that that Chief Alexander
24      is a jerk to work for.  You can tell them it was
25      politics.  I don't care what you tell them.  But you
```

RON ALEXANDER

```
 1      no longer work for the Colby Police Department.
 2               I didn't say, Lance, you are fired because
 3      of politics.  As a matter of fact, there was a lot
 4      of times I told Lance to stay out of politics and,
 5      yet, he couldn't.  And so here we are.
 6   Q  What did you warn Lance Finley about with the
 7      politics?
 8   A  The -- the whole situation of the former sheriff and
 9      Marc Finley, Lance's brother, blowing up in the
10      newspaper, throwing darts at each other.  Lance was
11      very frustrated about that situation.  He wanted to
12      come to his brother's defense.
13               I remember talking to Lance, going, your
14      brother is a big boy, don't get caught up in that
15      stuff.  The issue of Jim Cousins' snow falling down
16      on his windshield as he is driving and Lance wanting
17      to go after him for that.  He had the opportunity to
18      write a ticket in the field on that, and he didn't.
19      He basically came back and asked for permission to
20      do that.
21               I felt like he was getting caught up in
22      the politics.  I am, like, you had your chance to
23      write that ticket out in the field.  Instead, you
24      released him, sent him down the road, and here you
25      are telling me about it now.  If you wanted to write
```

RON ALEXANDER

| | |
|---|---|
| 1 | him a ticket, you should have done it, but you |
| 2 | didn't.  And I am just going to warn you, don't get |
| 3 | caught up in the politics.  Because Jim Cousins, I |
| 4 | felt like, was an issue for him.  Driving his |
| 5 | brother's former Tahoe, I know that was an issue. |
| 6 | Q  You knew that Jim Cousins driving the Tahoe that |
| 7 | used to be assigned to Marc Finley was an issue for |
| 8 | Lance Finley? |
| 9 | A  I know that Jim Cousins' position in that department |
| 10 | was an issue for Lance Finley. |
| 11 | Q  Specifically, what was the issue for Lance Finley |
| 12 | that you are talking about? |
| 13 | A  I think that one time there was a rumor that Jim |
| 14 | Cousins was going to be the next undersheriff, which |
| 15 | is the position that Marc Finley had held.  Jim is |
| 16 | then driving the former canine vehicle that Marc |
| 17 | Finley drove.  And so I think that was an issue for |
| 18 | Lance. |
| 19 | Q  Let's go back to the handbook. |
| 20 | A  Okay. |
| 21 | Q  Oh.  When did you -- okay.  This incident with the |
| 22 | snow on the windshield, we will talk about that in |
| 23 | detail in a minute. |
| 24 | I presume you reviewed the dash cam video |
| 25 | from Mr. Finley's vehicle? |

RON ALEXANDER

```
 1    rehab this guy, he is not going to fall in line of
 2    our request of the -- what we expect out of our
 3    employees.
 4              After he was verbally reprimanded in
 5    February of '16 about having somebody's cell phone
 6    again without any paperwork, that he had taken from
 7    a suspect.  He left the room.  Richard and I looking
 8    at each other, like we are going to -- this guy is
 9    going to get terminated, he doesn't want to listen
10    to anything we have to say.  And then once the video
11    was produced by the Thomas County Sheriff's
12    Department, we felt he was deceitful and so we
13    allowed him the opportunity to resign.
14 Q  Do you know who Bob Herron is?
15              MR. GLENDENNING:  Is this a good place for
16    a break?
17              MR. MCGIVERN:  One more question really
18    quick.
19 Q  (BY MR. MCGIVERN)  Is it your testimony to the jury,
20    Mr. Alexander, that the decision to terminate
21    Mr. Finley was made when you discovered he had cell
22    phones in his possession?
23 A  What I am saying is that the totality of the
24    circumstances that led us up to getting video of an
25    event that he called in a month prior, that until we
```

RON ALEXANDER

```
 1      received the video the report itself wasn't
 2      necessarily as important as the fact of finding a
 3      month later that we believed that he was deceitful
 4      about it.
 5   Q  What did you mean when you just testified that you
 6      and Mr. Barrett looked at each other after talking
 7      about the cell phone and said this guy is going to
 8      be terminated?
 9   A  It was -- we were frustrated at that point.  I
10      remember having a conversation with Richard Barrett
11      at that point going, we have tried to put him on
12      probation, we have written him up, we have verbally
13      reprimanded him and, yet, it has been warned about
14      this cell phone issue in evidence before and, yet,
15      here we are once again.
16              I know Sam Steele, I believe Kyle Askren
17      also, after the whole -- weren't really impressed
18      during the probationary period, that we were
19      allowing him to go on probation because he just
20      didn't want to listen to the supervisors.
21   Q  Okay.
22   A  So what I am saying is the totality.
23   Q  Give me the date that you are going to tell the jury
24      that you made the decision to terminate Mr. Finley.
25   A  The ultimate date was the date I received the video
```

RON ALEXANDER

```
 1    and watched the video and believed he was deceitful
 2    about it.  But we were already working towards
 3    that -- that decision.
 4  Q Okay.  Was there any paperwork generated as part of
 5    your working toward the decision to terminate
 6    Mr. Finley?
 7  A Other than everything already provided in his
 8    personnel file?
 9  Q So the answer is no?
10         MR. GLENDENNING:  Object to form.
11  A I am not saying no.
12  Q (BY MR. MCGIVERN)  Okay.
13  A I am saying I just went through two years of
14    personnel issues that there is write-ups, there was
15    report corrections, there is two years' worth of
16    evaluations, there is a two-month probation period,
17    that all of this led us up to a point of eventually
18    making the decision to terminate.
19  Q Okay.  But to be a hundred percent clear.  The
20    decision to terminate Mr. Finley was not triggered
21    by him having a cell phone in his desk?
22         MR. GLENDENNING:  Object to form.
23  A It was a continuing factor.
24  Q Okay.
25         MR. MCGIVERN:  We can take a break.
```

RON ALEXANDER

```
 1              (Recess taken at 10:11 a.m.  Resumed at
 2      10:20 a.m.)
 3  Q  (BY MR. MCGIVERN)  How serious of a policy violation
 4      did Mr. Finley commit by storing cell phones in the
 5      file cabinet?
 6              MR. GLENDENNING:  Object to form.
 7  Q  (BY MR. MCGIVERN)  Or are you capable of telling me?
 8              MR. GLENDENNING:  Object to form.
 9  A  How serious it is?
10  Q  (BY MR. MCGIVERN)  Yes.
11  A  Again, it was a broad accumulation of issues.
12  Q  Okay.
13  A  That in and of itself was an issue, but it was just
14      a compounding of events.
15  Q  When did you realize that Mr. Finley had stored cell
16      phones in the file cabinet?
17              MR. GLENDENNING:  Object to form.
18  Q  (BY MR. MCGIVERN)  Did you ever realize that, sir?
19  A  We had had a conversation with him previously about
20      the storage of evidence and where it needed to be
21      stored.  This particular cell phone that I am
22      bringing up today was not in a filing cabinet.  He
23      had it in his hand and was discussing what he needed
24      to do with it.  And a conversation came out about
25      that cell phone particularly.
```

RON ALEXANDER

```
 1  Q  Okay.  Do you recall the date?
 2  A  I believe maybe the -- February 12th maybe.
 3  Q  Okay.
 4  A  Somewhere around there.
 5  Q  Did you make the decision to terminate Mr. Finley on
 6     February 12, 2016?
 7  A  I don't think we ultimately made the decision to do
 8     that until we had the video.
 9  Q  So the decision to terminate Mr. Finley was not made
10     on the 12th of February, correct?
11  A  Not ultimately made that day, no.
12  Q  So the decision was not made that day?
13  A  Ultimately.
14  Q  Ultimately?  Okay.  The decision to terminate
15     Mr. Finley was not made on February 13 of 2016?
16  A  It would have been the date that we received the
17     video --
18  Q  Right.
19  A  -- is when we -- I communicated with the city
20     manager, communicated with Richard Barrett, and we
21     made the decision that day.
22  Q  Okay.
23  A  That evening.
24  Q  Okay.  So you had not made the decision to terminate
25     Mr. Finley until the sheriff's department provided
```

RON ALEXANDER

1     City of Colby?

2  A  I would say yes.  But also knowing that the amount

3     of miles we put on a car every month, that it is

4     probably going to happen at some point.

5  Q  Okay.  Who is John Nachtman?

6  A  John Nachtman is -- was formerly employed with the

7     Kansas Bureau of Investigation.  I don't believe he

8     is still there, so I don't know what his current

9     status is.

10 Q  Do you recall giving a statement, a sworn statement,

11    to him regarding the Charles Dewey matter in 2015?

12 A  I remember answering questions to John Nachtman,

13    yes.

14 Q  Okay.  And, of course, this arose from a shooting

15    death of a criminal suspect, right?

16 A  Correct.

17 Q  And is that a situation that KBI will come out and

18    take sworn statements from people?

19 A  Yes.

20 Q  Okay.  And when you were speaking with Mr. Nachtman

21    you understood you had an obligation to tell the

22    truth, right?

23 A  Yes.

24 Q  Okay.  I am going to play for you some of a

25    recording that we obtained through a subpoena and I

RON ALEXANDER

```
 1      am going to ask you questions about the contents of

 2      the recording.

 3   A  Okay.

 4              (Audio played.)

 5   Q  (BY MR. MCGIVERN)  Whose voice is that?

 6   A  I assume two seconds there --

 7              MR. GLENDENNING:  Don't assume.

 8   A  Okay.  I don't know officially.

 9   Q  (BY MR. MCGIVERN)  Okay.  I am going to keep playing

10      it.

11              (Audio played.)

12   Q  (BY MR. MCGIVERN)  Do you recognize the voices on

13      that recording?

14   A  I believe I do, yes.

15   Q  And whose voices did you hear?

16   A  I believe I hear mine on there.  I believe it was

17      giving a statement to John Nachtman, who was a field

18      agent for the Kansas Bureau of Investigation.

19   Q  And the statements you made to him were true,

20      correct?

21   A  Yes.

22   Q  Okay.  So do you have a memory that remembers events

23      better later in time?

24              MR. GLENDENNING:  Object to form.

25   A  As an overall blanket statement, I don't know that I
```

RON ALEXANDER

```
 1   exhibits in the middle of a deposition that I have
 2   not had a chance to review or discuss with my
 3   client.  If you have got any more of these let's
 4   have them all out now, tell me what they are, and
 5   then I may want to confer with my client before we
 6   continue.  This is ambush and it is inappropriate.
 7            MR. MCGIVERN:  To use a deposition exhibit
 8   that I just received?
 9            MR. GLENDENNING:  Yes.  To spring it on me
10   in the middle of a deposition.  You had it
11   yesterday.  You didn't tell me --
12            MR. MCGIVERN:  All right.
13            MR. GLENDENNING:  -- that we were going to
14   have new exhibits and new documents.  You could have
15   told me yesterday.
16 Q (BY MR. MCGIVERN)  Who is Tyson McGreer?
17 A Tyson McGreer is the city manager for the City of
18   Colby.
19 Q Okay.  Do you socialize with Mr. McGreer outside of
20   work?
21 A No.
22 Q Do you do CrossFit with Mr. McGreer outside of work?
23 A I haven't done CrossFit in over five years.
24 Q Okay.  Who is Sherri Overton?
25 A Sherri Overton is a woman who lives in our
```

RON ALEXANDER

```
 1      community.
 2   Q  Okay.  Who is her husband?
 3   A  From what I understand, she doesn't have a husband.
 4   Q  Did she have a husband in '13?
 5   A  I believe she was married to a Terry Overton in
 6      2013.
 7   Q  How about '15?
 8   A  I don't remember -- probably still maybe married at
 9      that point.  I don't remember.
10   Q  Okay.  Did you attend her CrossFit studio in the
11      city of Colby?
12   A  I don't -- I am not aware that she owned a CrossFit
13      studio.
14   Q  Did you attend a CrossFit studio in the city of
15      Colby with her?
16   A  For nine months up to the point of Memorial Day
17      weekend of 2014, I attended CrossFit two or three
18      times a week on average for nine months in which she
19      was one of the coaches of many coaches at that
20      facility.
21   Q  Okay.  Did you consume marijuana with her?
22   A  No.
23   Q  Okay.  Did you ever consume marijuana with her
24      husband?
25   A  No.
```

RON ALEXANDER

1    Cousins was out back and I asked him, hey, this is

2    what is going on, just so you know, Lance has

3    resigned from the department, and he said fair

4    enough.

5  Q  Okay.  So you reported to Tom Nickols that

6    Mr. Finley's employment was over, right?

7  A  That -- later that day, yes.

8  Q  And that is when he told you --

9  A  On the 17th.

10 Q  And that is when he told you, okay, we are not going

11   to be filing a criminal case?

12 A  I asked him at that point, I said, hey, just so you

13   know, I gave Lance an opportunity to resign, he

14   accepted that, he has turned in his verbal

15   resignation, are you guys looking at going any

16   further with this case, and he said no, he is not.

17 Q  Okay.  So when Tom Nickols learned that Mr. Finley's

18   employment was separated, he said he would not be

19   looking into any type of filing a case?

20 A  That was the impression he gave me.

21 Q  Okay.  Was he satisfied that Mr. Finley had been

22   separated from employment?

23            MR. GLENDENNING:  Object to form and

24   foundation.

25 A  I don't know if he was or not.

RON ALEXANDER

1   Q   Just two?

2   A   Yes.

3   Q   Okay.

4   A   I don't remember where the Andreasons lived prior to

5       their Third Street address.

6   Q   Did Tom Nickols ever tell you why it took him so

7       long to get you the video of the Jim Cousins

8       incident?

9   A   No.

10  Q   Okay.

11                  (Marked Exhibit 24.)

12  Q   (BY MR. MCGIVERN)  What is Deposition Exhibit 24?

13  A   It looks like when I submitted to CPOST a Notice of

14      Termination or Status Change concerning Lance

15      Finley.

16  Q   And can you turn to the second page?

17  A   Yes.

18  Q   Read to the jury what you wrote on "Please give a

19      brief description".

20  A   "Numerous performance evaluation issues.

21      Accusation against another LEO of traffic infraction

22      that wasn't substantiated."

23  Q   Okay.  Do you stand by those statements?

24  A   Yes.

25  Q   Okay.  Now, in November of '15, Mr. Finley made an

RON ALEXANDER

```
 1   A   A merit increase would have been whatever percentage
 2       he was due for that yearly evaluation that should
 3       have taken place in August, but we postponed because
 4       he was put on probation.
 5   Q   So he earned a raise based on his performance in
 6       October of '15?
 7   A   Yes.
 8   Q   Okay.  And he also received a promotion in October
 9       of '15?
10   A   Yes.
11   Q   All right.  Is there anything on Exhibit 25 or 26
12       that isn't true?
13   A   No, it is true.
14   Q   Thank you.
15   A   Uh-huh.
16                (Marked Exhibit 27.)
17   Q   (BY MR. MCGIVERN)  This looks like a series of
18       emails.  Can you tell me what it is?
19   A   I believe this is my correspondence with a Dave
20       Thompson from Kansas CPOST.
21   Q   So why did you send in -- it appears from this email
22       exchange, it appears that you sent in documentation
23       as well as the video to CPOST?
24   A   I believe I faxed them -- if I remember right, I
25       faxed them the two pages for the termination or
```

RON ALEXANDER

1  through that situation, the plan was to let the
2  suspect go mobile southbound on Franklin, getting
3  him past College Drive and taking him down with four
4  or more officers.  They had two officers, Sam Steele
5  and Chris Bustillos, that were in that area waiting.
6          And I remember apparently several blocks
7  prior to that Lance and Kraig Cersovsky, I believe,
8  initiating a traffic stop and taking him into
9  custody at that point.
10 Q  What do you recall about Mr. -- what do you recall
11    about a use of force allegation against Mr. Finley
12    from that incident?
13          MR. GLENDENNING:  Object to form.
14 A  Like I said, I remember Sam Steele informing me
15    about the situation.  He was not happy.  He was
16    upset about the situation.  But it was a lot less
17    about it being a use of force situation than
18    breaking the ops plan.
19 Q  That portion of it that was about use of force,
20    however small it is, tell me what you remember about
21    that.
22          MR. GLENDENNING:  Object to form.
23 A  Again, I think from what I understand, is that maybe
24    use of force wouldn't have had to have been applied,
25    not that it was unjustified use of force, but maybe

RON ALEXANDER

```
1   A   Right.

2   Q   So you understand this issue with Mr. Finley having

3       gone out on a -- this allegation that you sent out

4       Mr. Finley on a drug buy after you had determined

5       that he engaged in deceitful conduct.  You know what

6       I am talking about?

7   A   You are talking that -- the night that -- or the day

8       that I --

9   Q   The 16th.

10  A   The 16th, that I received information, that I

11      followed up on the information, spoke to my

12      detective about it, talked to my city manager about

13      it, and ultimately made the decision to terminate

14      him the next morning.  I know there is an issue

15      coming out of why would I allow Lance Finley to be

16      involved in a drug buy that night when I am probably

17      going to be terminating him in the morning.

18              I was focused on making that ultimate

19      determination the next morning.  I knew at that time

20      that there was going to be a KBI agent, I believe,

21      by the name of Mike Lynn that was going to be

22      present during the drug buy, another City of Colby

23      police officer by the name of Kraig Cersovsky at the

24      time, that if we still needed information -- that it

25      wasn't Lance going and doing this drug buy all by
```

RON ALEXANDER

```
 1    himself after I have called his integrity into
 2    question, that there was other people being involved
 3    in this that could provide testimony, if that case
 4    went forward.
 5  Q So you had decided Mr. Finley's integrity was an
 6    issue before he went out on that drug buy that
 7    night?
 8  A Throughout a course of -- yes.
 9  Q Okay.  Is that good police practice to send out
10    somebody to do drug buys when the chief of police
11    has problems with their integrity?
12              MR. GLENDENNING:  Object to form.
13  A It was -- it was a bad decision on my point [sic].
14  Q (BY MR. MCGIVERN)  Okay.
15  A And I can't deny that.  But there was two other
16    people present that can give testimony on that
17    case -- for one, not every drug buy that is planned
18    is going to go.
19  Q Okay.
20  A It may not go.  If it does go, there is two other
21    people involved that could have given sworn
22    testimony to it.  I knew that there was talk of a
23    drug buy maybe going down that night, maybe not.
24              But I made the decision that I wasn't
25    going to terminate him until the next morning.  And
```

RON ALEXANDER

1    that was a choice that I made and I have to stand by

2    that choice, whether it was a good choice or a bad

3    choice.

4  Q  Could it be that you didn't have any problems with

5    his integrity on the 16th?

6  A  No.  I think when I had the video, that I had

7    everything that I needed to know.

8  Q  And you sent him out on that anyway?

9          MR. GLENDENNING:  Object to form.

10 A  I didn't send him out on a drug buy.

11 Q  (BY MR. MCGIVERN)  You permitted him to go?

12 A  They had talked about the probability of a drug buy

13    taking place.  And ultimately, I didn't stop that

14    from happening as far as Lance's involvement in it,

15    which I will admit that was -- looking back now,

16    that was a poor decision.

17 Q  Okay.

18 A  That is the first guy I had terminated in my three

19    years of employment as chief of police at that

20    point.

21 Q  Did anyone discipline you over sending out an

22    officer that you perceived had integrity issues?

23          MR. GLENDENNING:  Object to form.  He has

24    told you several times he didn't send him.

25          MR. MCGIVERN:  Sorry.

RON ALEXANDER

```
 1     have stopped several times in that process.  But he
 2     was always smarter, didn't have to listen, knew more
 3     than the supervisors at the time.
 4  Q  Did you have any discussions with Mr. Glendenning
 5     back in '15 regarding Rod Taylor?
 6  A  I believe we probably did when all that was blowing
 7     up.
 8  Q  And do you recall what his role was at that time?
 9  A  I believe he mentioned yesterday, to remind me, that
10     I think he was a part of --
11              MR. GLENDENNING:  Wait just a minute.  You
12     don't tell him anything that you and I have said
13     when you have been my client.
14              THE WITNESS:  Okay.
15              MR. GLENDENNING:  You just tell him what
16     you know from back then.
17  A  I think he had something to do with the possibility
18     of recalling the sheriff or something, but I don't
19     remember exactly what his role was.
20  Q  (BY MR. MCGIVERN)  What do you know about Rod
21     Taylor's driver's license getting turned in for
22     review?
23  A  I believe at some point it was turned in for review.
24     I believe at some point it came up in communication
25     when we were still, as in the police department, in
```

RON ALEXANDER

```
 1     that building, the sheriff's department.  I believe
 2     the rumor going around and the guys were starting to
 3     talk about how they had heard that Rod's license had
 4     been terminated, suspended, put on hold, something
 5     medical.  And my advice to them was to not enforce
 6     anything that they didn't absolutely know or were
 7     aware of, sure of.  But if you are hearing that this
 8     is going on, maybe find out what is going on.
 9   Q  And did you play any role with turning in
10     Mr. Taylor's driver's license for review?
11   A  I believe I may have sent in his driver's license
12     for review, but I would have to go back.  I know
13     somebody did.
14   Q  I mean, if there was a rumor about it, it probably
15     was true then, right?
16   A  Well, just because you --
17            MR. GLENDENNING:  Object to form.
18   A  Just because you submit a driver review doesn't mean
19     that it automatically gets suspended --
20   Q  (BY MR. MCGIVERN)  Okay.
21   A  -- in a decent time frame.
22   Q  Okay.  And did you ever discuss with Marc Finley
23     signing off on his letter that he wrote about
24     misconduct by Rod Taylor?
25   A  I don't know that I ever signed off on anything.
```