THE UNTIED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LANCE FINLEY,                                  )
                              Plaintiff,       )
        vs.                                    )        Case 6:17-CV-01215-EFM-KGG
                                               )
CITY OF COLBY, KANSAS,                         )
RON ALEXANDER and                              )
TOM NICKOLS, JR.,                              )
                              Defendants.      )
                                               )
_____       )

## **REPLY IN SUPPORT OF DEFENDANTS**
## **MOTION FOR SUMMARY JUDGEMENT**

### **INTRODUCTION**

Plaintiff's Response does not adequately rebut Defendant's right to summary judgment. He admits most of the facts and fails to actually controvert the remaining facts.

It is now clear that the video at the center of this case is not disputed and clearly shows that Cousins was in his own lane traveling at a reasonable rate of speed when he went past Plaintiff – just like he did 40+ other vehicles on the road that day.   Plaintiff does not contend that the video supports his dramatic reports of being run off the road.    Those false reports enjoy no First Amendment protection.

It is likewise clear as a matter of law that no action was taken as result of the reports.  It was not until a month later when an unsolicited and admittedly accurate video surfaced, on the heels of Plaintiff being caught, once again mishandling evidence – misconduct for which he had been placed on probation earlier – that adverse employment action occurred.  Thus the fact that Plaintiff made a report against Cousins, itself, was not a motivating factor.

-1-

Plaintiff's attempts to make his case with comparators falls short because none of them have the sufficiently high level of similarity. In particular, Plaintiff wholly ignores the work history factor. None of the comparators has the same dismal history as the Plaintiff and none of them committed the alleged misconduct at the same time they were discovered to be once again engaging in additional misconduct for which they had already been placed on probation.

Plaintiff's Response concerning the whistle blower claim is essentially an attempt to conflate that Kansas exception to at will employment with the First Amendment. In addition it is based in part on the nonsensical argument that Chief Alexander was so upset with Marc Finley's letter that he fired Plaintiff but then offered Marc a job.

Defendants have shown that they are entitled to summary judgment.

**STATEMENT OF FACTS**

Plaintiff does not successfully controvert any of the facts. He admits a large number of them are unconvtorverted. He concedes others but adds additional facts or quibbles with supposed implications. The facts that Plaintiff concedes are uncontroverted are in bold below. The facts Plaintiff claims to controvert are in italics followed by Defendants' reply.

1.     **Plaintiff was hired by Colby Police Department as a police officer in August of 2013.**

2.     **Ron Alexander became Chief of Police in the fall of 2013.**

3.     **Tyson McGreer became the City Administrator in September 2012.**

4.     **On January 15, 2016 Plaintiff was still employed by the Colby, Kansas police.**

**The encounter with Cousins**

5.      On the morning of January 15, 2016 Plaintiff was driving on Kansas Highway 25.

6.      Plaintiff was traveling northbound.

7.      A Thomas County Sheriff's patrol vehicle was traveling on Kansas Highway 25.

8.      *The Thomas County Sheriff's vehicle was driven by Jim Cousins. (Doc. 95, ¶¶ 1 and 2.)*  Plaintiff does not controvert this fact.  He adds the irrelevant additional fact that he did not know this fact at the time he encountered the vehicle being driven by Cousins.

9.      Jim Cousins had driven from Colby to Atwood, picked up a prisoner and was returning to Colby.

10.     Plaintiff and the Thomas county vehicle passed each other near County Road W on Kansas Highway 25.

11.     Plaintiff recognized the vehicle as the Thomas County Sheriff's vehicle previously operated by his brother Marc Finley.

12.     Plaintiff's brother had been terminated from the position of Thomas County Undersheriff a few months prior to January 2016.

13.     *It was rumored that Jim Cousins would be Marc Finley's replacement as Undersheriff. (Alexander Dep. 48:13-15.)*  Plaintiff does not controvert the fact as stated.  He quibbles with a possible implication – that he was aware of this rumor.  Interestingly, he does not offer anything – not even his own testimony – to controvert the implication with which he quibbles.

**The reports by Plaintiff**

**14.     Plaintiff called the law enforcement dispatch after passing the Thomas County Sheriff's vehicle.**

15.     *Exhibit B is a true and accurate audio recording of Plaintiff's call to dispatch. Doc.129, p. 3, § 2.a.iii; (Finley Dep., 266:20-23).* Plaintiff expressly states that he does not controvert or even disagree with the content and accuracy of audio of his call to dispatch.  He merely adds an irrelevant argument about who listened to the audio when.

16.     *Plaintiff stated to the dispatcher that the driver of the Thomas County Sheriff's vehicle "Just went left of center and about ran me off the road."  (Exhibit B, 00:31-00:40). See* Defendant's Reply to SOF 15.

17.     *Plaintiff stated to the dispatcher: "and it looks like he is running a hundred and twenty." (Exhibit B, 00:31-00:40). See* Defendant's Reply to SOF 15.

18.     *Plaintiff told the dispatcher that the Thomas County Sheriff's vehicle "just about fucking hit me." (Finley Dep. 169:15-17; Exhibit B, 00:31-00:40). See* Defendant's Reply to SOF 15.

19.     *Plaintiff's call to dispatch was transferred to Deputy Jake Cox. (Exhibit B, 00:56-3:20). See* Defendant's Reply to SOF 15.

20.     *Plaintiff told Deputy Jake Cox the driver of the Thomas County Sheriff's vehicle was "running at least ninety plus." (Exhibit B, 3:25-3:33). See* Defendant's Reply to SOF 15.

21.     *Plaintiff told Deputy Jake Cox the Thomas County Sheriff's vehicle "Just about went head on with me." Exhibit B, 3:25-3:33). See* Defendant's Reply to SOF 15.

22.     *Plaintiff stated that the Thomas County Sheriff's vehicle came "clear left of center." (Exhibit B, 3:25-3:33; 4:01-4:05). See* Defendant's Reply to SOF 15.

23.     *Plaintiff told Deputy Jake Cox "to do what you want" with his report of the incident. (Exhibit B, 3:22-3:25;3:55-57). See* Defendant's Reply to SOF 15.

24.     *Plaintiff was asked by Deputy Cox "you want to sign a ticket?" (Exhibit B, 3:50-51). See* Defendant's Reply to SOF 15.

25.     *Plaintiff was also asked if he would "rather [Deputy Cox] just chew [Cousins'] ass?" (Exhibit B, 3:50-51). See* Defendant's Reply to SOF 15.

26.     *Plaintiff responded "might just say something to him." (Exhibit B, 4:15-16). 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25 & 26. See* Defendant's Reply to SOF 15.

**27.     After talking to Deputy Cox, Plaintiff tried to call Chief Ron Alexander.**

**28.     Chief Alexander did not answer.**

**29.     Plaintiff then called County Attorney Kevin Berens.**

**30.     Plaintiff sent Defendant Ron Alexander the following text:**

> **Hey for what it's worth Jim just went left of center and ran me off the road at county road w i [sic] realize nothing can be done but it was bad he went left of center I called Kevin and he said he would note it.**

**31.     Chief Alexanders response to the text was "k".**

**32.     Cousins denies the allegations.**

**33.     After the text with Ron Alexander on January 15, 2016, there was no communication between Defendant and Plaintiff regarding Plaintiff's allegations about the operation of the Thomas County Sheriff's vehicle for about a month.**

**The video**

**34.**     There was a dash cam in the Thomas County Sheriff's vehicle.

**35.**     The dashcam recorded Cousins entire trip from Colby to Atwood and back.

**36.**     The dashcam recorded when the vehicles passed each other.

**37.**     That dashcam recording is the video offered as Deposition Exhibit 1 in the deposition of Lance Finely and previously filed conventionally with the court as Exhibit C.

**38.**     Exhibit C is a true and accurate copy of the Tahoe's dashcam video[1].

**39.**     Exhibit C shows Plaintiff's vehicle going past the Thomas County Sheriff's vehicle at Media Player 01:19:13-01:19:22 and Time Stamp 09:19:20-09:19:29; [2]

**40.**     It is about thirty (30) miles from Atwood to Colby.

**41.**     The speed limit on K-25 between Atwood and Colby is Sixty-five miles per hour.

**42.**     It took Cousins about thirty minutes to travel between Atwood and Colby

*43.*     *The video does not indicate that the Thomas County vehicle was ever operated at an unsafe speed. (Finley Dep., 160:14-19; Exhibit C).* Plaintiff admits that he cannot point to any place on the video that shows the vehicle was ever driven at an *unsafe* speed.  He then adds what is an evasive mere assertion that it was driven "above the posted maximum speed." But this evasive mere assertion is clearly contradicted by the video and, therefore, need not be accepted.

---

[1] The file can be opened with VLC media player. The file used in this memorandum is VIDEO_TS, IFO.

[2] In this memorandum, references to Media player are to the time into the video beginning with 0:00.  The Time Stamp refers to the time stamp on the face of the video itself.  To view the Time Stamp in VLC player click on Subtitle, go to Sub Track and select Closed Captions 1.

44.     *The video shows one location where Cousins went left of center to go around a semi on the shoulder with its flashers on. (Exhibit C, Media Player 00:21:24-00:21:32, Time Stamp 08:21:17-08:21:25; Cousins Dep. 12:14 thru 13: 4).*  Plaintiff's response does not controvert this fact about what a single location in the video clearly shows.  He adds irrelevant and evasive assertions about what the video shows in *other* locations.  Notably, he does not even assert that there is any other location that shows the vehicle left of center, only that he thinks it is inconclusive.  He does not however controvert the actual fact asserted - that there is a place in the video that clearly shows what it looks like when the vehicle is left of center, which can be compared to the location where Plaintiff met the vehicle to conclusively show that it was not left center at that meeting.  The court need not accept Plaintiff's assertions that are plainly contradicted by the video.

45.     *Plaintiff cannot identify any other place in the video where the Thomas County Sheriff's vehicle was not within its own lane.  (Finley Dep., 86:21-25, 87:1-2).* Plaintiff's response does not controvert this fact about what a single location in the video clearly shows.  He adds irrelevant and evasive assertions about what the video shows in *other* locations.  Notably, he does not even assert that there is any other location that shows the vehicle left of center, only that he thinks it is inconclusive.  He does not however controvert the actual fact asserted - that there is a place in the video that clearly shows what it looks like when the vehicle is left of center, which can be compared to the location where Plaintiff met the vehicle to conclusively show that it was not left center at that meeting.  The court need not accept Plaintiff's assertions that are plainly contradicted by the video.

**46.     The video shows Cousins passing more than 40 other vehicles traveling in the**

**opposite direction.**

*47. Sheriff Nickols received no other complaints about Cousins' driving on that trip. (Nickols Dep. 16:25 thru 17:2.)* Again Plaintiff fails to controvert the fact actually asserted by making a different assertion. What Nickols observed on the tape a month later does not controvert that he did not receive any complaints from any of more than 40 drivers that Cousins encountered in the same manner as he encountered Plaintiff that morning. Moreover, what Nickols observed has no relevance to the truthfulness of Plaintiff's allegations that "Cousins went left of center and ran me off the road." They deal with such minor matters as parking in a stripped area near the door where he would be bringing a prisoner out for transport.

**48.    The video shows an occasion where Cousins past an oncoming car that was stopped and waiting to turn left.**

**49.    Other than the one location where Cousins went around a semi stopped on the shoulder, the video shows no occasion on which Cousins overtook and passed traffic traveling in the same direction.**

### The video is given to Chief Alexander

**50.    Sometime after January 15, 2016, one of Sheriff Nickols' employees gave him the video from the dashcam.**

**51.    Sheriff Nickols reviewed the entire video.**

**52.    Sheriff Nickols reviewed the video several times just to be sure Cousins stayed in his lane.**

**53.    It did not appear to Sheriff Nickols that Cousins went left of center or in**

**anyway swerved at Plaintiff.**

**54.     Sheriff Nickols perceived from reviewing the video, that Plaintiff's accusation was false.**

**55.     In mid February, 2016, Sheriff Nickols gave the video to Chief Alexander.**

*56.     Chief Alexander reviewed the video numerous times and concluded that it did not show Cousins leaving his lane of traffic when he passed Plaintiff. (Alexander Dep., 145:15-21, 60:10-13).* Plaintiff attempts to controvert this fact with the testimony of another former officer who was fired when he was caught on video receiving oral sex while on duty in a police vehicle with the door open in a residential neighborhood. (SOF 98).   But the video clearly supports the conclusion that Alexander reached and Plaintiff admits that Alexander told him at the termination meeting that he had concluded the video did not show what Plaintiff had reported.   Even Plaintiff's long interrogatory response–in which he attempts to list every misstep shown by the video–can only assert the video shows the Tahoe "crowding if not crossing" the centerline.   These assertions of questionable credibility which the video plainly contradicts need not be accepted.

*57.     Chief Alexander concluded that Plaintiff had been deceitful in making the report. (Alexander Dep., 145:15-21, 60:10-13; Alexander Affd. ¶ 5, DEF 244-245). Controverted. Finley incorporates by reference his response to SOF No. 56.*

See reply to SOF 56.

*58.     Chief Alexander also had another officer review the video, who advised that he agreed with Chief Alexander's assessment. (Alexander Affd., ¶ 5, DEF 244, 3ʳᵈ paragraph.)* Plaintiff offers no evidence to controvert this fact, which is not hearsay because it demonstrates information

Alexander received to confirm his own conclusion.  Moreover, once again, the video plainly shows that the vehicle did not go "left of center and ran me off the road" as Plaintiff falsely reported to Alexander.

### Plaintiff's termination

59.     **Plaintiff met with Chief Alexander on February 17, 2016.**

60.     **This meeting was the first time Defendant Ron Alexander communicated with Plaintiff regarding Plaintiff's report about the operation of the Thomas County sheriff's vehicle since January 15, 2016.**

61.     **Prior to this meeting there was no criticism by Defendant Ron Alexander regarding Plaintiff's report on January 15, 2016.**

62.     **Chief Alexander placed the video recording on the desk during the meeting.**

63.     **This was the first time Plaintiff knew video existed of his encounter with the Thomas County Sheriff's vehicle on January 15,2016.**

64.     *Chief Alexander informed Plaintiff that from his review of the dashcam footage he did not think the Thomas County Sheriff's vehicle had come left of center.  (Finley Dep., 194:22-25).* Plaintiff does not controvert the fact actually asserted – what Chief Alexander stated.  Moreover, once again, what the video plainly shows supports this statement.

65.     *Plaintiff has no reason to believe Defendant Ron Alexander did not honestly believe the Thomas County Sheriff's vehicle did not come left of center. (Finley Dep., 195:5-9).* This fact comes directly from Plaintiff's testimony and addresses what Alexander "honestly believed." The passages cited by Plaintiff addresses Plaintiff's assertions about the *reasonableness* of that belief

-10-

– assertions that need not be accepted because they are plainly contradicted by the video itself, as well as the conclusions of every other officer who reviewed the video–including the Sheriff and Sgt. Barret.  (SOF 58).

*66.  Chief Alexander offered Plaintiff a chance to resign. (Alexander Dep., 60:10-13).* Plaintiff does not controvert the fact asserted, but quibbles with a possible implication that is not actually there.  The fact that Plaintiff was offered a chance to resign says nothing about whether his ultimate departure was voluntary, as Plaintiff admits by agreeing that SOF 67 is not controverted.

**67.  Plaintiff initially resigned but then recanted his resignation.  His separation was involuntary.**

**Plaintiff's job duties**

**68.  In becoming a law enforcement officer Plaintiff promised to "keep [...] [his] private life unsullied ... and [...] [to] behave in a manner that [...] [would] not bring discredit [...] to [...] [his] agency."**

**69.  Plaintiff understood it was his fundamental duty as a law enforcement officer "to protect the innocent against deception."**

*70.  Plaintiff's Job Description included reporting "public safety or traffic hazards and other items requiring attention by other departments" (Alexander Aff'd., ¶ 15, DEF 502).* Plaintiff does not controvert the fact asserted, but quibbles with the possible implication he might have a duty to remain true to those job duties even in his personal life off the clock.

**Plaintiff's work record**

**71.  Plaintiff was evaluated on August, 15, 2014.**

72.     The "Initiative" section of the 2014 evaluation states "Areas of interest the initiative is excellent,""initiative on getting reports done & other calls are lacking."

73.     The "Productivity" section of the 2014 employee evaluation states: "Deadlines for reports getting better but needs improvement.".

74.     The "Interpersonal Relations" section of the 2104 evaluation rated the Plaintiff "Below Standard[,] Occasionally causes conflict with others in implementation of assignment.  Occasionally fails to compromise or understand other points of view.  Tends to be negative."

75.     The handwritten note under "Interpersonal Relations" on the 2014 employee evaluation states "Could be better at respecting chain of command & view points of other employees."

76.     The 2014 employee evaluation rated Plaintiff's "Teamwork" as "Below Standard[,] Requires considerable 'selling' of policies and disagreements are frequent. Uncooperativeness displayed frequently.  Cannot count on willing contributions to the team. Reactive rather than proactive."

77.     The 2014 employee evaluation also noted Plaintiff "[a]pparently [has] issues while on nights of not showing up on time."

78.     Plaintiff responded to this 2014 evaluation. (the "Rebuttal").

79.     In his Rebuttal, Plaintiff stated:  "I agree that I do have little respect for some in the chain of command" and admits "this is a fault."

80.     In his rebuttal, Plaintiff acknowledged "I have issues with two supervisors, and

one road officer."

81.     On May 26, 2015, Plaintiff was placed on probation beginning May 27, 2015 to end on August 15, 2015.

82.     The reasons for the probation were: (1) Supervisor contact on controlled buys; (2) Narrative reports; (3) Timeliness on reports–per County Attorney; (4) Showing up for pass down; (5) Working with corporal Steele on corrections to reports and improving on future reports.

83.     On June 10, 2014 Plaintiff was given a warning concerning "[f]ailing to contact supervisor while assisting with drug buys w/ sheriff Dept. in Rexford on 6/7/15.  Lance was recently written up for this issue.  When confronted on this date, Lance advised since he was not turning in OT w/ the city he didn't think notification was required."

84.     At the intended end of the probation period on August 15, 2015, Plaintiff was given an evaluation.

85.     On the August, 2015 evaluation,  Plaintiff was scored "Below Standard" under the "Productivity" section.

86.     On the August 2015 evaluation, Plaintiff was scored "Below Standard" on "quality".

87.     The August, 2015 Employee evaluation scored Plaintiff "Below Standard" on "Interpersonal Relations."

88.     The August 2015 employee evaluation rated Plaintiff "Below Standard" for "Communications."

**89.     The August 2015 evaluation rated Plaintiff "Below Standard" on "Teamwork."**

**90.     On the August 2015 Evaluation, Plaintiff's probation was extended.  (Alexander Affd. ¶ 13.)**

**91.     On October 1, 2015, Plaintiff was again evaluated.**

**92.     The October 2015 evaluation was generally favorable and Plaintiff was taken off probation, given a promotion and salary increase.**

**93.     While employed with the city, Plaintiff would take cell phones from suspects and keep them in his file cabinet instead of getting an evidence custody receipt and logging them into evidence.**

*94.     Plaintiff would sometimes hold the phones in the file cabinet for months. (Finley Dep.  254:15-19.)*  Plaintiff offers no evidence to controvert this fact, rather he draws attention to his own testimony that the cell phones were inappropriately held for long periods of time, "possibly" even for months at a time.

**95.     Plaintiff was talked to by his supervisors about holding the phones outside of evidence without an evidence custody receipt or warrant.**

**96.     On February 12, 2016, Plaintiff was again discovered to be possessing cell phones outside the evidence locker, without an evidence custody receipt or a search warrant.** .[3]

*97.     Plaintiff's termination was the culmination of issues including his probation,*

[3]Plaintiff does not include this paragraph in his list of uncontroverted facts.  However he does not address it at all and, therefore, it is uncontroverted.

*inappropriate handling of evidence, written warnings and problems on his written evaluations two*

*years in a row and the video.  (Alexander Dep., 59:17 thru 60:13).* Plaintiff does not controvert this

fact, Plaintiff offers no evidence Plaintiff's termination was not the culmination of issues included

in the list.  Plaintiff merely points out there were many reasons to terminate Plaintiff, even beyond

those explicitly stated.

Plaintiff asserts his termination was "political"–a nebulous term.  Plaintiff immediately

controverts his very own assertion by showing Defendant's denied ever firing anyone in 2016 for

political considerations.  Ron Alexander told Plaintiff he could tell people it was political if he

wanted.

**Comparators**

**98.    Ron Alexander terminated former officer, Kraig Cersovsky, because dash cam**

**footage showed him being fellated in uniform in a patrol car.**

**Running tags**

**99.    Chris Bustillos became an officer with Colby Police Department in December**

**2014**

**100.    He began going on patrol by himself in February of March of 2015.**

**101.    Ben Kahle, an officer with the Kansas State Patrol, approached Plaintiff and his**

**brother Marc.**

*102.    Despite knowing this, and being on the Police force, Lance Finley did not ever*

*talk to Ron Alexander about it. (Finley Dep., 207:2-4).*  Plaintiff does not controvert this fact.  He

merely quibbles with the implication that he knowingly withheld information.  However, it is

undisputed he was a police officer, Bustillos was a police officer, and he did nothing to make Chief Alexander aware of this allegation.

103. **Either Kraig Cervosky or Marc Finley brought this to Ron Alexander's attention.**

*104.     Ron Alexander does not recall being provided a name. (Alexander Dep., 126:2-8).* Plaintiff fails to controvert that Ron Alexander does not recall being provided a name.  He merely controverts whether he was provided a name and then attacks Ron Alexander's memory.  None of which shows how Bustillos was a proper comparator.

*105.     They only provided very general information.  (Alexander Dep., 126:7-9).* Even knowing the name of the victim does nothing to make Bustillos a proper comparator.

*106.     This triggered an investigation by Ron Alexander. (Alexander Dep., 124:25; 125:1-4).* Plaintiff has not controverted this fact, he merely quibbles with the scope and manner of the investigation and the brief description of the investigation provided, as requested, in the interrogatory.

*107.     The investigation included "checking dispatch logs, checking driver's license numbers" to calculate how many women versus men he pulled over.* See Reply to 106.  Further, controverting the scope and manner of this investigation does nothing to show Bustillos was a proper comparator.

*109.     Chief Alexander confronted Chris Bustillos about the allegation.  (Alexander Dep., 126:9-10).* Plaintiff has not shown this is controverted.  Plaintiff cites to Bustillos Deposition where Bustillos makes clear he cannot recall if he was asked the name.  Immediately following this

answer is the question, located partially on a page not included in Plaintiff's exhibit, "[d]id he ask

you the names– name of the person?"  Bustillos explicitly answered "[w]hen I first told him I think -

- I honestly can't remember, it was so long ago." (Bustillos Depo., 19:15-25; 20:1-3).  Plaintiff offers

nothing to show that Defendnat Alexander did not address the issue in part or in whole.

*110.Chris Bustillos assured Ron Alexander "that didn't happen and wasn't happening."*

*(Alexander Dep., 125:12-14).* Plaintiff does not controvert the fact Bustillos assured Ron Alexander.

Plaintiff attempts to change the fact to something akin to "Bustillos told the truth when assuring..."

However, that is not the Statement of Fact and the actual Statement of Fact remains uncontroverted.

**111.    Chris Bustillos told him of an incident where he accidently sent a friend
request while doing some investigative work.**

*112.    Ron Alexander counseled Chris Bustillos about this. (Finley Dep., 6-8).*

*113.    During discovery in this case, additional information was provided supporting the*

*allegation against Chris Bustillos.  He was written up and required to retake training from the*

*Kansas Highway Patrol on the proper uses of the NCIC computer.  (Alexander Affd., ¶ 18.)* Plaintiff

does not controvert the nut of the fact.  He quibbles with the term "written up." However, alleged

misuse of NCIC does not establish Bustillos as a proper comparator.

**Use of force report**

**114.    One of Plaintiff's commanding officers, Sam Steele, complained about the
manner in which Finley performed the stop and arrest of Aaron Taylor.**

**115.    The complaint was about Finley and another officer deviating from the
operation plan.**

-17-

116. *The complaint against Finely encompassed a complaint about the amount of force Finley used. (Alexander Dep., 122:23-25; 123:1-3).* Plaintiff does not controvert this fact, he even lists it among the uncontroverted facts. He quibbles with whether the report was true. However this fact does not claim the report was true. It merely states what the report encompassed.

117. *Ron Alexander understood these complaints were tied together because "maybe use of force wouldn't have had to been applied, not that it was unjustified use of force, but maybe it wouldn't have had to have been applied had they stuck with the ops plan and had more officers present at the designated location." (Alexander Dep., 122:23-25; 123:1-3).* Plaintiff does not convert this fact. In fact Plaintiff agrees "[u]se of force was part of the complaint." However, Plaintiff quibbles whether the report was true. First, this fact does not claim the report was true. It merely states that Ron Alexander understood the complaints were tied together.

**118.  Sam Steele addressed his concern regarding the deviation from the plan to both Plaintiff and Ron Alexander.**

119. *Sam Steele only addressed his concern that force could be avoided to Ron Alexander. (Finley Dep., 217:14-17).* Plaintiff has not controverted this fact. Plaintiff offers no evidence to the contrary but suggests the only evidence on the topic be disregarded because the witness once admitted his memory was less than perfect.

141. Plaintiff has two SOF 141. One is placed here. Plaintiff mis-characterizes Kenya Baalman's declaration. She does not state what her understanding was, nor would her speculation be admissible. . She only states what Finley and Chief Alexander told her. She does not state that Chief Alexander said what he didn't believe Finley about, or that Chief Alexander stated what Steele

-18-

did not tell the truth about.

### Alleged sexual harassment

**120.     Andrea Davis is the 911 Director and Chief Communications Supervisor.**

**121.     Andrea Davis characterized these as "hitting on her."**

**122.     Marc Finley was one of the men hitting on her.**

**123.     Andrea Davis never reported receiving or being exposed to unwanted or inappropriate text massages to Chief Ron Alexander or Tyson McGreer or anyone.**

**124.     Andrea Davis was not upset by any texts she saw or was exposed too.**

**125.     No text or images interfered with Andrea Davis' ability to do her job.**

### Alleged investigation suppression

*126.     At some point around July or August of 2014 Lance Finley told Ron Alexander that Sherri Overton's name had come up in a drug investigation.  (Alexander Dep., 76:4-10).* Plaintiff has not controverted the fact that he told Ron Alexander Sherri Overton's name came up in a drug investigation.  Plaintiff merely adds an additional fact.

**127.     Terry Overton told Tyson Mcgreer that there were text messages from his wife to someone being investigated or who had been arrested.** [4]

### Storage of cocain by canine officer

*128.     During Bob Herren's tenure as an Officer with the Colby Police Department Gary Shull, Kent Dible, and Chief Randy Jones all had seniority over Ron Alexander concerning personnel Issues.  (Alexander Aff'd. ¶ 16).* Plaintiff does not controvert this fact.  He quibbles with

---

[4] Ron Alexander has testified that he told Plaintiff to do whatever he needed to do. (Alexander Dep., 85:4-6) However, even taking Plaintiff's version of this incident, it is not a proper comparator.

a supposed implication that is not being made – that Ron Alexander had no supervisory authority over Bob Herron.  The fact stated establishes that Alexander was low on the chain of command at that time, as opposed to his much higher position when he asked for Plaintiff's resignation.  Moreover, Plaintiff's basis for this comparator is Marc Finley's declaration Ron Alexander informed him "Bob Herren stored six kilograms in his personal safe at his home" and that Alexander "acknowledged this was wrong."  (Marc Finley Declaration, ¶ 5).  This is inadmissible hearsay and cannot be used to show what Ron Alexander knew, what Bob Herren had done, or whether Alexander made any judgment about whether Bob Herrren's activities were right or wrong.  But the real fact here is simply that Ron Alexander was not in the same position of authority at that time as he was when Plaintiff was asked to resign.  A fact Plaintiff does not controvert.

**129.    Bob Herren has not worked for the Colby Police Department since 2008.**

**Acceptance of gratuities**

**130.    Sam Steele is a supervisor with the Colby Police.  (Steele Dep., 7:10-11).**

**131.    Sam Steele received free popcorn and was allowed to go see movies for free at the movie theater.**

**132.    Sam Steele received iced tea and other drinks from Starbucks for free.**

*133.    Sam Steele had offered numerous times to pay for the movie and popcorn and they would not accept his money.  (Steele Dep., 39:13-19).*  Plaintiff has not controverted this fact and offers no evidence to support his allegation that Defendants have acknowledged Sam Steele is dishonest.  At best Plaintiff's assertion is based on inadmissible hearsay.  (*See* SOF 116-119).  But the specific fact alleged here is not controverted.

-20-

134. **Sam Steele never told Ron Alexander he was receiving gratuities.**

**Marc Finley's letter**

135. **In September, 2015, Plaintiff's brother Marc Finley submitted a seven page letter to the KBI, the Attorney General, KS CPOST, and the Board of County Commissioners of Thomas County, Kansas, reporting numerous misdeed by Sheriff Rod Taylor.**

136. **Chief Alexander supported Marc Finley's efforts to notify public officials and media outlets about Sheriff Taylor's illegal conduct.**

137. **Marc Finley spoke to Chief Alexander about obtaining employment with the City when his employment with the Sheriff was deteriorating.**

138. **After considering the issues raised by having the brothers working for the same agency, the city decided it would be willing to hire Marc and so advised him.**

139. **After Marc Finley was terminated from the Sheriff's department, Chief Alexander attended a County Commissioner's meeting to defend Marc Finley's position on the retirement of his drug dog.**

## PLAINTIFF'S ADDITIONAL FACTS

Because this is a motion for summary judgement all genuine material factual disputes must be resolved in Plaintiff's favor. For that reason, defendants will not burden the record with citations controverting the facts asserted by Plaintiff but will confine their response to addressing relevance, and admissibility. Defendants reserve the right to contest the facts if the case proceeds beyond this motion.

None of the facts are relevant and are, therefore inadmissable. In addition, some of them are

unsupported by the record or misleading:

140-141.   Plaintiff's brother's declaration, even taken at face value, indicates that at one point in time, Ron Alexander indicated some limitations, due to medical issues at that time.   The implication that this means anything Chief Alexander has to say must be disregarded is unwarranted and unreasonable.   Ex Q, shows that the medical issues involved a particular time frame.   More importantly, there is no issue involved in this motion that turns on memories of Alexander for details under pressure.

160.     This is misleading.   While Plaintiff said he could not *pace* the Tahoe, he, nevertheless twice offered speed estimates that are wildly at odds with what is clearly shown on the video.

165.     Unsupported.   Sheriff Nickols testified that he told people what they were doing "really upsets me or pisses me off, yeah, if that is an anger issue."   He then stated that "in the past" he had told people he has anger issues.   More importantly, this is one of Plaintiff's many attempts to merely cast aspiration without regard to relevance.   Many of them are merely attempts to sling mud on the defendants and even non-parties in a apparent attempt to divert attention from the issues and facts requiring summary judgement.   Any anger issues Nickols may have had have no relevance to the case and are inadmissable

167.     This is a classic red herring.   Plaintiff has stipulated that the video is a true and accurate copy of the Tahoe's dashcam video (Doc. 95), and further agreed that it is uncontroverted that the video shows the entire trip form Colby to Atwood and back, including the encounter between Cousins and Plaintiff. (SOF 34-39).

## ARGUMENTS AND AUTHORITIES

**I.**     **Plaintiff cannot establish the elements of a First Amendment claim.**

Plaintiff does not contest the elements he is required to prove to establish a First Amendment claim.

**A.**     **Plaintiff's Allegation against Cousins was not protected speech**.

**1.**     **The reports were not protected because it was false.**

Plaintiff does not contest the point that the court need not accept his claims that are contradicted by the video.  Notably, Plaintiff does not attempt to argue that his reports of Cousins' driving were true or that the video shows that the report he made to dispatch and Chief Alexander were true.  The best he can muster in an attempt to avoid what is plainly shown by an honest review of the entire video, is asserting that **he** perceived the events on the morning of January 15, 2016 differently.   However courts need not and should not ignore clear, video evidence in the record that contradicts Plaintiff's self serving claims.  *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1207 (10th Cir. 2017).  When a party tells a version of events which is "blatantly contradicted by the record so that no reasonable juror could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Id.,* quoting *Scott v. Harris,* 550 U.S. 372, 378 (2007.)  The video not only contradicts Plaintiff's reports and alleged perception, but contradicts the Cervoski testimony upon which he relies to claim that Chief Alexander supposedly said that the video is inconclusive.

Plaintiff further exacerbates his bold attempt to deny reality by asserting: " (i) Finley perceived that Cousins vehicle crowded, if not crossed, the center line; and (ii) Finley's tires left the

pavement." and then asserting that"this is entirely consisted with Finley's communication to Defendant Alexander." (Response to MSJ, Doc. 138, pp. 20, ¶ 3). It clearly is not.  Plaintiff's text to Ron Alexander stated: "[h]ey for what it's worth Jim just **went left of center** and **ran me off the road . . .**" (SOF 30), (emphasis added.)  In his initial report to the county, Plaintiff stated: "about ran me off the road," "Just about went head on with me," "Just about fucking hit me."  These are not consistent with "crowded if not crossed."

Plaintiff does not mention *Durastanti*–let alone distinguish it.  That case makes clear "while a court considering a summary judgment motion.... 'usually' must 'adopt[] . . . the plaintiff's version of the facts,' that is not true to the extent that there is clear contrary video evidence of the incident at issue" *Thomas v. Durastanti*, 607 F. 3d 655, 659 (10th Cir. 2010).

In *Durastanti*, the defendant law enforcement agent "argue[d] that the speed of the Lincoln is not a contested fact because it can be observed on the marked patrol car's video tape." The Tenth Circuit  "agree[d] that the speed of the Lincoln is not a genuine dispute of material fact, *even recognizing that the video does not capture the entire episode* [emphasis added]." *Thomas v. Durastanti*, 607 F. 3d 655, 664 (10th Cir. 2010).

That court found "[t]he video sufficiently captures the path of the Lincoln and its speed as well as its close proximity to the agents.  There seems to be no room for genuine disagreement as to the speed of the Lincoln–it was moving deliberately out of the parking lot." *Thomas v. Durastanti*, 607 F. 3d 655, 664-65 (10th Cir. 2010)  This was despite the vehicle being obscured behind another vehicle briefly and the plaintiff maintaining certain witnesses claimed the vehicle slowed and perhaps even stopped.  *Thomas v. Durastanti*, 607 F. 3d 655, 664-65 (10th Cir. 2010).

This clearly refutes Plaintiff's position that because the video was "taken from the perspective of the Tahoe not the Finley's vehicle" it could not "blatantly contradict" the report. (Response to MSJ, Doc. 138, pp. 21, ¶ 1).

Just as in *Durastanti*, the Tahoe video, like the marked patrol car, is not from the witnesses perspective, but it does sufficiently capture the path of the Tahoe and its speed as well as its proximity to Finley and the travel lane.  *See Thomas v. Durastanti*, 607 F. 3d 655, 664-65 (10th Cir. 2010).  Moreover, this video shows the entire encounter.  Upon viewing the **entire** tape, it is clear that Cousins either made the entire trip left of center or remained in his own lane when he encountered Plaintiff.  Moreover, the spot on the video where Cousins actually went left of center to go around a stopped semi makes clear what it looks like from the perspective of the Tahoe when it does actually go left of center.  This looks nothing like the encounter with Plaintiff.  The encounter with the Plaintiff looks just like the encounters with over 40 other motorists during the trip, including one that was stopped make a lefthand turn and, therefore, could not have swerved or run off the road to avoid being hit if Cousins had been left of center.

Further damaging Plaintiff's position is the United State's Supreme Court case of *Scott*. There the court "emphasized '[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007) (qouting *Matsushita Elc. Industrial Co. V. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed 2d 538 (1986).

-25-

Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007).

The Supreme Court in *Scott* continued "[t]hat was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007).

Finally, the Supreme Court made clear the lower court "... should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the video tape." *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007).

Plaintiff argues that the tape is inconclusive.  However, he has stipulated that the tape is a true and accurate copy of the Tahoe's dashcam video.  (SOF 38).  The entire tape shows that his encounter with Cousins was a normal bread and butter passing at a normal speed – not the dramatic encounter Plaintiff reported to dispatch and Chief Alexander of having been run off the road by the Cousins vehicle coming left of center at an extremely high rate of speed.  It shows that Cousins vehicle in the same position on the roadway as when he passed the 40 plus other cars on that trip, including one that was stopped to make a left turn and could not have avoided him if he had been left of center. (SOF 48)  Moreover, this can be contrasted with the spot that clearly shows what it looks like when the Cousins vehicle is left of center – when it went around a stopped semi. (SOF 44).

In his lengthy interrogatory answers, which he introduces in his additional facts, Plaintiff attempts to note every possible infraction shown.  However he cannot note anywhere that Cousins was left of center.  The best he can manage is Cousins was "crowding, if not crossing the line." Plaintiff's claim that the video is inconclusive is in bizarre contrast to the amount of time his interrogatory spent noting every possible infraction.

Plaintiff completely ignores the portion of the video showing what it looks like when the Tahoe does travel left of center to pass the parked semi.  He utterly disregards the Tahoe's passage of a car in the opposite direction of travel stopped waiting to turn left and the fact the camera perspective is identical when he passes Plaintiff.

Plaintiff story has varied from "went left of center," "ran me off the road," "just about fucking hit me," "just about went head on with me," before finally becoming the vehicle "crowded, if not crossed."

As *Scott* made clear, the court is not to rely on such a visible fiction as Plaintiff's report to Ron Alexander that he was run off the road as a result of Cousins going left of center when the video clearly shows this was not the case.

Plaintiff's report was plainly false and does not enjoy First Amendment protection.

> **2.      Police Officers can be held to a higher standard on and off duty**.

Plaintiff does not and cannot contest that: "It is well-settled that a police department may, in accordance with its well-established duty to keep peace, place demands upon members of the police force which have no counterpart with respect to the public at large." *Seegmiller v. LaVerkin City*, 528 F. 3d 762, 772 (10th Cir. 2008) (finding Police Department could reprimand officer for off-

duty sexual activity based on the same law enforcement code of ethics language).

Plaintiff's only response to this portion of Defendant's Memorandum is to point out that *Seegmiller* involved "sexual conduct reported in the newspaper. " (Doc 138, p. 23).   But the point of *Seegmiller* is that officer can be held to a higher duty, even where it involves off-duty activity. There is no warrant for the proposition that it should be limited to sexual misconduct.  Plaintiff offers no reason why it should be.

> **3.     Plaintiff's report is not protected because it was pursuant to his employment duties**.

Plaintiff's attempt to make a distinction between whether his conduct was "pursuant" to or "related" to his job duties flies in the face of the applicable case law.

The Tenth Circuit has "noted that the question under *Garcetti* is not whether the speech was made during the employee's work hours, *or whether it concerned the subject matter of his employment*." *Reinhardt v. Albuquerque Pub. Bd. Of Educ.*, 595 F.3d 1126, 1135 (10th Cir. 2010)(emphasis added); *Thomas v. City of Blanchard*, 548 F.3d 1317,1323 (10th Cir. 2008) (internal quotation marks and citation omitted).  "[T]his court has generally identified two factors that suggest an employee was speaking as a private citizen rather than pursuant to [...] [their] job responsibilities: (1) the employee's job responsibilities did not relate to reporting wrongdoing and (2) the employee went outside the chain of command when reporting the wrongdoing."   *Reinhardt v. Albuquerque Pub. Bd. Of Educ.*, 595 F.3d 1126, 1135-36 (10th Cir. 2010).

Plaintiff fails to meet either factor from *Reinhardt* because both the code of ethics he signed and his job description show that he had a responsibility to report erratic driving to the appropriate department on and off duty.  (SOF 70).

Plaintiff's report–viewed in the context of his job description, code of ethics, and behavior–demonstrate his report was made "pursuant to his official duties," within "the chain of command" and as such his supervisor was "ensur[ing] that [...] [his] employees' official communications [...] [were] accurate, demonstrate[d] sound judgment, and promote[d] the employer's mission." *Garcetti v. Ceballos*, 547 U.S. 410, 422-23 (2006).

The Law Enforcement Code of Ethics is not merely aspirational as Plaintiff describes it. Kansas makes clear that all city officers may be required "to take and subscribe an oath... for the faithful performance of their duties." K.S.A. 14-205. That is exactly what this is–an oath by Finley to faithfully perform these duties, not just to aspire to perform these duties. According to Plaintiff's logic an oath to "tell the truth" in court would also be merely "aspirational."

Moreover, *Seegmiller* relied on a similar if not identical law-enforcement code of ethics as the one Plaintiff derides. *Seegmiller v. LaVerkin City*, 528 F. 3d 762, 772 (10th Cir. 2008) ("[L]aw enforcement code of ethics *requires* [emphasis added] officers to 'keep [their] private life unsullied as an example to all and [to] behave in a manner that does not bring discredit to [the officer] or [the] agency.'" *Seegmiller v. LaVerkin City*, 528 F. 3d 762, 772 (10th Cir. 2008); (SOF 68) (Here, Plaintiff signed the Law Enforcement Code of Ethics promising to "keep [...] [his] private life unsullied ... and [...] [to] behave in a manner that [...] [would] not bring discredit [...] to [...] [his] agency").

The reports were false. That is bad enough, but this was done by a police officer whose job duties require him to accurately observe and report the conduct of others - particularly illegal activity. Plaintiff's job required him to give testimony under oath that could result in lengthy jail sentences and other serious consequences. At worst the wide difference between what Plaintiff

reported and what the video plainly shows draws Plaintiff's integrity and honesty into question.  At best the wide difference raises serious questions about his judgment and his ability to accurately observe and report what happens in front of him.  Either way it negatively impacts the question of whether he should continue to be employed as a police officer and Chief Alexander was entitled to consider in making that decision.  Plaintiff's false or, at best inaccurate, report is not protected from scrutiny by his law enforcement employer and cannot form the basis of a First Amendment claim.

**B.     The Report against Cousins was not a matter of public concern.**

Plaintiff's only response to this portion of Defendants' Memorandum is to mistakenly rely upon the Court's discussion and reasoning on pages 9 & 10 of the previous Memorandum & Order, Doc. 65.  (Response to MSJ, Doc. 138, pp. 24, ¶ 2).  However, that ruling was  at the Motion to Dismiss stage before discovery.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, *as revealed by the whole record* [emphasis added]."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  This court now has the whole record before it.  Prior to this the content, form and context of Plaintiff's statements were not available–now they are.

With this the "court[] [can] focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."  *Gardetto v. Mason*, 100 F. 3d 803, 812 (10th Cir. 1996).

Plaintiff clearly did not intend anything be done with this information–he said so in his text to Alexander.  (SOF 30). He also declined to push any public action when that course was offered

-30-

to him by Deputy Cox. (SOF 24-26).  The text to Alexander was only to him, who had no power over Sheriff personnel.   Obviously, Plaintiff contacted Defendant as an employee with no expectation anything would be done.  Therefore, the speaker's intent was clearly that this was not to be a matter of public concern.

Further, Plaintiff's report regarding Jim Cousin's driving was false to such an extent that it "[did] not supply the public with any useful information [...] [which is] generally insufficient to be protected, even if they relate generally to an issue of potential public concern."  Sean McGivern & Donald Peterson, *Employment Law Chapter 5: Civil Rights Act of 1871*, 5-11 (3rd ed. 2016).  A false report of something that did not happen provides absolutely no useful information.  Plaintiff makes no response to this point.  He makes no attempt to argue that his perception provided any useful information.

### C.   Defendant's interest in the efficiency of the public service it performs sufficiently outweighs Plaintiff's free speech interest.

Here again, Plaintiff makes no meaningful attempt to address Defendants' arguments but merely relies upon the Court's ruling at the Motion to Dismiss stage.  As this Court noted then: "The Court does not consider the parties' respective interests in a "vacuum," but rather, considers "the manner, time, and place of the employee's expression." (Memorandum and Order, Doc. 65, pp. 10 ¶ 3, 11 ¶ 1) (citing *Helget v. City of Hays*, 844 F.3d 1216, 1222 (10th Cir. 2017).  The "manner, time, and place of the employee's expression" was unknown until discovery.  Without that context it is impossible to weigh the parties interests.  We now have that context–a context Plaintiff ignored when he relied solely on the court's reasoning at the Motion to Dismiss stage.

Moreover, at that stage of the proceeding the Court could not accept the premise that

Defendant reasonably concluded the report was false. (Memorandum and Order, Doc. 65, pp. 11 ¶ 3).  Here, at the Motion for Summary Judgment stage, it can and must watch the video, which shows the report was false.  *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776 (2007).[5]

Plaintiff concedes that if " Finley's report was 'deceitful'... Finley will not fare well."  But he argues this is a fact question.   It is not, given the video tape that clearly shows that the facts differ too widely from Plaintiff's dramatic reports to allow any conclusion other than they were false.

Plaintiff points out that Defendant has provided precedential support for his position – "a litany of authorities." (Response to MSJ, Doc. 138, pp. 25, ¶ 2).  Plaintiff offers none for his.

### D.    The report itself was not a motivating factor.

#### 1.    It is uncontroverted that the report itself resulted in no action.

The evidence is uncontradicted that, when Chief Alexander's received Plaintiff's text falsely stating that Cousins "went left of center and ran me off the road ... it was bad he went left of center...," his response was to text back: "k", and no employment action was initiated or taken.  (SOF 30-33).  At that point Alexander knew the report had been made but did not yet know it was false. As a result he took no action *on the basis of the report*.  The action to terminate Plaintiff occurred a month later and resulted from the discovery of video evidence showing his report was false, along with continuing and repeated performance issues, including the recent discovery that Plaintiff had returned to inappropriately handling evidence – misconduct for which he had been previously placed on probation.  The alleged protected speech itself drew no adverse reaction.

---

[5] This has been addressed under I(A)(1)(a) The Report was not Protected because it was False in a detailed analysis of *Drastanti* and *Scott*

2.      **Plaintiff's attempt to show motivating factor by the use of comparators fails**.

Plaintiff does not and cannot dispute that he is required to "make the showing" and "must allege an extremely high level of similarity" where the "circumstances are prima facie identical." *Gearin v. City of Maplewood*, 780 F. Supp. 2d 843, 859-60 (D. Minn. 2011). ; *Ellibee v. Roberts*, No. 08-3189-SAC, 2009 U.S. Dist. LEXIS 91405, at *6 (D. Kan. Sep. 30, 2009).

Plaintiff completely ignores the factor of work history.  None of the comparators, while being supervised by Alexander as Chief of Police, had 2 out of 3 unfavorable evaluations, had been on probation, then had that probation extended, and then been discovered to have returned to the misconduct that caused the probation , followed by video evidence coming to light showing them to have made a false report of serious misconduct by another officer.

Moreover, Plaintiff does nothing to bear his burden of showing an extremely high level of similarity between the different instances, some of them remote in time and  when Alexander did not have the final word on discipline.

**II.      Defendant Ron Alexander is entitled to Qualified Immunity**

Here again Plaintiff relies primarily on the Court's ruling at the Motion to Dismiss stage. However, at the Motion to Dismiss stage this Court could not accept as true the premise that Chief Alexander believed Plaintiff made a false accusation at the time of his termination.  (Order Denying MTD, Doc. 65, pp. 16 FN 49).  Nor did the court rely upon the video or determine that Chief Alexander had viewed the video before the termination.

But Plaintiff has now stipulated that the video is true and accurate and the record shows that it is uncontroverted that Chief Alexander watched it prior to Plaintiff's termination.  (SOF 34-39,

55-64).

Plaintiff argues that Defendant Alexander's qualified immunity defense hinges on one version of competing facts and it would therefore be improper to sustain his request for qualified immunity. (Response to MSJ, Doc. 138, pp. 28, ¶ 2).  However, as already discussed, the video to which Plaintiff has stipulated clearly shows that Plaintiff's version differs widely from the actual facts accurately shown on the video.

Even if Plaintiff's claim of mis-perception is credited, Plaintiff offers no case law to support the proposition that Alexander should have known that, when faced with a video indicating that Plaintiff had made a false report, it would violate his First Amendment right to terminate him.

Plaintiff's reliance on W*aters v. Churchill*, 511 U.S. 661, 698 (1994) is misplaced.  That case involved a third party report of what the Plaintiff "supposedly said" and the questions of fact found to remain involved questions of what statements the Plaintiff had made and which of several statements might have been the motivating factor.  This is nothing like our case, in which Plaintiff's reports were audio taped and made in text form directly to Ron Alexander.   Moreover, there is no dispute that nothing happened as a result of the reports, but action was only taken when a video was provided – unsolicited – that showed the undisputed reports to be false.  Plaintiff claims that *Waters* establishes a right to some investigation that was not taken.  It actually does not stand for that right. But even if it did, it would not be applicable here as there was no further investigation required. What Plaintiff said is not disputed – it was taped and in a text.  (SOF 15-31.)  The accuracy of the video of the actual encounter is also now in the record and stipulated to.  Moreover, Plaintiff was called in, advised of the existence of the video and given a chance to respond.

-34-

Plaintiff argues that *Waters* requires that Alexander inquire into the truthfulness of a rumor about Cousins potential promotion. But he does not explain why that rumor has any significance to the termination. There is no evidence that the rumor was a part of the termination decision.

Chief Alexander's decision under these circumstances was well within the "wide degree of deference to the employer's judgment." He is, therefore, entitled to qualified immunity.

**III.    Plaintiff cannot establish a Kansas "whistle blower" claim.**

Plaintiff does not contest the required elements of his claim. Lost in Plaintiff's Response is the fact that a whistle blower claim is much narrower than a First Amendment claim. The First Amendment right protects the right of citizens against infringement of free speech by governmental actors. It has no application to employers in general. It only becomes relevant in an employment setting when the employer is also a governmental actor.   A whistle blower claim applies to any employer in Kansas and is not intended to protect the right to free speech but to encourage exposure of wrong doing. It is an exception to the employment at will doctrine, not a generalized protection of free speech.

A First Amendment claim can arise outside of the context of employment and relates to governmental attempts to control any protected speech on any topic. A whistle blower claim arises in the context of employment for the protection of employees and does not prohibit a employer from terminating an employee for such things as voicing opinions on political issues of the day and other things that would be protected under the First Amendment. It only applies to blowing the whistle from within on specific types of wrongdoing by the employer or a co-employee.

A whistle blower claim also has additional elements such as the requirement that the whistle

blower is seeking to stop unlawful conduct.   In contrast, the First Amendment protects the right of citizens to voice personal or political opinions for no other reason than to voice them.

A First Amendment Claim can be based upon speech to friends, neighbors or the public at large.   In contrast, "the plaintiff in a Kansas whistle blower action must show by clear and convincing evidence that he reported the wrongdoing to 'either company management or law enforcement officials.'  If the Plaintiff reports wrongdoing to corporate management, he must do so to management higher than that of the wrongdoer." *Lykins v. Certainteed Corp.,* No. 11-2133-JTM, 2012 U.S. Dist LEXIS 161353, at *17-18 (D. Kan. Nov. 9, 2012).  Moreover, "a whistle blower complaint must be made to someone with 'the authority to rectify the problem.'" *Shaw v S.W. Kansas Groundwater Mgt. Dist. Three*, 219 P.3d 857, 863 (Kan. App. 2009).

Whistle blower protection "simply was not meant to endow every workplace dispute over the water cooler on company practices and the effect of government regulation with whistle-blower overtones." *Fowler v. Criticare Home Health Servs.*, 27 Kan. App. 2d 869, 876, 10 P. 3d 8, 15 (2000).

The court should not accept Plaintiff's invitation to conflate the two claims.

### A.      Plaintiff's report about Cousins is not "whistle blowing."

#### 1.      The Uncontroverted facts negate the first element.

##### a.      Plaintiff's report did not involve his employer or a co-worker.

Plaintiff's response on this point is clearly an attempt to conflate a whistle blower claim with a First Amendment claim.  He attempts to define "coworker" so broadly that it would include anyone he works around even if he is not working at the time.  Not only is there no case law to

-36-

warrant this broad definition but doing so would be contrary to the narrow parameters of a whistle blower claim. The concept of whistle blowing implies acting from within the organization to expose problems from within. It is not reporting or commenting on something that occurs in full view of the public that anyone can see or that is not the conduct of the employer itself or through a co-worker. Plaintiff cites to no authority for the proposition that whistle blowing applies to reports of violations of other persons or organizations that he observes while not on duty.

The term "co-worker" under the whistle blower exception is directed at those whom an Employer has authority over. The focus is not on how closely individuals worked together, but on whether a report was made to a higher authority who could rectify the problem. Ron Alexander did not have the "authority to rectify" Cousins driving because (1) Ron Alexander was the City Police Chief and this incident occurred outside the Police department's jurisdiction; and (2) Cousin's was a member of the Sheriff office and not under the authority of the Police Chief.

"A worker who wants to come under the [whistle blower] protections... *must seek out the intervention of a higher authority* [emphasis added], either inside or outside of the company. *Fowler v. Criticare Home Health Servs.*, 27 Kan. App. 2d 869, 876, 10 P. 3d 8, 15 (2000). Plaintiff mistakenly equates sending a text that "nothing can be done" with seeking the intervention of a higher authority. Kansas law is clear that "only those employees who seek to stop unlawful conduct through the intervention of a higher authority... are protected from retaliatory discharge for whistle blowing." *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 42 Kan. App. 2d 994, 1001-02, 219 P. 3d 857, 863 (2009).

Plaintiff does not allege he sought to stop unlawful activity through a higher authority. He

alleges only that he sent a text that was explicit that he realized nothing could be done NOT that he was reporting to Ron Alexander so he would intervene. Further, he declined to sign a ticket when offered the chance to do so.

Plaintiff's reports clearly do not fit the concept of "whistle blowing."

>
b. No reasonable person could have concluded that Cousins was violating the law.

Plaintiff ignores the lack of temporal proximity. The closest he comes to addressing the issue is claiming "Alexander's concern about Marc Finley's 'political' activities extended from the time September 2015 through the date of Lance Finley's termination in February 2016." (Response to MSJ, Doc. 138, pp. 29-30). A concern about "political activities" or even "harping about avoiding politics" does not demonstrate a pattern of retaliatory conduct stretching from the report, the text message, to plaintiff's termination. Plaintiff being advised not to let his brother's problems consume him is hardly a pattern of retaliation.

Further, plaintiff seems to want the time period to run from September of 2015 until the date of termination. However, even this time line shows no pattern of retaliation. Instead Plaintiff's October 2015 evaluation was generally favorable and plaintiff was taken off probation, given a promotion and a salary increase. (SOF 91 and 92). That video clearly shows Cousins was not violating the law at the moment he encountered Plaintiff. Plaintiff does not argue otherwise. He merely alleges that **he** had a perception plainly contradicted by the video. His perception is not relevant at all. The question is what a reasonable person would have concluded. The video shows what happened and Cousins was not left of center, not about "head on" with Plaintiff and not running at 120 or even 90 miles an hour.

### 2. Plaintiff was not discharged for making the report.

As discussed above, the report itself drew no criticism, reaction or disciplinary action.  The action came a month later when the Chief was given unsolicited and irrefutable evidence the report was false, on the heels of discovering Plaintiff was again engaged in other misconduct for which he was previously disciplined.  In other words, even if Plaintiff's report is regarded as whistle blowing, no one reacted to him "blowing the whistle."  It was long after the alleged whistle's echos would have faded that evidence surfaced showing Plaintiff was untruthful and he was asked to resign.

Plaintiff's termination occurred not because he blew a whistle, but because evidence came to light showing he had "cried wolf."

### 3. Plaintiff's report was not made in good faith.

Plaintiff claims he addressed Defendant's good faith argument elsewhere in his response.  However, the term good faith only appears twice in Plaintiff's Response once in his assurance to the court that he addressed this issue and once in Plaintiff's introduction where he makes an unsupported contention.  Based on that unsupported contention it seems Plaintiff is arguing the report was in good faith because Ron Alexander allegedly is unclear whether the "report" was not made in good faith.

Plaintiff alleges "(i) Finley perceived that Cousins vehicle crowded, if not crossed, the center line; and (ii) Finley's tires left the pavement."  (Response to MSJ, Doc. 138, pp. 20, ¶ 3).  Further, Plaintiff claims "this is entirely consistent with Finley's communication to Defendant Alexander." (Response to MSJ, Doc. 138, pp. 20, ¶ 3). It is not.  Plaintiff's text to Ron Alexander "[h]ey for what it's worth Jim just went left of center and ran me off the road at county road w i [sic] realize nothing

can be done but it was bad he went left of center I called Kevin and he said he would note it." (SOF 30).

Plaintiff clearly stated "Jim just went Left of center," not that he "crowded, if not crossed, the center line" that is not consistent with what was stated.  Moreover, Finley stated "it was bad he went left of center."  This is not a text saying "hey, somebody almost or barely drifted into my lane, they need to watch it."

Plaintiff wants to rely on the law of defamation "by analogy."  However, defamation has no "good faith" concern requirement, but whistle blowing does.  Plaintiff's whistle blowing "must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy, or personal gain." *Moyer v. Allen Freight Lines*, Inc., 885 P.2d 391, 394 (Kan. App. 1994).

Further, Plaintiff tries to have it both ways, claiming he "perceived" the vehicle crowded the line possibly crossing it and limiting the report to the text message provided to Defendant.  Such would not be a serious violation and, where a "[p]laintiff has failed to cite any evidence showing that her alleged whistle blowing pertained to any *serious* [emphasis added] violation of rules or laws affecting public health, safety or welfare" their "claim of unlawful retaliatory discharge fails as a matter of law." *Taylor v. Home Depot USA, Inc.*, 506 F. Supp. 2d 504, 520 (D. Kan. 2007).

### B.   Plaintiff is not entitled to protection from retaliation based upon the activities of his family.

Plaintiff is trying to assert a whistle blower claim because someone else allegedly blew the whistle on an agency Plaintiff was not employed by, that none of his co-workers were employed by, and over whom Defendants had no authority or power to rectify.  This is not warranted by existing

case law.

Plaintiff's reliance on *Thummel v.PSI Transp*., LLC, No. CIV.A. 14-1299-MLB, 2015 WL 475183, at *2 (D. Kan. Feb. 5, 2015) cited in FN 9, is misplaced.  There, both siblings worked for the defendant and the "whistle blowing" was about OSHA violations allegedly committed by Defendant.  Here, Marc Finley neither worked for the City of Colby, nor did he allege violations committed by any Defendant.

But perhaps most damning to Plaintiff's claim is the fact, which he concedes and affirmatively alleges that  Ron Alexander *supported* Marc's efforts to report or blow the whistle on the issues with Sheriff Taylor. (SOF 136).  Moreover,  Chief Alexander agreed to hire the author of the letter, Marc Finely, to work at the City of Colby because of his deteriorating relationship with Sheriff Taylor over the issues addressed in his letter. (SOF 137-138.)  Yet Plaintiff claims it is disputed that Ron Alexander supported Marc's efforts to report or blow the whistle on the issues with Sheriff Taylor.  But then he wanders off point into a general discussion of staying out of political activities and discouraging *Colby officers* (Marc Finley was an employee of the sheriff ) from getting caught up in the conflict.  Nowhere does Plaintiff provide an argument that would explain why Ron Alexander would be so upset about a letter Marc wrote that he would terminate Plaintiff while simultaneously offering employment to the actual author of the letter.  Such an argument defies reason.

In addition, Plaintiff's evaluations in 2014 and early 2015, before Marc's letter was sent, were negative.  He was placed on probation in May, 2015 and that probation was extended in August.  Marc Finley sent the letter to CPOST in September of 2015.  The next action Chief

Alexander took concerning Plaintiff's employment was to lift his probation, give him the best evaluation he had at the city, give him a promotion and raise his pay.  (SOF 92).  Again, to somehow see a pattern of retaliation for Marc's letter here defies reason.

Plaintiff being advised not to let his brother's problems consume him is hardly a pattern of retaliation.

No reasonable person could conclude that Marc Finely's letter was the reason for the termination, 5 months later, when Chief Alexander was shown a video showing clearly that Plaintiff made a false report and Plaintiff was, once again, found to be improperly handling confiscated cell phones.  No reasonable juror could conclude Plaintiff was terminated because of Marc's activities concerning the Thomas County Sheriff several months prior – which Chief Alexander supported.

## CONCLUSION

For the forgoing reasons and those set forth in Defendants' Memorandum in Support of Summary Judgment, Defendants should be granted Summary Judgment on all claims.

WATKINS CALCARA, CHTD.


/s/ ALLEN G. GLENDENNING
    Allen G. Glendenning, #12187
    Michael C. Abbott #28111
    1321 Main Street - Suite 300
    P.O. Drawer 1110
    Great Bend, Kansas  67530
    (620) 792-8231  Fax (620) 792-2775
    Attorneys for Defendants Ron Alexander and
    City of Colby, KS

-42-

**CERTIFICATE OF SERVICE**

The undersigned does hereby certify that on this 13th day of December, 2019, the above and foregoing Reply in support of Motion for Summary Judgment was filed electronically with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Sean M. McGiven, #22932
Donald N. Peterson, II, #13805
Graybill & Hazlewood, LLC
218 N. Mosley St.
Wichita, KS 67202
Attorneys for Plaintiff


/s/ ALLEN G. GLENDENNING
        Allen G. Glendenning, #12187